# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### —BROWNSVILLE DIVISION—

NATIONAL UNION FIRE INSURANCE §
COMPANY OF PITTSBURGH, P.A., §
      Plaintiff, §
§
v. §            CIVIL ACTION NO. B-05-050
§
PUGET PLASTICS CORPORATION, §
PUGET PLASTICS CORPORATION, §
S.A. de C.V., and WAUSAU BUSINESS §
INSURANCE COMPANY, §
      Defendants. §

## MEMORANDUM OPINION AND ORDER

Pending before the Court are: the Motion for Summary Judgment of National Union Fire Insurance Company of Pittsburgh, P.A. [Docket No. 95], Motion for Summary Judgment of Puget Plastics Corporation, Arctic Slope Regional Corporation and Microtherm, Inc. [Docket No. 99], National Union's Motion for Leave to File Sur-Reply to Arctic Slope Regional Corporation, et al.'s Reply to National Union's Response to Defendant's Motion for Summary Judgment [Docket No. 110], and National Union's Amended Motion for Leave to File Sur-Reply to Arctic Slope Regional Corporation, et al.'s Reply to National Union's Response to Defendants' Motion for Summary Judgment [Docket No. 112]. National Union's Amended Motion for Leave to File Sur-Reply to Arctic Slope Corporation, et al.'s Reply to National Union's Response to Defendant's Motion for Summary Judgment [Docket No. 112] is **GRANTED**. National Union's Motion for Leave to File Sur-Reply to Arctic Slope Regional Corporation, et al.'s Reply to National Union's Response to Defendant's Motion for Summary Judgment [Docket No. 110] is withdrawn as per National Union's request and is therefore **DENIED as moot**. The parties' cross motions for summary judgment will

be addressed below.

## I.  Background

National Union Fire Insurance Company of Pittsburgh, P.A. ("National Union") filed the instant action seeking a declaration that it does not have a duty to pay the defense costs and damages resulting from a state court lawsuit filed against Puget Plastic Corporation and Puget Plastic Corporation, S.A. de C.V. ("PPC"), and Arctic Slope Regional Corporation ("Arctic"), PPC's parent company and the named insured under National Union's policy.  Microtherm, the plaintiff in the underlying suit, was in the business of manufacturing tankless water heaters.  PPC manufactured component parts for the water heaters, specifically, plastic water chambers.  The plastic water chambers manufactured by PPC began to fail, causing damage to the water heaters, as well as homes and businesses where the water heaters were installed.[1]  Due to the failure of the plastic water chambers, Microtherm filed suit against PPC and parent company Arctic in the 357th Judicial District Court of Cameron County, Texas.  The jury found in favor of Microtherm, awarding at total of $36,081,807.18 against PPC, which included attorneys' fees and prejudgment interest.

Arctic had two insurance policies, a Commercial General Liability ("CGL") policy issued by Wausau Business Insurance Company ("Wausau") and a Commercial Umbrella Insurance Policy issued by National Union.  When the suit was originally initiated by Microtherm, National Union issued a letter which, according to the Defendants' brief, was a reservation of rights and "denial of coverage" letter.  When the case went to trial the jury made several findings against PPC.  First, the jury found that PPC engaged in false, misleading or deceptive acts by: (1) "[r]epresenting that goods

---

[1]Although the extent of the damage and whether evidence of the damage currently exists in the record or is otherwise admissible are disputed, the parties seem to agree that there was *some* damage to homes and businesses where the water heaters were installed.  For purposes of this order, the Court will assume hypothetically, without so holding, that such damage occurred and that evidence of such is in a form the Court can consider.

or services had or would have characteristics that they do not have," (2) "[r]epresenting that goods or services are or will be of a particular quality if they were of another," and (3) "[f]ailing to disclose information about goods or services that was known at the time of the transaction with the intention to induce Microtherm into a transaction it otherwise would have entered into if the information had been disclosed."   [Docket No. 95, Ex. 2]   Second, the jury found that PPC engaged in unconscionable actions, that is, "an act or practice that, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree."  *Id.*  Third, the jury found that PPC failed to comply with a warranty, specifically: (1) "[f]ailing to comply with an express warranty," (2) "[f]urnishing or selecting goods that were not suitable for a particular purpose," and (3) "[f]ailing to perform services in a good and workmanlike manner."  *Id.*  Finally, the jury found that all of the above was done "knowingly," under the Texas Deceptive Trade Practices Act ("DTPA").  *Id.*  The jury did not find liability or attribute any of the damages to Arctic, PPC's parent company.  *Id.*  Although the jury also found that PPC committed fraud, Microtherm elected to pursue its recovery under the DTPA causes of action.  *Id.*

After entering a final judgment in favor of Microtherm, the state district court ordered the parties to mediation.  National Union was invited to participate in the mediation, but refused.  At the mediation Wausau tendered its policy limits of one million dollars on behalf of the defendants in the underlying suit.  Arctic paid Microtherm an additional two million dollars, despite the fact that the judgment stated Microtherm should "take nothing" from Arctic,[2] and PPC assigned any and all rights it had under the National Union policy to Microtherm under the agreement that Microtherm

---

[2]The settlement agreement states that the payment by Arctic was "by or on behalf of" Arctic and PPC. [Docket No. 95, Ex. 3, ¶ 2.13]  There is a dispute between the parties as to whether National Union would have to reimburse Arctic for the payment if the Court finds the judgment was covered under the policy, but the Court will not address that issue at this time.

would not to execute on the judgment against PPC. [Docket No. 95, Exs. 3, 4 & 5]  PPC further

agreed to aid Microtherm by providing all relevant documents, taking no action to interfere with

Microtherm's rights under the assignment, and making witnesses available to Microtherm. [Docket

No. 95, Ex. 5]

National Union responded by filing a declaratory judgment action against Arctic in Alaska and

against PPC in this Court.   The Alaska action was subsequently transferred to this Court and

Microtherm intervened.   National Union now seeks a declaration that it has no duty to pay the

judgment under its umbrella policy.   Meanwhile, PPC and Microtherm seek payment of the state

court judgment under the umbrella policy, and Arctic seeks reimbursement of the two million dollars

paid at the mediation.

## II.  Analysis

The central issue in this case is whether the state court judgment is covered under the policy

issued by National Union.[3]   The "Coverage" section of the policy states:

> [National Union] will pay on behalf of the Insured those sums in excess of the Retained
> Limit that the Insured becomes legally obligated to pay . . . because of Bodily Injury,
> Property Damage, Personal Injury or Advertising Injury that takes place during the
> Policy Period and is caused by an Occurrence . . .

[Docket No. 95, Ex. 6, ¶ I]  PPC, Arctic and Microtherm (hereinafter "Defendants") argue that there

was an "Occurrence" and, alternatively, that they need not prove an occurrence because there was

a separate grant of coverage under the Products-Completed Operations Hazard section of the policy.

In determining whether there is coverage for the damages awarded in the underlying action, the

Court will address three issues in this order: (A) whether there was a separate grant of coverage

---

[3]All parties concede that Texas law controls and this Court, seeing no manifest injustice, will apply Texas
law in accordance with the parties' motions for summary judgment.  *See, e.g., J & D Aircraft Sales, LLC v.
Continental Ins. Co.*, No. 03-0007, 2004 WL 2389445 (N.D. Tex. Oct. 26, 2004).

under the Products-Completed Operations Hazard, (B) whether there was or could have been an "occurrence" under the policy, and (C) whether consequential damages are covered under the policy.

A.    *Products-Completed Operations Hazard Coverage*

Defendants argue that the Products-Completed Operations Hazard ("PCOH") coverage is a separate grant of coverage which does not require an occurrence.  [Docket No. 124]  Urging that there is PCOH coverage, Defendants claim that the definition of PCOH is more than merely a definition because it "tells the insured what is <u>included</u> and <u>excluded</u>," and, in an effort to avoid the "occurrence" requirement under the policy's grant of coverage, explains that "the language of the insuring agreement is written broadly to provide protection for bodily injury and property damage without reference to the cause."  *Id.* (emphasis original).  The Court cannot accept this interpretation of the PCOH coverage.

PCOH coverage is discussed in two sections of the policy, the limits of insurance section and the definitions section.  [Docket No. 95, Ex. 6, ¶ III and ¶ IV]  The policy states that:

> Products Completed Operations Hazard includes all Bodily Injury and Property Damage occurring away from premises you own or rent and arising out of Your Product or Your Work except:
> a.  products that are still in your physical possession; or
> b.  work that has not yet been completed or abandoned.

*Id.* at ¶ IV.J.1.  Providing a separate definition for completed products allows the insurer to set different limits of liability for an insured's completed products, but does not alter the prerequisites to coverage.  *See, e.g., Valmont Energy Steel, Inc. v. Commercial Union Ins. Co.*, 359 F.3d 770, 775-76 (5th Cir. 2004).  Another purpose of PCOH coverage is to distinguish between the amount of on-premises coverage and off-premises coverage as it would be much more expensive for an insured to obtain a CGL policy to cover every product that has been shipped off-premises to a distributor

or end-user. *Id.* Thus, PCOH coverage allows the insured to choose different limits for completed and shipped products. For example, an insured can choose a different aggregate limit for PCOH coverage than the general aggregate limit for the policy, keeping in mind that a higher PCOH limit will usually result in higher premiums. Electing to set an aggregate limit for PCOH coverage equal to that of the general aggregate limit and paying the "premium dollar" does not allow the insured to circumvent the coverage requirements or occurrence definition set forth in the policy. *Id.* at 774-76.

In support of their claims Defendants also quote COMMERCIAL LIABILITY INSURANCE, a publication by the International Risk Management Institute, as stating that "'[o]ne of the most significant changes in the 1973 CGL policy was that products completed operations coverage was automatically included unless excluded.'" Defendants then conclude that because there was no exclusion for PCOH coverage in National Union's policy there must be coverage. [Docket No. 124] (quoting 1 JACK P. GIBSON, MAUREEN C. MCLENDON & W. JEFFREY WOODWARD, COMMERCIAL LIABILITY INSURANCE at V.L.202 (2006). However, immediately preceding the 1973 version, the COMMERCIAL LIABILITY INSURANCE text states that the 1966 version did not automatically include PCOH coverage, such that an insured would have to seek coverage. Thus, the reference was simply to the inclusion of PCOH coverage in the CGL policy, not a suggestion that once PCOH coverage is purchased it covers anything that is not excluded.

Defendants cannot escape the requirements of the policy's coverage section [Docket No. 95, Ex. 6, ¶I] through the inclusion of the PCOH aggregate limit contained in the limits of insurance section. Although the PCOH coverage may be applicable in this case, Defendants must still prove an occurrence.

B.    *Occurrence*

National Union contends that there can be no coverage because there was not an "occurrence"

under the policy.   The Commercial Umbrella Policy states:

> Occurrence means:
>
> 1. As respects bodily injury or property damage, ***an accident***, including continuous or repeated exposure to conditions, ***which results in*** Bodily Injury or ***Property Damage neither expected nor intended from the standpoint of the Insured***.  All such exposure to substantially the same general conditions shall be considered as arising out one Occurrence;

[Docket No. 95, Ex. 6, ¶ IV.H] (emphasis added).  National Union argues that in order to show there

was an "occurrence" the Defendants "have the burden to prove two things: first, that the misconduct

was an 'accident' <u>and</u> second, that the resulting 'Property Damage' was neither expected nor

intended from the standpoint of Puget."   [Docket No. 95] (emphasis original).   National Union

claims that the Defendants cannot satisfy either requirement.   The Court will separately address

below whether there was (1) an accident and (2) property damage.

   *1.    Accident*

The Supreme Court of Texas has held that "an injury is accidental if 'from the viewpoint of

the insured, [it is] not the natural and probable consequence of the action or occurrence which

produced the injury; or in other words, if the injury could not reasonably be anticipated by the

insured, or would not ordinarily follow from the action or occurrence which caused the injury.'"

*Mid-Century Ins. Co. v. Lindsey*, 997 S.W.2d 153, 155 (Tex. 1999) (quoting *Republic Nat'l Life Ins.*

*Co. v. Heyward*, 536 S.W.2d 549, 557 (Tex. 1976)).   National Union argues that the finding that

PPC engaged in the harmful conduct "knowingly" precludes Defendants from maintaining that

PPC's conduct was an accident for insurance purposes.   Defendants contend that "[t]he fact that PPC

was found to have engaged in some conduct 'knowingly' under the DTPA does nothing to deprive the ruptures and damages of their accidental nature."  [Docket No. 99]

A review of the state court judgment reveals that the jury found the false, misleading or deceptive acts, the unconscionable actions, and the breaches of warranty, were done "knowingly," for purposes of the DTPA, in response to the following inquiry:

> Do you find that such conduct was engaged in knowingly?
>
> "Knowingly" means actual awareness, at the time of the conduct, of the falsity, deception, or unfairness of the conduct in question or actual awareness of the conduct constituting a failure to comply with a warranty.  Actual awareness may be inferred where objective manifestations indicate that a person acted with actual awareness.
>
> In answering this question, consider only the conduct that you have found was a producing cause of damages to Microtherm.[4]

[Docket No. 95, Ex. 2]  A "producing cause" under the DTPA does not include an element of foreseeability.  *Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 481 (Tex. 1995) (stating that "[f]or DTPA claims, the plaintiffs need only show producing cause and need not establish that the harm was foreseeable").

The Fifth Circuit has conducted an extensive review of Texas case law to determine when an "accident" has taken place for insurance purposes in *Federated Mutual Ins. Co. v. Grapevine Excavation, Inc.*, 197 F.3d 720 (5th Cir. 1999).  Although *Grapevine* was a duty to defend case, the factual situation was similar to the instant case.  Grapevine Excavation, Inc., a sub-contractor responsible for providing and installing fill materials for the construction of a parking lot, was sued for allegedly furnishing substandard fill materials which caused damages to the parking lot.  *Id.* at

---

[4] The state court jury instructions provided that "'Producing Cause' means an efficient, exciting, or contributing cause that, in a natural sequence, produced the damages, if any.  There may be more than one producing cause."  *Id.*  It is, in effect, a definition of cause-in-fact.

722-23.  The complaint alleged that  the materials provided by Grapevine Excavation had "a California Bearing Ratio ("CBR") in the range of 3.7 to 4.9, well below the 15 CBR specified in the contract."  *Id.* at 725-26.  Once the suit was filed, Grapevine Excavation looked to its CGL carrier to provide a defense.  *Id.* at 722.  The district court held that Grapevine Excavation's "performance under its subcontract was an intentional act and, therefore, did not constitute an 'occurrence,'" because the policy defined an "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."  *Id.*  On appeal the Fifth Circuit distinguished between two lines of Texas cases: (1) the *Maupin*[5] line, which addresses claims against the insured for damages resulting from an intentional tort, and (2) the *Orkin*[6] line, which deals with claims against an insured that involve intentional acts, but are based on negligence.  *Id.* at 723-26. The court explained that when there has been an intentional tort, as in *Maupin*, Texas state and federal courts have consistently upheld insurers' denial of coverage.  *Id.* at 724 (citing *State Fire & Cas. Co. v. Brooks*, 43 F. Supp. 2d 695, 702 (E.D. Tex. 1998); *Metropolitan Property & Cas. Co. v. Murphy*, 896 F. Supp. 65, 648 (E.D. Tex. 1995); *Trinity Universal Ins. Co. v. Cowan*, 945 S.W.2d 819, 828 (Tex. 1997); *Baldwin v. Aetna Cas. & Sur. Co.*, 750 S.W.2d 919, 921 (Tex. App.—Amarillo 1988, writ denied)).  In *Orkin*, according to the Fifth Circuit, the Supreme Court of Texas "construed the term 'accident' to 'include negligent acts of the insured causing damage which is undesigned and unexpected.'"  *Id.* at 725.  "Following Orkin, both state and federal courts in Texas have interpreted the terms 'accident' and 'occurrence' to include damage that is the 'unexpected, unforeseen or undesigned happening or consequence' of an insured's negligent

---

[5]*Argonaut Southwest Ins. Co. v. Maupin*, 500 S.W.2d 633 (Tex. 1973).

[6]*Massachusetts Bonding & Ins. Co. v. Orkin Exterminating Co.*, 416 S.W.2d 396 (Tex. 1967).

behavior." *Id.* (citing *Lafarge Corp. v. Hartford Cas. Ins. Co.*, 61 F.3d 389, 395 (5th Cir. 1995);

*Hartford Cas. Co. v. Cruse*, 938 F.2d 601, 604-05 (5th Cir. 1991); *Travelers Ins. Co. v. Volentine*,

578 S.W.2d 501, 503 (Tex. Civ. App.—Texarkana 1979, no writ); *Employers Cas. Co. v. Brown-*

*McKee, Inc.*, 430 S.W.2d 21, 24 (Tex. Civ. App.—Tyler 1968, writ ref'd n.r.e.)).   The court

concluded by explaining that "[i]n the [*Maupin* line], the damage-causing acts of the tortfeasor are

either actually or legally deemed to be *intentionally harmful*; in the [*Orkin* line], the acts that are

performed intentionally are not intended to cause harm but do so as the result of negligent

performance of those acts." *Id.* at 729 (emphasis added).   In holding that the complaint alleged an

"occurrence" under the policy, the court noted that "an obligor who intends his performance to be

correct, but who negligently falls short of the appropriate standard and causes unintentional damage,

is an *Orkin* tortfeasor." *Id.* at 729-30.   In the instant case we do not have a finding on intent; instead

this Court seems to be confronted with a scenario where PPC was found to have acted knowingly,

but possibly caused unintentional damage.[7]

Thus, this Court must determine whether it is possible for an "accident," as that term is used

in the policy, to have been caused "knowingly" under the DTPA.   In light of the above, it is

important to note the distinction between a finding of "knowingly" versus "intentionally" under the

DTPA.

"Knowingly" means actual awareness, at the time of the act or practice complained of,
of the falsity, deception, or unfairness of the act or practice giving rise to the consumer's

---

[7]The *Grapevine* court also noted that:
Although [Grapevine Excavation] readily admits that it intentionally performed under the subcontract,
it denies that it intentionally substituted inferior materials—and nothing in the facts alleged by [the
contractor] supports a claim of *knowing* or intentional substitution of inferior fill matter.  Indeed, the
only allegation of *knowing* conduct anywhere in [the contractor's] complaint appears within the
context of its DTPA claim.
*Id.* at 726 (emphasis added).

claim or, in an action brought under Subdivision (2) of Subsection (a) of Section 17.50, actual awareness of the act, practice, condition, defect, or failure constituting the breach of warranty, but actual awareness may be inferred where objective manifestations indicate that a person acted with actual awareness.

\* \* \*

"Intentionally" means actual awareness of the falsity, deception, or unfairness of the act or practice, or the condition, defect, or failure constituting a breach of warranty or giving rise to the consumer's claim, coupled with the specific intent that the consumer act in detrimental reliance on the falsity or deception or in detrimental ignorance of the unfairness. Intention may be inferred from facts showing that a defendant acted with flagrant disregard of prudent and fair business practices to the extent that the defendant should be treated as having acted intentionally.[8]

TEX. BUS. & COM. CODE ANN. § 17.45(9) & (13) (2005). When the DTPA's definitions of "intentionally" and "knowingly" are compared the difference is clear—a finding of "knowingly" only requires "actual awareness" while a finding of "intentionally" requires "actual awareness . . . coupled with the specific intent that the consumer act in reliance." *Id.* The distinction is significant because it seems possible for an individual to "knowingly" engage in conduct constituting "falsity, deception, or unfairness," but not actually intend, or even foresee, the resulting harm. In considering specific intent or foreseeability, it is also interesting to note that while the definition of knowingly in the jury instructions in the underlying case used the word "conduct" four times, there is no mention of the resulting harm or consequences. [Docket No. 95, Ex. 2]

Although neither party has brought forth a case and this Court has been unable to find any Texas case law specifically holding that a "knowing" finding under the DTPA is an accident,

---

[8]Although the jury was not presented with the definition of "intentional" conduct under the DTPA [Docket No. 95, Ex. 2], the definition is noted here to illustrate that there is a significant difference despite the common tendency of courts to speak of "knowing" conduct and "intentional" conduct as though they are the same in cases where the only conduct at issue is intentional conduct. *See, e.g.*, *Huffines v. State Farm Lloyds*, 167 S.W.3d 493 (Tex. App.—Houston [14th Dist.] 2005, no pet.) (referring to a "knowing misrepresentation" as "intentional," but eventually holding that there was no occurrence because the damage was of a type that "ordinarily follow[s]"); *State Farm Lloyds v. Kessler*, 932 S.W.2d 732, 738 (Tex. App.—Fort Worth 1996, writ denied) (using "knowingly" and "intentional" interchangeably).

thereby triggering a duty to indemnify, it is helpful to look to Texas cases determining when an accident has taken place for insurance purposes.  In *Trinity Universal Ins. Co. v. Cowan*, 945 S.W.2d 819, 826-29 (Tex. 1997), the Supreme Court of Texas was called upon to determine what constitutes an "accident" when the term was left undefined in the policy.  The insured in *Cowan* was a clerk at an H.E.B. photo lab who was sued after he made extra prints of revealing photos of a customer then shared them with his friends.  *Id.* at 820.  The insured's homeowners' carrier argued that there was no "occurrence" under the policy because there was no "accident."  *Id.* at 826.  The court held that the intentional tort was not an accident, and thus did not constitute an occurrence, because the insured "did exactly what he intended to do when he purposefully copied the photographs and showed them to his friends."  *Id.* at 827.  The fact that the insured "did not expect or intend Cowan to learn of his actions is of no consequence."  *Id.*  The court stated that the conduct was not an accident because the injury was the type that "ordinarily follow[s]" from the conduct.  *Id.* at 828. The court also rejected the argument that although the insured intended to show the pictures to others, he did not intend the harm because he did not expect or intend for the victim to find out about his conduct.  *Id.* at 826.  In effect, the court held that the harm was in actually showing the photos to others, regardless of whether the victim knew, because the invasion of her privacy was in actually showing the photos, not in her knowledge thereof.  Regardless, the court rejected the insurer's argument that "if an actor intended to engage in the conduct that gave rise to the injury, there can be no 'accident.'"  *Id.*  The court explained by way of example: "Consider the hunter who deliberately fires a gun at what he believes to be a deer but is actually a person.  Though firing the gun was intentional, the harm can reasonably be characterized as an 'accident.'"  *Id.*  *Cowan* does not fall into the *Orkin* line of cases.  Clearly, *Cowan* falls into the *Maupin* line because it involves

an intentional tort, which by its very nature is "intentionally harmful" as described in *Grapevine*. Thus, arguments that an insured intended the conduct, but not the harm, are not necessarily foreclosed by *Cowan*.

The Supreme Court of Texas again considered the issue of what constitutes an accident two years later in *Mid-Century Ins. Co. v. Lindsey*, 997 S.W.2d 153, 155 (Tex. 1999). *Lindsey* involved, *inter alia*, whether the unintentional discharge of a firearm in an automobile was an "accident" under the standard Texas personal auto policy. *Id.* at 154. In determining whether the discharge of the firearm was an accident, the court explained:

> An injury caused by voluntary and intentional conduct is not an accident just because "the result or injury may have been unexpected, unforeseen and unintended." On the other hand, *the mere fact that "an actor intended to engage in the conduct that gave rise to the injury" does not mean that the injury was not accidental.* Rather, both the actor's intent and the reasonably foreseeable effect of his conduct bear on the determination of whether an occurrence is accidental.

*Id.* at 155 (emphasis added). Thus, the Supreme Court of Texas has recognized that the mere presence of "voluntary and intentional" conduct does not negate the existence of an accident—that is, the actor must also have intended to produce the harm or the harm must have been reasonably foreseeable. *Id.* The *Lindsey* decision is also consistent with *Cowan's* example of the hunter who intentionally fires his gun at what he believes to be a deer, but in actuality is a human, such that the hunter intended the act—or knowingly fired his gun—but did not intend the harm. *See Cowan*, 945 S.W.2d at 828.

National Union argues, however, that "[i]t is well established under Texas law that when the insured does exactly what he intended to do, the fact that the resulting injury was unexpected, unforeseen and unintended does not mean that the harm was caused by an accident." [Docket No. 95] (citing *Trinity Universal Ins. Co. v. Cowan*, 945 S.W.2d 819, 827-28 (Tex. 1997)). It is

important to distinguish between *Cowan*, which deals with *unforseen* harm, and *Lindsey*, which deals with *unforseeable* harm. There is a significant difference between a harm that an individual does not subjectively expect, foresee, or intend, and a harm which an individual does not foresee because it was not reasonably foreseeable or does not ordinarily follow. *See, e.g.,* Mary Sue Bloomfield, *The Role of Foreseeability in Allocation of Risk Under UCC 2-615, Excuse By Failure of Presupposed Conditions*, 21 S. TEX. L.J. 446-47 (1980-1981) (citing WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE 890 (1971)). That is, the "accident" requirement and the "neither expected nor intended" language of the policy's coverage section are intertwined. Thus, *Cowan* and *Lindsey* can be read together because *Cowan* simply states that coverage is not automatic when the insured fails to anticipate the harm, while *Lindsey* explains that there is an exception to the general rule that an accident does not occur when an individual intends the conduct if the resulting harm was not the type that would normally be expected. The First Court of Appeals seems to agree with such a conclusion, interpreting *Lindsey* as holding that "determining whether an injury is accidental inquires into *both* the insured's intent *and* the reasonably foreseeable effect or consequences of the insured's conduct. *Hartrick v. Great American Lloyds Ins. Co.*, 62 S.W.3d 270, 277 (Tex. App.—Hous. [1st Dist.] 2001, no pet.) (emphasis original).

In *Stumph v. Dallas Fire Ins. Co.*, 34 S.W.3d 722 (Tex. App.—Austin 2000, no pet.), the Austin Court of Appeals determined that a finding that conduct was engaged in "knowingly" under the DTPA and conduct which is an "accident" for insurance coverage purposes are not necessarily mutually exclusive. The policy at issue in *Stumph* "define[d] an 'occurrence' as 'an accident, including continuous or repeated exposure to substantially the same general harmful conditions,'" but left the term "accident" undefined. *Id.* at 728. Stumph sought defense and indemnification from

his insurer in a suit where several vehicles were damaged as a result of Stumph's concrete repairs to a parking garage. *Id.* The suit alleged breach of contract, breach of warranties, and DTPA violations. *Id.* at 729. Stumph settled the lawsuit with the owner of the parking garage, then filed suit against his insurance carrier, Dallas Fire Insurance Company ("Dallas Fire"), alleging, *inter alia*, that Dallas Fire had a duty to defend and a duty to indemnify. *Id.* at 726. The jury in the coverage case returned a verdict in favor of Stumph and Dallas Fire appealed. *Id.* On appeal Dallas Fire argued that there was no duty to defend because the suit filed against Stumph by the owner of the parking garage included a claim that Stumph acted "knowingly" under the DTPA. *Id.* at 729. Rejecting Dallas Fire's argument in the duty to defend context, the Austin Court of Appeals noted that "[t]he inclusion of a DTPA claim and the allegation that Stumph acted knowingly would not preclude [the owner of the parking garage] from ultimately prevailing in this underlying suit if Stumph's breach of contract and warranties resulted from an 'accident' within the meaning assigned to it by Dallas Fire in the insurance policy." *Id.* Thus, so long as there was coverage for some portion of the suit, under the "eight corners" rule,[9] Dallas Fire was obligated to provide a defense to the entire lawsuit against Stumph. *See St. Paul Ins. Co. v. Texas Dep't of Transp.*, 999 S.W.2d 881, 884 (Tex. App.—Austin 1999, pet. denied) ("Once coverage has been found for any portion of a suit, an insurer must defend the entire suit.").

With regard to the duty to indemnify, Dallas Fire argued that "the damage to the vehicles from

---

[9]"The eight corners rule compares the provisions within the four corners of the policy with the factual allegations contained within the four corners of the plaintiff's pleadings (in the underlying lawsuit) to determine whether any claim alleged in the pleadings is within the coverage of the policy." *Tucker v. Allstate Texas Lloyds Ins. Co.*, 180 S.W.3d 880, 884 (Tex. App.—Texarkana 2005, no pet.) (citing *Nat'l Union Fire Ins. Co. v. Merchants Fast Motor Lines, Inc.*, 939 S.W.2d 139, 141 (Tex. 1997)). The rule has been most recently addressed by the Supreme Court of Texas in *GuideOne Elite Ins. Co. v. Fielder Road Baptist Church*, No. 04-0692, 2006 WL 1791689 (Tex. June 30, 2006).

falling debris was not an 'accident' because Stumph 'clearly anticipated and expected' concrete to fall while he was working on an upper level." *Id.* The court stated that the "damage can be characterized as an accident," pointing out that "[i]n determining whether an event is an accident we consider both the actor's intent and the reasonably foreseeable effect of his conduct." *Id.* at 730 (citing *Lindsey*, 997 S.W.2d at 155). Stumph's testimony revealed that he was aware of the possibility of falling debris, but the court was unwilling "to rely on the mere existence of a result which was in the realm of possibilities to prove that falling concrete was a [sic] reasonably foreseeable." *Id.* (citing *Lindsey*, 997 S.W.2d at 155-56; *Cowan*, 945 S.W.2d at 827-28). Although there was never a finding of "knowingly" under the DTPA in *Dallas Fire*, the Austin Court of Appeals acknowledged that a knowing violation of the DTPA could constitute an accident. *Id.* at 729. The court merely stated that "[i]t is *unlikely* that a plaintiff alleging knowing violations of the DTPA would characterize the actions of the party being sued as 'accidental.'" *Id.* (emphasis added). While certainly not conclusive, this tends to indicate that the Texas courts can conceive of certain circumstances where a knowing violation of the DTPA still constitutes an accident for insurance purposes. "Courts determine whether certain conduct constitutes an 'accident' for purposes of insurance coverage on a case-by-case basis."[10] *Wessinger v. Fire Ins. Exchange*, 949 S.W.2d 834, 837 (Tex. App.—Dallas 1997).

National Union points out that "[n]one of the cases relied upon by Defendant[s] stand for the proposition that knowing violations of the DTPA or knowing breach of warranty are occurrences giving rise to a duty to indemnify for such conduct under a liability insurance policy [because]

---

[10]The decision as to whether there was an "accident" constituting an "occurrence" within the policy is to be made from the point of view of the insured. *King v. Dallas Fire Ins. Co.*, 85 S.W.3d 185, 188-90 (Tex. 2002) (holding that "the insured's standpoint controls in determining whether there has been an occurrence").

[t]here are no cases that reach such an absurd conclusion." [Docket No. 107]  However, all of the cases National Union cites in support of the proposition that knowing conduct disqualifies an event from being an occurrence turn on the facts of the individual cases.[11]  Furthermore, the majority of the cases cited by National Union were duty to defend cases involving fairly simple facts, whereas the instant case is a duty to indemnify case involving more complicated facts and multiple claims. Therefore, based upon the Texas case law cited above, this Court is unwilling to accept the broad proposition that knowing violations of the DTPA can never be accidents for insurance purposes.

This Court holds that the fact that the jury in the underlying case found the DTPA violations to have occurred as a result of "knowing" conduct does not in and of itself mean there can never be an accident under the policy.  This Court also holds that knowing conduct can still constitute an accident unless the actor either: (1) intended the harm that occurred or (2) should have reasonably expected the harm.  For the reasons discussed below, the Court cannot resolve the applicability of this second holding at this stage of the proceedings.

     *a.*      *Looking Beyond the Underlying Judgment?*

National Union argues that the Court should not look beyond the verdict and judgment in the underlying case.  *See, e.g. Hartrick*, 62 S.W.3d at 277 (looking to the jury charge to determine

---

[11]*Huffines v. State Farm Lloyds*, 167 S.W.3d 493, 499 (Tex. App.—Houston [14th Dist.] 2005, no pet.) (stating that "[w]ater damage is of a type that 'ordinarily follow[s]' from existing undisclosed water encroachment; and the injuries to Piper . . . could be 'reasonably anticipated from the use of the means, or an effect' appellants can 'be charged with . . . producing.'"); *State Farm Lloyds v. Kessler*, 932 S.W.2d 732, 738 (Tex. App.—Fort Worth 1996, writ denied) (holding there was no "accident" in a duty to defend case where the petition alleged the seller of a home knowingly made false statements and omissions "with knowledge that the [plaintiffs] would rely upon them as an inducement to enter into the contract"); *Freedman v. Cigna Ins. Co. of Texas*, 976 S.W.2d 776, 778-79(Tex. App.—Houston [1st Dist.] 1998, no pet.) (holding that based on the facts of the case the misrepresentation was actually an intentional act, despite the fact that the complaint alleged the misrepresentation was negligent); *Hartrick*, 62 S.W.3d at 278 (finding that there was no "accident" because the damages were "reasonably foreseeable"); *Jim Johnson Homes, Inc. v. Mid-Continent Cas. Co.*, 244 F. Supp. 2d 706, 716 (N.D. Tex. 2003) (applying the plain-meaning rule rather than the definition of accident provided by the Supreme Court of Texas and explaining that the conduct complained of was "deficient and substandard construction, not an accident or occurrence").

whether the "injuries were reasonably foreseeable results that would ordinarily flow").  Although the judgment is silent as to what specific acts were done knowingly, National Union claims that there can be no accident because the jury found the conduct was done "knowingly" [Docket No. 95], while Defendants claim that "the judgment does not mean that PPC knowingly . . . caused the harm that forms the basis of the underlying suit" [Docket No. 99].

The *Wessigner* court explained that once it has been determined that an act was "voluntary and intentional" the court "must then decide under the [*Maupin*] definition whether the injuries were a 'natural result' of the acts."[12]  *Wessinger*, 949 S.W.2d at 837.  "The natural result of an act is the result that ordinarily follows, may be reasonably anticipated, and ought to be expected."  *Id.*  In the case at bar, it is not clear what specific acts were done "knowingly" based solely on the state court judgment, although the parties seem to agree in both the state trial court and here that the specific allegations involved molding the chambers below the recommended processing temperatures. [Docket No. 95, Ex. 2]  Thus, this Court must look to the facts in order to determine whether the harm was the type that "ordinarily follow[s]" or could have been a "reasonably anticipated" or "expected" result of the conduct.  *Wessinger*, 949 S.W.2d at 837; *Commercial Underwriters Ins. Co. v. Royal Surplus Lines Ins. Co.*, 345 F. Supp. 2d 652, 663 (S.D. Tex. 2004).

In *Swicegood v. The Medical Protective Co.*, Civ. No. 95-0335-D, 2003 WL 22234928, *14 (N.D. Tex. Sept. 19, 2003), the Northern District of Texas has observed that "[i]n *Hartrick* the court was able to grant summary judgment in favor of the insurer in a coverage case because it was clear

---

[12]As recently pointed out by Texas' Fourteenth Court of Appeals, the Supreme Court of Texas "has explicitly rejected the suggestion that 'if an actor intended to engage in the conduct that gave rise to the injury, there can be no 'accident.''"  *Lennar Corp. v. Great American Ins. Co.*, Civ. No. 14-02-00860, 2006 WL 406609, *13 (Tex. App.—Hous. [14th Dist.] Feb. 23, 2006) (citing *Lindsey*, 997 S.W.2d at 155; *Cowan*, 945 S.W.2d at 828; *Harken*, 261 F.3d at 472).

from the verdict and judgment in the underlying case that the judgment did not award damages caused by a covered 'occurrence,' within the meaning of a general liability policy."  In the instant case, however, these determinations cannot be made based on the verdict and judgment alone. Therefore, the Court may have to look beyond the verdict to the facts proven in the underlying state court trial.  *Cowan*, 945 S.W.2d at 821 ("The duty to indemnify is triggered by the actual facts establishing liability in the underlying suit."); *Hartrick*, 62 S.W.3d at 275 ("Unlike the duty to defend, which arises when a petition seeking damages alleges facts that *potentially* support claims covered by a liability policy, the duty to indemnify arises from proven, adjudicated facts."); *Ins. Co. of N. Am. v. McCarthy Bros. Co.*, 123 F. Supp. 2d 373, 377 (S.D. Tex. 2000) ("In Texas, the underlying liability facts, rather than the legal theory of liability, trigger the duty to indemnify."). Thus, the question becomes whether, based on the facts proven at trial, the consequences or effects of PPC's actions were the type that "ordinarily follow" or could have been "reasonably anticipated."

        b.    *PPC's Conduct as an Accident*

When evaluating PPC's acts to determine whether there was an accident, it is important to differentiate between the harm to PPC's product, the water chambers, and harm to the property of others, such as Microtherm's product, the tankless water heater.  The nature of the property that was damaged may be determinative of whether the damage was intended or should have been reasonably anticipated.  For example, it might not be reasonably foreseeable that property outside of PPC's control would be damaged by the chambers.  Therefore, the Court will address damages to PPC's own product and damages to the property of others, such as Microtherm, separately.

      i.  *Anticipation of Damage to PPC's Own Work or Own Product*

Arguing that PPC knew molding the chambers at a lower processing temperature could cause them to fail, National Union points out the following exchange from the cross-examination of Chuck Fletcher, head of PPC's molding operations in Mexico, by counsel for Microtherm.

> Q.   In talking with Mr. Mendoza on Thursday, he said you were aware that molding the resin at low processing temperatures can cause the part to be weak; that is, its going to affect the integrity of the part?
>
> A.   Yes.

*Docket No. 123, Ex. F,* 29 R.R. 107.  Although Defendants argue that this exchange was simply an acknowledgement that Mr. Mendoza made those comments, rather than an admission that the statement was true,[13] the exchange tends to indicate that PPC knew of the potential consequences of molding the chambers at low processing temperatures.  In fact, counsel for Microtherm latched onto this theory, arguing to the jury that:

> [T]he head of molding down there in Guadalajara will tell you, he knew from the very get-go, the first day he started running these chambers, he knew, not only that Dupont specified, or Dupont recommended the 550 to 580 degrees, he also knew that if you mold it at much less temperature than that, that it could compromise the integrity of the product.

* * *

> [W]hat [Mr. Fletcher] does say is that, 'From day one, when I ran those chamber molds, I used the temperatures that were a hundred degrees less than what Dupont recommended.  And I knew that that could cause problems with the product.'  So you're going to be asked at the end of this case about knowing violations of creating a product that you represent should have one quality or characteristic but it has another.  And we're going to be pointing to that evidence.  It's an admission.  I couldn't bring you better evidence than that.

*Docket No. 123, Ex. C,* 10 R.R. 53-56.  Based on the above, National Union argues that there was no accident because the failure of the chambers was a reasonably foreseeable result of molding them

---

[13][Docket No. 127]

at low processing temperatures.  Regardless of the conclusions that may be drawn from the underlying trial testimony or argument of counsel, the Court need not reach the issue of whether the damage to the chambers was an accident because such damages are specifically excluded by the policy's "business risk" exclusion.  [Docket No. 95, Ex. 6, ¶ V.F]  The purpose of a "business risk" exclusion is to protect insurers from damages to an insured's product by his own hand, as this is typically considered a cost of doing business.  *Comsys Info. Tech. Services, Inc. v. Twin City Fire Ins. Co.*, 130 S.W.3d 181, 196 (Tex. App.—Houston [14th Dist.] 2003); T.C. *Bateson Const. Co. v. Lumbermans Mut. Cas. Co.*, 784 S.W.2d 692, 695 (Tex. App.—Houston [14th Dist.] 1989).  The "business risk" exclusion in National Union's policy specifically excludes "Property Damage to Your Product arising out of it or any part of it."[14]  [Docket No. 95, Ex. 6, ¶ V.F]  Defendants point out that National Union's policy specifically defines "Your Product" as including "[w]arranties or representations made at any time with respect to the fitness, quality, durability, performance or use of Your Product," arguing that the breach of warranty claims are covered under the policy.  [Docket No. 95, Ex. 6, ¶ IV.M]  Such an argument ignores the fact that the exclusion for damages to "Your Product" necessarily includes those warranties.  Therefore, damages to the chambers themselves, including damages arising from a breach of warranty, are clearly excluded by the "business risk"

---

[14]The policy defines "Your Product" as:
1.  Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:
      a.  you;
      b.  others trading under your name; or
      c.  a person or organization whose business or assets you have acquired; and
2.  Containers (other than vehicles) materials, parts or equipment furnished in connection with such goods or products.
Your Product includes:
1.  Warranties and representations made at any time with respect to the fitness, quality, durability, performance or use of Your Product; and
2.  The providing of or failure to provide warnings or instructions.
[Docket No. 95, Ex. 6, ¶ M]

exclusion.

### ii. Anticipation of Damage to the Property of Others

Although excluding damages to "Your Work" and "Your Product" prevents a recovery based on damages to the chambers,[15] damages to the property of a third party is not excluded by the business risk exclusion.  *Travelers Ins. Co. v. Volentine*, 578 S.W.2d 501, 503-05 (Tex. Civ. App.—Texarkana 1979, no writ).  In *Volentine* the Texarkana Court of Appeals evaluated a similar "business risk" exclusion and found that damage to property other than the insured's own work or product was not encompassed in the exclusion.  *Id.*  The court explained:

> Similar and even identical policy provisions have on many occasions been construed by the courts, and it has been uniformly held that a liability policy containing such an exclusion does not insure the policyholder against liability to repair or replace his own defective work or product, but it does provide coverage for the insured's liability for damages to other property resulting from the defective condition of the work, even though injury to the work product itself is excluded.

*Id.* at 503-04 (noting that "the language of the exclusion does not refer to damages Due to work performed; it refers to damages To the work performed").  Having determined that damage to the chambers themselves is excluded by the policy's "business risk" exclusion, but that damage to the property of others is not, the Court now turns to whether the damage to the property of others was an accident under the policy.

In determining whether there was an accident in regards to the property damage suffered by other parties, the question becomes whether the resulting harm was intended or was reasonably foreseeable or the type which ordinarily follows.  Defendants argue that under the Fifth Circuit's interpretation of Texas law "there is a presumption of an 'occurrence' when the property of a third

---

[15][Docket No. 95, Ex. 6, ¶¶ V.F & V.G]

party is harmed." [Docket No. 124] (citing *Grapevine*, 197 F.3d at 725). In *Grapevine*, the Fifth

Circuit explained:

> Following *Orkin*, both state and federal courts in Texas have interpreted the terms
> 'accident' and 'occurrence' to include damage that is the 'unexpected, unforeseen or
> undesigned happening or consequence of an insured's negligent behavior. Many of
> these cases have involved claims for damage caused by an insured's defective
> performance or faulty workmanship. *Furthermore, within this genre, courts have
> consistently held that damage wreaked on the work product of a third party—as opposed
> to that of the insured—is presumed to have been unexpected and, therefore, constitutes
> an accident or an occurrence.*

*Id.* (citing *Lafarge Corp. v. Hartford Cas. Ins. Co.*, 61 F.3d 389, 395 (5th Cir. 1995)) (emphasis

added); *Hartford Cas. Co. v. Cruse*, 938 F.2d 601, 604-05 (5th Cir. 1991); *Grimes Constr., Inc. v.

Great American Lloyds Ins. Co.*, 188 S.W.3d 805, 813 (Tex. App.—Fort Worth 2006) (noting the

exception for damage to the work product of a third party, but it did not apply because "the only

damage was to work that Appellant, the insured, contracted to perform"); *Volentine*, 578 S.W.2d at

503-04).

Thus, the existence of a presumption turns on whether the actions of the insured place the case

"within the genre" of *Orkin* (i.e. whether the situation is more akin to an unintended result from a

negligent performance as opposed to a situation more akin to an intentional tort). The Fifth Circuit

has held that an accident has taken place for insurance purposes when the insured's work causes

damage to a third party, to an extent which could not be anticipated by the insured. *Hartford Cas.

Co. v. Cruse*, 938 F.2d 601, 604-05 (5th Cir. 1991). A careful reading of *Cruse* reveals that the Fifth

Circuit has treated property damage to an insured's own work differently than it does property

damage to the work of another. *Id.* In *Cruse,* the insurer sought a declaration that it had no

obligation to pay a judgment in favor of Cruse against the insured based on breach of warranties,

negligence and DTPA violations arising out of "defectively performed foundation leveling services"

-23-

on the Cruses' home. *Id.* at 602. The district court held that there was no coverage for any damages based on the "business risk" exclusion, the "care, custody, control" exclusion, and the fact that there was no "occurrence" under the policy. *Id.* at 602–03. On appeal, the Fifth Circuit acknowledged that the "business risk" exclusion provided that "Hartford's comprehensive general liability policy does not cover 'property damage to work performed by or on behalf of the named insured arising out of the work or any portion thereof, or out of materials, parts or equipment furnished in connection therewith.'" *Id.* at 603. Nevertheless, the court explained that:

> A comprehensive general liability policy with this "business risk" exclusion provides protection "for personal injury or for property damage caused by the completed product but not for the replacement and repair of that product. The justification for treating these risks differently is that the insured can control the quality of the goods and services he supplies, while accidental injury to property or persons exposes him to almost limitless liability." Thus a contractor cannot recover from the insurer for "his own failure to perform his contract," but can recover for damage other than to his own work whether or not that work is defective.

*Id.* (citations omitted). Therefore, the "business risk" exclusion did not apply to the damage other than to the foundation because the insured only performed work on the foundation, but caused damage to the entire house. *Id.* The court noted that the situation was one in which the defective product caused damage to the entire entity,[16] as opposed to a situation where the damage was limited to the defective product itself. *Id.* at 604 (citing *T.C. Bateson Constr. Co. v. Lumberman's Mut. Cas. Co.*, 784 S.W.2d 692, 697-98 (Tex. App.—Hous. [14th Dist.] 1989, *writ denied*) (holding the "business risk" exclusion applied because the builder was hired to construct the entire structure which was damaged, not just a portion thereof); *Eulich v. Home Indem. Co.*, 503 S.W.2d 846, 849 (Tex. Civ. App.—Dallas 1974, *writ refused n.r.e.*) (holding "business risk" exclusion applied after

---

[16]*Id.* (citing *Todd Shipyards v. Turbine Serv., Inc.*, 674 F.2d 401, 421 (5th Cir. 1982) (holding that the exclusion for "property damage to work performed by or on behalf of the named insured" did not apply because the entire turbine was damaged and the insured only performed work on specific component parts of the turbine)).

building collapsed when builder was hired to construct the entire building)).  Briefly reviewing the

"care, custody, control" exclusion, the court found that it did not apply.  *Id.* at 604.  Finally, turning

to the whether there was an "occurrence" under the policy, the Fifth Ciruit explained that when

"[c]onsidered in tandem with the business risk exclusion, the 'occurrence' requirement illuminates

the allocation of risk."[17]   *Id.*   While the court acknowledged that "[d]irect (as opposed to

consequential) damages that naturally follow from a breach of contract . . . may [] constitute

expected or intended damages," the court noted that an "accident may inhere in the scope of

damages."  *Id.* at 604-05 (citing *Volentine*, 578 S.W.2d at 503.).  Ultimately, the court found that

there was an "occurrence" based on the extent of the damage to the home.  *Id.* at 605 (explaining that

"[w]ith the extensive damage to the Cruses' home, we find an occurrence sufficient to trigger

coverage").  The Cruses' were awarded damages under the insured's CGL policy for the diminution

in value to their home and cost of repairs to their home, but the insurer was not held liable for the

damage to the foundation itself, which fell within the "business risk" exclusion.  *Id.*

Similarly, in *Volentine*, the Texarkana Court of Appeals explained that although the defective

performance of repair work to an engine valve might not have been an "accident" for insurance

purposes, "the destruction of the entire engine as a result of the malfunction of one of the repaired

valves was certainly unexpected and unintended, and constituted an accident within the meaning of

the policy provisions."  *Volentine*, 578 S.W.2d at 503; *see also Dayton Indep. School Dist. v. Nat'l*

---

[17]*Lennar Corp. v. Great American Ins. Co.*, Civ. No. 14-02-00860, 2006 WL 406609, *7 (Tex.
App.—Hous. [14th Dist.] Feb. 23, 2006) (explaining that "coverage for 'business risks' is ordinarily eliminated
through exclusions—not through the 'occurrence' requirement in the initial 'insuring agreement'"); *Hartford Cas.
Co. v. Cruse*, 938 F.2d 601, 604 (5th Cir. 1991) ("A builder who fails to abide by the specifications of a contract, for
example by substituting a weaker building material, may by that breach produce expected property damage to his or
her work, and may thus fail to show a covered 'occurrence.'  But 'an occurrence takes place where the resulting
injury or damage was unexpected and unintended, regardless of whether the policyholder's acts were intentional.'").

*Gypsum Co.*, 682 F. Supp. 1403, 1412 (E.D. Tex. 1988) (explaining that "the 'own product' exclusion does not apply to bar coverage of third-party claims for damage to property into which the policyholder's property or product has been incorporated").  That is, conduct that does not constitute an accident as to the insured could still be construed as an accident as to a third party.  In that same vein, Defendants in the instant case argue that even if PPC was aware that molding the chambers at a low temperature could cause them to weaken and fail, it does not necessarily follow that they expected or intended the destruction of the entire water heater or damage to the homes and businesses where they were installed.

Defendants' argument is supported by the Fifth Circuit's coverage opinion in *Lafarge*, a duty to defend case, which held that "there is an accident or occurrence when the alleged product defect has caused damage to other property."  61 F.3d at 395 (citing *Cruse*, 938 F.2d at 604-05; *Volentine*, 578 S.W.2d at 503).  The policy at hand in *Lafarge* stated that "an 'occurrence' is defined as 'an accident, including continuous or repeated exposure to conditions, which results in . . . property damage neither expected or intended from the standpoint of the insured.'" *Id.*  The underlying case was filed by a pipeline company against the insured, Leonard Pipeline-Anchor Wate ("LAC"), after the protective coating provided by LAC failed, causing damage to the pipeline.  *Id.* at 391-92.  Although the insurer argued "that the failure of a product to work does not constitute an accident," explaining that "corrosion of the pipeline was not an accident because exposure to soil was contemplated," the Fifth Circuit disagreed.  *Id.* at 395.  The court noted that "the complaint sought damages not simply because the coating failed but because the failure of the coating caused damage to the pipeline." *Id.*  Thus, the court held that when there is an allegation that the insured's product caused damage to the property of another an accident is inferred, relying on *Cruse* and *Volentine*.

In the case at hand there is evidence that PPC knew manufacturing the chambers at lower processing temperatures could cause them to be weaker, but there was no summary judgment evidence to which this court was directed that establishes as a matter of law that PPC knew the failure of the chambers would cause water to damage to the circuit boards, destroying the entire water heater.  Similarly, it has not been established as a matter of law that PPC intended harm to third parties or reasonably anticipated that if the chambers ruptured it would cause water to leak outside of the water heaters themselves, causing damage to the homes and businesses where the water heaters were installed.  In light of the Fifth Circuit's interpretation of Texas law in *Grapevine*, this Court presumes an accident, and therefore an occurrence, insofar as there was damage to third parties.[18]  Therefore, the Court holds that, to the extent Defendants have admissible evidence to show there was property damage to third parties, there is a rebuttable presumption of an occurrence and that the Court can look beyond the judgment in the underlying case to determine if PPC intended the harm or should have reasonably anticipated that the harm would occur.

### c.   Fraud Finding

National Union argues that the jury's fraud finding proves PPC's conduct was intentional because the finding was based on the same conduct as the DTPA claims. [Docket No. 123] Defendants point out that "the jury made a separate and distinct award" for the fraud finding and that

---

[18]National Union argues that even if the Court were to find some of the DTPA violations constituted an occurrence, "a breach of warranty in violation of the DTPA is not an occurrence." [Docket No. 123] (citing *Grimes Constr., Inc. v. Great American Lloyds Ins. Co.*, 188 S.W.3d 805 (Tex. App.—Fort Worth 2006, no pet. h.); *Malone v. Scottsdale Ins. Co.*, 147 F. Supp. 2d 623, 627-30 (S.D. Tex. 2001); *Hartrick v. Great American Lloyds Ins. Co.*, 62 S.W.3d 270, 278 (Tex. App.—Hous. [1st Dist.] 2001, no pet.).  However, all of the cases cited by National Union involved property damage to the insured's own work or product, as opposed to damage to the property of a third person based on the breach of warranty.

they do not seek to recover the damages apportioned to the fraud findings.[19]  [Docket No. 124]  In response, National Union argued that Microtherm's petition in the underlying state court case "alleged that the same conduct constituted knowing violations of the DTPA and fraud."  [Docket No. 123]  Although the fraud allegation in paragraph VIII of Microtherm's petition incorporated "[a]ll of the allegations and averments contained in paragraphs II-VII," the fraud allegation also listed 25 particulars specific to the fraud "[i]n addition to the representations contained herein and incorporated by reference."  [Docket No. 95, Ex. 1]  The 25 particulars included, *inter alia*, that PPC committed fraud by:

> a.   stating that the problems had been taken care of when they had not;
> b.   giving false information about the cause or source of the problems with their goods and/or services;
> c.   representing that quality parts could be molded notwithstanding compliance;
> . . . .
> e.   deliberately concealing defects by blaming others or attributing them to other causes;
> . . . .
> u.   after the fact, they misrepresented the need or necessity of altering the process and then lied to cover up their conduct;
> v.   the need and/or the reasons for tooling repairs;

*Id.*  Based on the above, at least some of the fraud allegations involved conduct which occurred after the chambers were molded.  The jury findings were not specific to any individual allegation.  Therefore, the jury could have found fraud based on conduct that was separate and apart from PPC's false, misleading or deceptive acts, unconscionable acts, or breach of warranty.  In fact, a fraud finding based on some of the unrelated conduct described above would explain why the jury found separate and different damages for fraud.  For example, the jury attributed $4,000,000 in damages

---

[19]The parties agree that Microtherm, as the plaintiff in the underlying case, was forced to make an election of remedies and pursuant to that election chose to forego proceeding upon its fraud theory.  The judgment therefore includes only damages found by virtue of the DTPA findings.  The Defendants are not seeking from National Union in this matter any recovery emanating from the fraud verdict.

to PPC's fraudulent conduct, but attributed $22,515,000 to PPC's DTPA violations and an additional $700,000 in addition to those actual damages based on the fact that PPC's conduct was committed knowingly.  [Docket No. 95, Ex. 2]  Both the fraud damages and the DTPA damages included the costs of repairing the chambers, lost profits, and damage to the value of Microtherm, but the jury attributed different amounts to each finding.  *Id.*  Without knowing what conduct formed the basis for the fraud finding, for which the jury apportioned separate damages, the Court cannot hold that the presence of a positive finding on fraud necessarily means all of the DTPA violations were intentional, as that was not the finding of the jury.[20]

       2.    *Proof of Property Damage*

In addition to an accident, an "occurrence" under the policy requires property damage. Although the plain language of the policy and the Texarkana Court of Appeals' decision in *Volentine* indicate that damage to the property of others is not excluded under the business risk exclusion, there must be actual damage to the property—which brings us to the policy's exclusion for "impaired property."  [Docket No. 95, Ex. 6, ¶ V.E]  The "impaired property" exclusion states that there is no coverage for:

> Property Damage to Impaired Property or property that has not been physically injured, arising out of:
> 1.  A defect, deficiency, inadequacy or dangerous condition in Your Product or Your Work; or
> 2.  A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

*Id.*

> Impaired Property means tangible property, other than Your Product or Your Work, that cannot be used or is less useful because:

---

[20]That being the case, this Court does not reach the question of whether an abandoned fraud finding could be used by an insurer to preclude coverage.

    1.     It incorporates Your Product or Your Work that is known or thought to be defective, deficient, inadequate or dangerous; or

    2.     You have failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by:

    1.     The repair, replacement, adjustment or removal of Your Product or Your Work; or

    2.     Your fulfilling the terms of the contract or agreement.

[Docket No. 95, Ex. 6, ¶ IV.D]  In the May 2, 2006 motion hearing, counsel for Defendants stated that some of the water heaters suffered damage due to the failure of the water chambers, but that others were put back into service after the water chambers were replaced.  A water heater that could be placed back into service simply by repair or replacement of the water chambers clearly falls within the definition of "impaired property."[21]  However, a water heater that has been damaged due to the water leakage to the point where it will not properly function by repair or replacement of the water chambers does not fall within the definition of "impaired property."[22]

      This brings us to the question of what evidence may be considered to prove there was property damage.  National Union argues that even if there was an accident and even if the Court is not bound to look solely at the judgment, it still cannot look past the facts proven in the underlying trial in order to find there was property damage.  Although in many cases the courts have not actually looked to additional evidence,[23] "[t]here are decisions of the Texas Supreme Court and of the Fifth

---

[21]The Court notes that the "impaired property" exclusion contains an exception for "the loss of use of other property arising out of sudden and accidental physical injury to Your Product or Your Work after it has been put to its intended use."  In the event that there is admissible evidence tending to prove the exception the Court will consider the loss of use issue, assuming the Court can properly consider such evidence.

[22]According to the deposition of David Seitz [Docket No. 109, Ex. 2] about 75 percent of the chamber failures would result in the entire water heater needing to be replaced.  However, Mr. Seitz's testimony in this regard was not taken in the underlying case, but in the instant coverage case.  National Union has objected to the admission of this evidence on multiple bases, but the Court here is not relying on this testimony for the basis of its ruling and therefore feels no need to address the objections at this time.

[23]*Hartrick*, 62 S.W.3d at 278; *Commercial Underwriters Ins. Co. v. Royal Surplus Lines Ins. Co.*, 345 F. Supp. 2d 652, 667 (S.D. Tex. 2004); *Malone*, 147 F. Supp. 2d at 630.

Circuit interpreting Texas law that indicate new evidence is admissible when the coverage question turns on a matter that was not adjudicated in the liability suit." *Swicegood v. The Medical Protective Co.*, Civ. No. 95-0335-D, 2003 WL 22234928, *12 (N.D. Tex. Sept. 19, 2003). The *Swicegood* court pointed out that "[i]n *Hartrick* the court was able to grant summary judgment in favor of the insurer in a coverage case because it was clear from the verdict and judgment in the underlying case that the judgment did not award damages caused by a covered 'occurrence' within the meaning of a commercial general liability policy." *Id.* at *14 (citing *Hartrick*, 62 S.W.3d at 278). The court also distinguished a case from the Fort Worth Court of Appeals, explaining that in that case "no new evidence was necessary because the coverage questions were purely issues of law." *Id.* (citing *Great Am. Lloyds Ins. Co. v. Mittlestadt*, 109 S.W.3d 784, 786 (Tex. App.—Fort Worth 2003, no pet.)).

Although courts in Texas have generally opted not to examine additional evidence which was not presented at the underlying trial when there is merely a question of law, the courts seem to have been willing to entertain such evidence in the coverage trial when there are factual questions that must be resolved. *See, e.g., Utica Nat'l Ins. Co. v. Am. Indem. Co.*, 141 S.W.3d 198 (Tex. 2004); *Enserch Corp. v. Shand Morahan & Co., Inc.*, 952 F.2d 1485 (5th Cir. 1992). In *Utica National*, the Supreme Court of Texas held that the question of coverage turned on factual issues and remanded the case to the trial court for additional findings of fact. *Utica National*, 141 S.W.3d at 204-05. Similarly, when faced with the question of whether an insurer was liable for a settlement the insured arranged on its own, the Fifth Circuit held that the trial court could look to the facts that would have been tried. *Enserch*, 952 F.2d at 1493-95. Based on these cases, the *Swicegood* court made an *Erie* prediction that the Supreme Court of Texas "will hold that new evidence can be introduced at a coverage trial when the proof is necessary to resolve a controlling coverage question

that was not conclusively decided in the indemnity suit." *Swicegood*, 2003 WL 22234928 at *14.

In *Mittlestadt*, the Fort Worth Court of Appeals was called upon to determine whether the plaintiffs had suffered "property damage." 109 S.W.3d at 786. Although the court stated that "we only look to the facts established in the underlying litigation to determine if a duty to indemnify exists," the evidence of the alleged property damage was already in the trial court record, thus, the court was presented with a question of law—whether a misrepresentation causing purely economic loss constituted property damage—not a question of fact. *Id.* at 787. Therefore, as pointed out by the *Swicegood* court, the decision of the *Mittlestadt* court "was correct considering that the issues before it were solely ones of law," such that "no new evidence was necessary." *Swicegood*, 2003 WL 22234928 at *14-15. The *Mittlestadt* court was not confronted with the situation currently before this Court, where there is limited, or perhaps no, testimony of property damage and the insurer seeks to deny coverage based, in part, on the fact that further evidence of property damage was offered in the underlying trial, but excluded based on an evidentiary ruling of the state court.

The testimony in the underlying suit alludes to the fact that there was damage to the water heater circuit boards,[24] but the Court has not been pointed to testimony or evidence admitted in the underlying trial proving property damage. Indeed, it was suggested at oral argument that the state trial court excluded all such evidence. Therefore, following an anticipated interlocutory appeal, the Court, if affirmed, will proceed to trial on the issues of: (1) if there was property damage (recoverable under the policy); (2) whether the property damage was intended or should have been reasonably anticipated; (3) damages; and (4) all other ancillary issues (e.g., the recoverability of the payment made by Arctic).

---

[24][Docket No. 127, Ex. D, 14 R.R. 58]

C.    *Consequential Damages*

The policy states that National Union "will pay . . . those sums . . . that the Insured becomes legally obligated to pay *by reason of* liability imposed by law . . . because of . . . property damage." [Docket No. 95, Ex. 6, ¶ I] (emphasis added).  National Union points out that "for consequential damages to be covered, they must result from damages that are covered by the policy in the first place," and explains that "none of the cases cited by the Defendants support the notion that consequential damages resulting from property damage for which the insured is not legally liable can be covered by insurance, yet that is precisely what Defendants ask of this Court." [Docket No. 107] Defendants reply by stating that "National Union appears now to concede that consequential damages flowing from property damage to a third person are covered under the policy." [Docket No. 109]  That being the case, it seems there is no dispute between the parties, that is, if there is covered property damage, the consequential damages flowing therefrom are covered as well. Furthermore, to the extent National Union does not concede consequential damages are covered, the Court holds that consequential damages are covered when they stem from a covered occurrence based on the plain language of the policy.

### III.  Conclusion and Certification for Interlocutory Appeal

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).  Based on Fifth Circuit precedent and the record in this case, an accident, and therefore an occurrence, may have taken place insofar as PPC's actions caused damage to the property of third parties.  As such, the Motion for Summary Judgment of Puget Plastics

Corporation, Arctic Slope Regional Corporation and Microtherm, Inc. [Docket No. 99] and the Motion for Summary Judgment of National Union Fire Insurance Company of Pittsburgh, P.A. [Docket No. 95] are **GRANTED in part**, and **DENIED in part**.  This Court has purposefully avoided ruling on the many different evidentiary issues that have been raised and that no doubt will be raised as this case progresses.  Instead, the goal of this opinion was to rule on the threshold legal issues and have these resolved before proceeding further.  The Court believes this to not only be in the best interest of the parties, but also the most efficient manner in which to handle these matters. Therefore, National Union Fire Insurance Company of Pittsburgh, PA.'s Motion for Protective Order [Docket No. 87] and Plaintiff National Union Fire Insurance Company of Pittsburgh, PA's Motion to Exclude Testimony of Robert Hughes [Dokcet No. 117] are **DENIED without prejudice to refiling**.

In summary, this Court holds as follows:

(A)   The PCOH portion of the policy is not a separate grant of coverage and, therefore, still requires an occurrence in order to trigger coverage.

(B)   A "knowing" violation of the DTPA does not automatically disqualify an event from being an accident, and ultimately an occurrence, as that term is defined in the insurance policy.

(C)   A "knowing" violation of the DTPA would not qualify as an accident if the actor intended the harm and/or should have reasonably anticipated the harm.

(D)   The fraud finding, which was abandoned by the Plaintiff pursuant to an election of remedies, under the particular circumstances of this case, does not bar the insured's claim.

(E)   Damage to the water chambers themselves is excluded by the policy and therefore will not suffice as proof of property damage, the second pertinent element of the occurrence requirement.

Damage to the water heaters or the homes and businesses in which the heaters were installed (if proven), however, would constitute property damage, so long as there is actual damage, as opposed to those water heaters which may fall into the category of "impaired property."

(F)   In resolving the issues presented by this case, this Court is not confined to the judgment in the underlying case.

(G)   The Court adopts the reasoning and *Erie* prediction made in *Swicegood v. The Medical Protective Co.*, No. 95-0335-D, 2003 WL 22234928 (N.D. Tex. Sept. 19, 2003), which, in effect, holds the Court may consider: (1) the evidence presented at the underlying trial and (2) new evidence relevant to the issues which remain to be resolved.

(H)   Consequential damages that stem from an occurrence may be recoverable under the policy in question, assuming, hypothetically, that all other prerequisites are proven.

With those conclusions in mind, this Court hereby finds and certifies: (1) that this order involves several controlling issues of law to which there are substantial grounds for a difference of opinion and (2) that an immediate appeal may materially advance the ultimate termination of this litigation as well as any other cases involving the same issues.  It will ultimately result in saving the parties both time and money and will result in judicial efficiency.  Having so ruled, this Court hereby stays this case for 20 days.  If either party elects to pursue an interlocutory appeal of this order pursuant to 28 U.S.C. § 1292(b), in addition to any other requirements by rule or statute, the appealing party shall provide notice to this Court and the Court will subsequently entertain a request to extend the stay.  If neither party elects to appeal, the Court will enter a new scheduling order which will control the resolution of the remaining issues in this case under the guidelines set forth herein.

Signed this 6th day of September, 2006.

Andrew S. Hanen
United States District Judge