IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
ENTERED

NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH, PA,
    Plaintiff,

§
§
§
§

AUG 1 2 2009

Clerk of Court

v.

§
§
§

Civil Action No. B-05-050

PUGET PLASTICS CORPORATION;
ARCTIC SLOPE REGIONAL
CORPORATION, ET AL.,
    Defendants.

§
§
§
§
§

**MEMORANDUM OPINION AND ORDER**

I.    CASE HISTORY

    Plaintiff National Union Fire Insurance Company of Pittsburgh, Pa. ("National Union") filed

the instant coverage action on February 11, 2005 seeking a declaration that it owed no defense or

duty to indemnify to its insureds, Defendants Arctic Slope Regional Corporation ("Arctic Slope")

and Puget Plastics Corporation ("Puget"), for claims and a judgment stemming from a Texas state

case brought against them by Defendant-Intervenor Microtherm, Inc. ("Microtherm"). The

Defendants counterclaimed seeking a declaration that National Union owed a defense and coverage

related to the underlying judgment and also asserting claims for breach of contract and deceptive

practices requiring National Union to pay the state judgment against Puget as well as additional

statutory penalties and fees.

    A.    The Underlying Case

    Microtherm manufactures and sells electronically controlled tankless water heaters under the

brand name Seisco. These water heaters contain a number of components, including plastic water

chambers ("chambers") molded out of Zytel 77G33, a glass fiber-reinforced nylon manufactured by

E.I. DuPont de Nemours & Company ("DuPont").  The Seisco water heaters also contain thermistors

manufactured by Dana Corporation ("Dana"), as well as circuit boards, heating elements, and various

other components.  Beginning in January of 2000, Puget, through its wholly owned Mexican

subsidiary, Puget Plastics Corporation S.A. de C.V. ("Puget Mexico"), molded the chambers that

Microtherm then incorporated into its Seisco water heaters.  Puget is itself a subsidiary of Arctic

Slope.  After a falling out between Microtherm and Puget in late 2000 involving Puget's repeated

delays in production and concerns over the processing parameters used by Puget to mold the

chambers, Microtherm moved the molding of the chambers to United Plastics Group ("UPG").

Between 1999 and 2002, the thermistors, heating elements, circuit boards, and chambers

began to malfunction, with the chambers beginning to fail in April of 2001.  In 2002, Microtherm[1]

filed suit against Puget, Puget Mexico, Arctic Slope, UPG, Dana, and other component

manufacturers in the 357th Judicial District Court of Cameron County, Texas in Cause No. 2002-03-

00993-E (the "Underlying Case").  Microtherm asserted claims against each defendant for breach

of contract, breach of warranty, fraud and misrepresentation, negligence, and violations of the Texas

Deceptive Trade Practices Act ("DTPA").  The trial of the Underlying Case began in November of

2004 and lasted four weeks.

On December 17, 2004, the jury reached a verdict in favor of Microtherm against Puget,

UPG, and Dana.  The jury awarded the following damages against Puget: (1) as a result of Puget

engaging in false, misleading, or deceptive acts or practices, engaging in unconscionable action, and

---

[1] The Underlying Case involved additional parties, including plaintiff Mavid Maquiladora, the company
Microtherm hired to assemble the components into the completed Seisco water heater.  David Seitz, the founder and
president of Microtherm, was also a plaintiff in the Underlying Case.  Emerson Electric Company, Wiegand
Appliance Division of Emerson Electric Company, and Chromalox, Inc. were also initially named as defendants.  By
the time the case reached the jury, however, each of these plaintiffs and defendants had either been dismissed or non-
suited.  The jury only considered Microtherm's claims against Puget, UPG, and Dana.

failing to comply with warranties: (a) $175,000 for costs to repair and replace parts provided by Puget; (b) $7,000,000 for past lost profits; (c) $340,000 for future lost profits; (d) $15,000,000 for damage to the value of Microtherm; and (e) $700,000 in additional damages for "knowing" conduct; (2) due to negligent misrepresentation by Puget, $0; (3) due to fraud committed by Puget, (a) $1,500,000 for costs to repair and replace parts by Puget; (b) $1,000,000 in past lost profits; (c) $500,000 in future lost profits; (d) $1,000,000 for damage to the value of Microtherm; and (e) $330,000 in exemplary damages due to finding fraud by clear and convincing evidence. The jury also found that Arctic Slope was not responsible for the acts of Puget.

Microtherm elected to forgo its right to recover damages for fraud, and the state court entered a final judgment against Puget based on the other causes of action on February 7, 2005, in the amount of $36,081,807, which included $10,308.088 in attorney's fees and $2,557,719 in prejudgment interest.[2] The state court also entered a take-nothing judgment in favor of Arctic Slope.

B.    Insurance Coverage of the Underlying Judgment

National Union issued Commercial Umbrella Policy No. BE 932-96-67 (the "Policy") to Arctic Slope for the period from July 1, 1999 to July 1, 2002. Under the Policy, Arctic Slope had a self-insured retention of $1 million per occurrence. Puget, as an Arctic Slope subsidiary, was an additional insured under the Policy. During the policy year from July 1, 2000 to July 1, 2001, Puget had underlying primary insurance from Wausau Business Insurance Company ("Wausau") under

---

[2] Under similar theories, the jury also awarded, and the state court entered a judgment for, damages against Dana in the amount of $27,600,000 in actual damages, $250,000 in additional damages, $3,308,712.33 in prejudgment interest, and $12,463.485 in reasonable and necessary attorneys' fees, and against UPG in the amount of $17,450,000.00 in actual damages, $600,000 in additional damages, $890,136.49 in prejudgment interest, and $7,576.055 in reasonable and necessary attorneys' fees. Microtherm put on the same general damage evidence for all three defendants. Based upon the record before this Court, it is unclear how the jury justified the different amounts against the three defendants; however, it is clear by the different verdicts that the jury somehow drew distinctions among the three.

Wausau Policy No. 2321-00-064183 (the "Wausau Policy"). The Wausau Policy had single-occurrence limits of $1 million.

Though the Underlying Case was filed in 2002, Arctic Slope and Puget did not tender the Underlying Case to National Union until July of 2004. Puget did not tender the Underlying Case to Wausau until November of 2004, but Wausau ultimately agreed to provide a defense to Puget for the Underlying Case under a reservation of rights. National Union never provided a defense to either Arctic Slope or Puget in the Underlying Case. On February 11, 2005, four days after the entry of judgment, National Union filed the present declaratory judgment action against Puget and Arctic Slope requesting a determination of the parties' respective rights and responsibilities under the Policy, including whether National Union must pay defense and indemnification in relation to the judgment rendered against Puget in the Underlying Case.

On April 1, 2005, the state trial court issued an order requiring Microtherm, Puget, UPG, and Dana, and each party's primary and excess insurers to attend a mediation in Houston, Texas on April 6 and 7, 2005. Although National Union had notice of the mediation and the court's order, and had been asked to attend by its insureds, National Union declined to attend the mediation after Puget and Arctic Slope failed to obtain a waiver from all of the other participants stating that by attending the mediation, National Union would not be subjecting itself to the jurisdiction of the state court.[3] Further, National Union maintained that because Wausau, the primary insurer, indicated that it had

---

[3] While not relevant to the ultimate outcome in this case, this Court questions the propriety and judgment exercised by National Union in making a unilateral decision to ignore a court order, forcing its insureds to attend a mediation in a non-compliant status. This is especially true given National Union's flimsy excuse for not attending since it is clear that National Union does business throughout the State of Texas and that its attendance at a mediation pursuant to a court order would not change any jurisdictional facts. Furthermore, less than two months earlier, National Union filed this coverage action in a courthouse one city block away from the state court in question.

no intention of tendering the limits of its insurance in settlement of the judgment, National Union's attendance as the excess carrier served no purpose. In contrast to National Union's explanation for why it did not attend the mediation, Puget and Arctic Slope assert that just prior to the mediation National Union unequivocally denied coverage, leaving the insureds to fend for themselves.

On the second day of the mediation, Puget and Arctic Slope reached an agreement with Microtherm under which Wausau would tender its $1 million single-occurrence limit to Microtherm, and Arctic Slope would pay an additional $2 million to Microtherm. In exchange, Microtherm agreed to provide a release of claims and a covenant not to execute against the assets of Puget and Arctic Slope. The parties further agreed that a credit in the amount of $3 million would be applied to the underlying judgment against Puget, and all parties entered into a covenant not to file a notice of appeal of the state judgment. Lastly, Puget and Arctic Slope agreed to assign their rights under the Policy to Microtherm. National Union maintains, for a number of reasons, that this settlement is contrary to the Policy and to public policy, and that it should therefore be relieved of any obligations to Puget or Arctic Slope.

C.    Procedural Posture

Earlier in this coverage action, this Court issued a Memorandum Opinion and Order regarding cross-motions for summary judgment filed by the parties which was then the subject of an interlocutory appeal taken pursuant to 28 U.S.C. § 1292(b). (Docket No. 131). This Court stayed the coverage action pending resolution of the appeal. The United States Court of Appeals for the Fifth Circuit affirmed this Court's order. (Docket No. 154, 155). This Court then granted the parties additional time for new discovery related to the legal and factual issues raised by Fifth Circuit's opinion.

The parties elected for a bench trial. In addition to presenting testimony and accompanying exhibits at trial, the parties, by agreement, submitted into evidence certain state trial transcript designations from the Underlying Case and numerous designations of depositions taken during the pendency of the Underlying Case and this coverage action. After the bench trial, the parties submitted post-trial briefs complete with proposed findings of facts and conclusions of law. The primary issues presented during the bench trial and in the post-trial briefs were: (1) whether Puget's, Arctic Slope's, or National Union's actions leading up to the mediation and the resulting settlement agreement violated any provisions of the Policy or duties owed under the Policy, and if so, whether these actions relieved Puget, Arctic Slope, or National Union of any duties owed under the Policy; (2) whether Puget's improper molding of the plastic water chambers was an "Occurrence" covered by the Policy; (3) whether the judgment in the Underlying Case was attributable to "Property Damage" covered by the Policy; and (4) whether the Defendants have carried their burden to allocate the damages contained in the judgment in the Underlying Case between covered and uncovered losses. Having now considered the record and briefing by the parties, the Court issues this its findings of fact and conclusions in narrative form.

II.    BARRIERS TO INSURANCE COVERAGE

National Union asserts that Puget's and Arctic Slope's actions leading to the post-mediation settlement, as well as the settlement agreement itself, violate certain provisions of the Policy, thereby voiding any coverage owed. National Union also contends that the covenant not to execute, signed in conjunction with the settlement agreement, negates any coverage under the Policy. Lastly, National Union asserts that the judgment in the Underlying Case is the product of multiple "occurrences" as defined by the Policy, creating additional requirements with regard to the

6

exhaustion of primary insurance and self-insured retention limits that must be satisfied prior to any payment of the judgment by National Union. Puget and Arctic Slope counter that National Union breached its duty to defend and denied coverage prior to the mediation, relieving them of any duty to comply with the Policy provisions and estopping National Union from asserting the procedural protections of the Policy. Further, Puget and Arctic Slope contend that the covenant not to execute does not act to negate any coverage that may be owed to them by National Union and that the judgment stemmed from a single "occurrence" as defined by the Policy.

In Texas, insurance policies are interpreted according to the general rules governing the construction of contracts. *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Crocker*, 246 S.W.3d 603, 606 (Tex. 2008). Policy terms are given their ordinary and commonly understood meaning unless the policy itself shows the parties intended a different, technical meaning. *Don's Bldg. Supply, Inc. v. OneBeacon Ins. Co.*, 267 S.W.3d 20, 23 (Tex. 2008) (citing *Gonzalez v. Mission Am. Ins. Co.*, 795 S.W.2d 734, 736 (Tex. 1990)). Unambiguous policy language must be enforced as written; however, where there is more than one reasonable interpretation of the policy language, ambiguities are resolved in favor of coverage. *Id.* (citing *Puckett v. U.S. Fire Ins. Co.*, 678 S.W.2d 936, 938 (Tex. 1984); *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133 (Tex. 1994)).

A.   Implications of a Breach of National Union's Duty to Defend and Duty to Indemnify

Texas law holds that insurers who wrongfully refuse to defend an insured or erroneously deny coverage under a policy lose the benefit of the policy's procedural protections. *Gulf Ins. Co. v. Parker Prods., Inc.*, 498 S.W.2d 676, 679 (Tex. 1973); *see Enserch Corp. v. Shand Morahan & Co., Inc.*, 952 F.2d 1485, 1496 n.17 (5th Cir. 1992); *McGinnis v. Union Pac. R. Co.*, 612 F. Supp. 2d 776, 811 (S.D. Tex. 2009); *Willcox v. Am. Home Assur. Co.*, 900 F. Supp. 850, 856 (S.D. Tex. 1995);

Allan D. Windt, 2 *Insurance Claims and Disputes* § 9:4 (5th ed. 2009) ("In general, an insured need not conform his or her conduct to the requirements contained in the insurance contract following the insurance company's breach of contract.") The insurer loses all procedural protections, including the ability to enforce "no action" and "no voluntary assumption of liability" clauses. *Willcox*, 900 F. Supp. at 856 (citing *Enserch Corp.*, 952 F.2d at 1496 n.17); *Parker Prods., Inc.*, 498 S.W.2d at 679.

1.   *Duty to Defend Puget Prior to the Mediation*

National Union had the right and duty to defend any claim or suit seeking damages covered by the terms and conditions of the Policy when:

> 1.   The applicable limits of insurance of the underlying policies listed in the schedule of underlying insurance and the limits of the insurance of any other underlying insurance providing coverage to the insured or the retained limit have been exhausted by payment of claims and/or defense expenses to which this policy applies; or
>
> 2.   Damages are sought for **Bodily Injury, Property Damage, Personal Injury** or **Advertising Injury** covered by this policy but not covered by any underlying insurance listed in the Schedule of Underlying Insurance or any other underlying insurance providing coverage to the Insured.

(PX 1[4] at Section II.A.; Endorsement No. 15) (emphasis in original).[5]

---

[4] The Court shall cite Plaintiff National Union's exhibits from the coverage trial as "PX" followed by the exhibit number and Defendants' exhibits from the coverage trial as "DX" followed by the exhibit number.

[5] Arctic Slope had no underlying insurance during the applicable policy periods and therefore was subject to a $1 million per occurrence self-insured retention per policy year. This self-insured retention had to be exhausted for each pertinent policy year by payment of claims or defenses before National Union owed any duty to defend. Arctic Slope asserts it paid $1.3 million of its own money defending the Underlying Case, thereby exhausting its self-insured retention and implicating National Union's duty to defend. (Michael Geraghty ("Geraghty"), 1 C.T. 146); (John Haller ("Haller"), 4 C.T. 835); (PX 36). Since Arctic Slope never provided any evidence or documentation to this effect, the Court must conclude that National Union never owed a duty to defend Arctic Slope. (*See* Haller, 4 C.T. 758-59, 848); (PX 39).

This provision tracks the majority rule regarding an excess insurer's duty to defend when the insured carries a primary insurance policy in that "'[w]here the insured maintains both primary and excess policies, . . . the excess liability insurer is not obligated to participate in the defense until the primary policy limits are exhausted.'" *Schneider Nat'l Transp. v. Ford Motor Co.*, 280 F.3d 532, 538 (5th Cir. 2002) (quoting *Keck, Mahin & Cate v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 20 S.W.3d 692, 700 (Tex. 2000)).[6]  Wausau agreed to pay its limits at the second day of mediation, but did not actually tender the limits of the underlying insurance policy until at least a week or two after the mediation and settlement agreement. (Deposition of Keith Odenweller (hereinafter Odenweller Dep.) at 49).  National Union's duty to defend Puget therefore only arose after the mediation, settlement agreement, and Wausau's tender.  National Union therefore could not have breached its duty to defend Puget prior to the mediation or the settlement agreement.

> 2.  *Duty to Indemnify*

While National Union did not breach its duty to defend either Arctic Slope or Puget, if it erroneously denied its duty to indemnify, it cannot thereafter rely on the procedural protections of the Policy to void any coverage owed to its insureds.  *See Willcox,* 900 F. Supp. at 856.  National Union's representative John Haller testified that a typical National Union denial of coverage letter includes a statement that there is no coverage for the insured's claims under the policy and a statement that the insured can provide additional information if the insured believes the denial was improper. (John Haller ("Haller"), 3 C.T. 752-53).  Haller testified that once National Union denies

---

[6] Pursuant to the Policy, Puget could also establish a duty to defend if its primary insurance did not cover the claims while the Policy did have coverage for those claims; however, Wausau ultimately determined its policy did cover the claims and judgment against Puget. (*See* Deposition of Emilee Scialpi (hereinafter Scialpi Dep.) at 28-29, 31); (Geraghty, 1 C.T. 102); (DX 31).  Puget is therefore limited to establishing a duty to defend by showing Wausau exhausted its limits with respect to the judgment in the Underlying Case.

coverage the insured is on its own and is free to assign and compromise the claim as the insured deems necessary. (*Id.* at 753, 871).

On October 21, 2004, National Union sent Arctic Slope a reservation of rights letter setting out its coverage position with respect to the Underlying Case and reserving National Union's right to deny coverage at a later date. (PX 30); (Haller, 3 C.T. 754-57)[7]; (Michael Geraghty ("Geraghty"), 1 C.T. 90, 135). This letter did not constitute a denial of coverage. National Union later hired the law firm Bierne Maynard & Parsons ("Bierne Maynard") as its coverage counsel for Puget's and Arctic Slope's claims. (Haller, 3 C.T. 747, 801). Jeffrey Parsons, an attorney for Bierne Maynard, filed this declaratory judgment action on National Union's behalf. The filing of this action also did not act as a denial of coverage.[8]

On April 5, 2005, as part of various exchanges prior to the mediation, Keith Odenweller ("Odenweller"), an attorney with Bierne Maynard who was also listed as counsel in the Original

---

[7] For the purpose of citing to the transcript of the Coverage Trial ("C.T."), the Court will use the following format (Witness's Name, Volume Number then C.T. followed by the Page Number from the transcript), for example, (Geraghty 1 C.T. 146) means that Mr. Geraghty's testimony can be found in Volume 1 of the transcript of the Coverage Trial at page 146. The Court will use the abbreviation "T.T." when citing to the transcript of the Underlying Case, for example, (Seitz, 25 T.T. 96) refers to Seitz's testimony on page 96 of Volume 25 of the transcript of the Underlying Case.

[8] A declaratory judgment action is "intended to provide a means of settling a controversy before it ripens into a violation of the civil or criminal law, or a breach of a contractual duty." *Rowan Cos. v. Griffin*, 876 F.2d 26, 28 (5th Cir. 1989) (citing *Scott-Burr Stores Corp. v. Wilcox*, 194 F.2d 989, 990 (5th Cir. 1952)); *see J.E.M. v. Fidelity & Cas. Co. of N.Y.*, 928 S.W.2d 668, 672 (Tex. App.—Houston [1st Dist.] 1996, no writ) (holding a declaratory action "is intended as a means for determining the rights of parties when a controversy has arisen, even before any wrong has actually been committed.") "The purpose of the Declaratory Judgment would be defeated if we were to require [the insurer] to take a position on coverage, and possibly breach its contract, before filing a declaratory judgment action seeking a construction of that contract." *Id.*; *cf. Scottsdale Ins. Co. v. A.F.C. Inc.*, No. 1:06cv1242LG-JMR, 2007 WL 2475935, at *1 (S.D. Miss. Aug. 28, 2007) (holding the filing of a declaratory judgment action by an insurer to determine whether it has the duty to indemnify an insured does not constitute a denial of coverage). Obviously, given the timing of the notice and judgment in the Underlying Case, it was not possible to resolve this controversy "before it ripened." This action was filed four days after the judgment was signed in the Underlying Case.

Complaint related to this action, wrote an e-mail to Geraghty, coverage counsel for Arctic Slope and Puget, stating:

> Given the jury findings and judgment in the Texas state court action, *National Union has no duty to your clients, contractual or otherwise.* Should circumstances change, please advise.

(DX 37) (emphasis added). This e-mail follows the standard format National Union uses in a denial of coverage letter as noted from Haller's testimony—a letter denying coverage, but leaving Puget and Arctic Slope with an opportunity to provide additional information. (*See* Haller, 3 C.T. p. 753, 871). In contrast to the October 2004 reservation of rights letter, the April 5, 2005 e-mail from Odenweller unequivocally denied coverage of the claim.[9] Indeed, Arctic Slope and Puget never treated the Odenweller's e-mail as anything but an unequivocal denial of coverage. (*See, e.g.,* Geraghty, 1 C.T. 159-60). As a consequence of this denial of coverage, if the denial is found to be erroneous,[10] Puget and Arctic Slope were freed from the procedural provisions of the Policy and could do whatever was necessary to resolve the claims and judgment against Puget.

---

[9] Haller testified that National Union did not deny coverage of the Underlying Case and that National Union has, in fact, repeatedly reiterated its reservation of rights. (Haller, 3 C.T. 747, 752, 777, 782, 792, 871). National Union asserts that Odenweller's denial of coverage was not authorized. (*Id.* at 747, 801). Regardless of these assertions, this Court finds that the individual National Union hired to represent it as coverage counsel unequivocally denied coverage on its behalf. National Union never provided Arctic Slope and Puget with any information or notice that Odenweller's authority to act on National Union's behalf had been terminated, or that it was or had been unauthorized. Further, at the same time he denied coverage, Odenweller was also representing National Union before this Court in this coverage matter. He was clearly an attorney authorized to speak for National Union at the time in question. Therefore, Arctic Slope and Puget could rely on Odenweller's, and thereby National Union's, unequivocal denial of coverage to avoid the procedural restrictions set out in the Policy.

[10] The case law regarding the effects of a denial of coverage appears to contemplate that only an erroneous denial of coverage prohibits the enforcement of the procedural protections of an insurance policy. *See Enserch Corp. v. Shand Morahan & Co., Inc.,* 952 F.2d 1485, 1496 n.17 (5th Cir. 1992); *McGinnis v. Union Pac. R. Co.,* 612 F. Supp. 2d 776, 811 (S.D. Tex. 2009); *Wilcox v. Am. Home Assur. Co.,* 900 F. Supp. 850, 856 (S.D. Tex. 1995); *Gulf Ins. Co. v. Parker Prods., Inc.,* 498 S.W.2d 676, 679 (Tex. 1973); Allan D. Windt, 2 *Insurance Claims and Disputes* § 9:4 (5th ed. 2009).

3.   *Impact of a Breach of the Duty to Indemnify on the Anti-Assignment Clause*

As part of the settlement agreement reached at mediation, Puget and Arctic Slope assigned their rights under the Policy to Microtherm.  (PX 14 at ¶ 2.13(c)-(d)); (*see* PX 15).   Neither Puget nor Arctic Slope ever sought or obtained National Union's written consent before settling the case and assigning their rights under the Policy to Microtherm.  (Geraghty, 1 C.T. 159-60, 172-73); (Haller, 4 C.T. 778-79).   Condition O of the Policy provides: "Your rights and duties under this policy may not be transferred without our written consent."  (PX 1).   Clearly, if in effect, Puget and Arctic Slope violated this provision of the Policy.

Anti-assignment clauses, such as this one, are routinely enforced under Texas law.  *Conoco, Inc. v. Republic Ins. Co.*, 819 F.2d 120, 123 (5th Cir. 1987); *Tex. Farmers Ins. Co. v. Gerdes*, 880 S.W.2d 215, 218 (Tex. App.—Fort Worth 1994, writ denied).   These clauses are enforceable unless rendered ineffective by an applicable statute, estoppel, waiver, or some other aspect of contract law.  *Johnson v. Structured Asset Servs., LLC*, 148 S.W.3d 711, 721 (Tex. App.—Dallas 2004, no pet.); *see Tex. Dev. Co. v. Exxon Mobil Corp.*, 119 S.W.3d 875, 880 (Tex. App.—Eastland 2003, no pet.).[11]  "In the absence of a successful attack upon an anti-assignment clause, a party is entitled to have the trial court enforce it."  *Johnson*, 148 S.W.3d at 721 (citing *Tex. Pac. Indem. Co. v. Atl. Richfield Co.*, 846 S.W.2d 580, 583 (Tex. App.—Houston [14th Dist.] 1993, writ denied)).

If an anti-assignment clause is enforceable, any purported assignment in violation of the clause is invalid and the assignee may not rely on the assignment document to proceed directly

---

[11] Some jurisdictions permit an insured to assign its rights under an insurance policy if the assignment was made after the insured actually incurs a loss, even though the policy contains an anti-assignment clause. *See, e.g., Antal's Rest., Inc. v. Lumbermens Mut. Cas. Co.*, 680 A.2d 1386, 1388 (D.C. Cir. 1996).  In Texas, however, an insurer may enforce an anti-assignment clause against an assignee regardless of when the assignment occurred. *See, e.g., Conoco, Inc. v. Republic Ins. Co.*, 819 F.2d 120, 123 (5th Cir. 1987).

against the insurer. *Conoco, Inc. v. Republic Ins. Co.*, 819 F.2d 120, 124 (5th Cir. 1987); *Island Recreational Dev. Corp. v. Republic of Texas Sav. Ass'n*, 710 S.W.2d 551, 556 (Tex. 1986) (holding that "any attempted assignment . . . would be of no force or effect.")  Further, Condition H of the Policy provides:

> There will be no right of action against us under this insurance unless:
>
> 1.    You have complied with all the terms of this policy; and
>
> 2.    The amount you owe has been determined with our consent or by actual trial and final judgment.

(PX 1 at Condition H).  A breach of the anti-assignment clause indicates a failure of the insured to comply with "all the terms of the policy."  Therefore, absent a showing that National Union waived or is otherwise estopped from enforcing the anti-assignment clause, the assignment to Microtherm is void and Puget and Arctic Slope are in violation of Condition H, which could possibly bar an action to enforce coverage against National Union.  As discussed above, an erroneous denial of coverage precludes an insurer from enforcing both a "no action" clause and the other procedural requirements of the Policy.  Therefore, if National Union's denial of coverage is erroneous, it has no rights to enforce the anti-assignment clause or invoke the consequences of Condition H.[12]

B.    <u>Collusive Settlement</u>

In addition to asserting a breach of the anti-assignment provision, National Union also contends that the settlement agreement was the product of collusion, thereby voiding coverage for

---

[12] The assignment of Puget's and Arctic Slope's rights under the Policy to Microtherm technically puts Microtherm in the position of the "insured" for the purpose of this coverage trial.  The majority of case law on insurance coverage refers to burdens and issues related to the insured, the insurer, and the victim separately.  The Court believes that referring to Microtherm both as victim/state plaintiff and the "insured by assignment" will become confusing.  Therefore, for clarity and ease, the Court will refer to the insured as Puget and/or Arctic Slope.  Any holding for or against Puget or Arctic Slope as the insured is also a ruling for or against Microtherm, as the assignee of the rights of Puget and Arctic Slope.

either insured under the Policy. The facts of this case simply do not support any collusion prior to or during the formation of the settlement. The Underlying Case was hard fought and there is no evidence that National Union's insureds—Puget, Arctic Slope, or their counsel—solicited or engaged in any attempt to create a collusive settlement.[13] (Geraghty, 1 C.T. 107, 123-26, 154, 165, 178-79)[14]; (Deposition of William Carroll (hereinafter Carroll Dep.) at 11, 24); (Deposition of Steve Bryant (hereinafter Bryant Dep.) at 9-16, 20, 34, 37-38. 46-49, 51); (Deposition of William Wood (hereinafter Wood Dep.) at 9-12); (Deposition of Denman Heard (hereinafter Heard Dep.) at 7); (Deposition of Graig Alvarez (hereinafter Alvarez Dep.) at 11); (Deposition of Alma Upicksoun (hereinafter Upicksoun Dep.) at 21-22); (Sciapli Dep. at 64-66); (Odenweller Dep. at 21-22).

C.   "Legally Obligated to Pay" Provision

National Union further contends that as a result of the covenant not to execute, neither Puget nor Arctic Slope have any amount they are "legally obligated to pay." The Policy only provides coverage for amounts:

> in excess of the Retained Limit that the Insured becomes legally obligated to pay by reason of liability imposed by law or assumed by the Insured under an Insured Contract because of Bodily Injury, Property Damage, Personal Injury or Advertising Injury that takes place during the Policy Period and is caused by an Occurrence happening anywhere in the world.

---

[13] National Union points to several actions by Microtherm's state trial counsel as indicators of collusion in the settlement. Even if these actions could be construed as attempting to create conditions or discussions that could have potentially led to collusion, there is no evidence Puget, Arctic Slope, or its counsel ever made any reciprocal efforts. (Geraghty, 1 C.T. 107, 123-26, 154, 165, 178-79); (Carroll Dep. at 11, 24); (Bryant Dep. at 9-16, 20, 34, 37-38, 46-49, 51); (Wood Dep. at 9-12); (Heard Dep. at 7); (Alvarez Dep. at 11); (Upicksoun Dep. at 21-22); (Sciapli Dep. at 64-66)); (Odenweller Dep. at 21-22).

[14] The letter agreement enabling Arctic Slope to recover some or all its payments made during the settlement was not considered or entered into until weeks after the settlement agreement was reached at the mediation. (Geraghty, 1 C.T. 173-74); (Bryant Dep. 16-18); (PX 363). Therefore, this letter agreement could have had no bearing on whether the settlement agreement was the product of collusion.

14

(PX 1 at Section I).  The settlement agreement stated:

> Upon the final termination of all controversies relating to National Union Fire Insurance Company's coverage obligations, Microtherm
>
> shall execute a Release of Judgment releasing Puget from the unpaid balance, if any, of the Final Judgment.
>
> [] Microtherm covenants not to execute or take any steps or actions to record, enforce or execute against [Arctic Slope], Puget or Puget Mexico with respect to the Final Judgment, Microtherm agreeing to look solely at ASRC and Puget's National Union Fire Insurance Company excess insurance policy and insurer for the remaining balance of the Final Judgment.

(PX 14 at ¶ 2.13(c)-(d)); (*see* PX 15).  The parties to the settlement agreed that "the Consideration is accepted in full settlement of the Controversy and the Lawsuit against [Arctic Slope] and Puget Mexico except as to the claim the parties may have against National Union Fire Insurance Company of Pittsburgh, Pa."  (*Id.* at ¶ 3.6).

The judgment from the Underlying Case has never been released.  (Geraghty, 1 C.T. 168).  Arctic Slope's and Puget's counsel from the Underlying Case viewed the Covenant Not to Execute as a complete release, or if not, could not otherwise state any circumstances under which Arctic Slope or Puget could be required to pay money to Microtherm in relation to the judgment from the Underlying case.  (*See* Wood Dep. at 20-21); (Geraghty, 1 C.T. 169, 175); (Upicksoun Dep. at 71).

There is a split between jurisdictions on the interaction between a covenant not to execute and "legally obligated to pay" language in an insurance policy.  *See Freeman v. Schmidt Real Estate & Ins., Inc.*, 755 F.2d 135, 137 (8th Cir. 1985) (setting out the split among jurisdictions).  Some jurisdictions, like Texas, hold that a covenant not to execute is merely a contract, rather than a release, such that the underlying tort liability remains and a breach of contract action lies if the

15

injured party seeks to collect his judgment. *Id.* Texas courts readily apply covenants not to execute and still allow enforcement of a judgment directly against a non-defending/non-indemnifying insurer, even doing so where the policy contains "legally obligated language." *Enserch Corp.*, 952 F.2d at 1496 n.17. A covenant not to execute against the insured, given by the plaintiff in an underlying suit, does not release the insurance carrier from liability. *Willcox v. Am. Home Assur. Co.*, 900 F. Supp. 850, 856 (S.D. Tex. 1995) (citing *Foremost County Mut. Ins. Co. v. Home Indem. Co.*, 897 F.2d 754, 758 (5th Cir. 1990); *Young Men's Christian Ass'n v. Comm. Standard Ins. Co.*, 552 S.W.2d 497, 504-05 (Tex. Civ. App.—Fort Worth 1977, writ ref'd n.r.e)). "As long as the insured does not act in bad faith or in collusion with the [claimant], the covenant not to enforce adjudged damages against the insured does not bar recovery from the insurer within its policy limits." *Id.* (citing *Enserch Corp.*, 952 F.2d at 1496 n.17; *Whatley v. City of Dallas*, 758 S.W.2d 301, 310 (Tex. App.—Dallas 1988, writ denied). Having found no bad faith or collusion on the part of either Arctic Slope or Puget, the covenant not to enforce does not bar recovery against National Union within its policy limits.

### D. Voluntary Payment

Condition F.4 states that "No Insureds will, except at their own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent." (PX 1). Only a material breach of a voluntary payment provision of an insurance policy voids coverage. *Coastal Ref. & Mktng. v. U.S. Fid. & Guar. Co.*, 218 S.W.3d 279, 294 (Tex. App.—Houston [14th Dist.] 2007, pet. denied) (citing *Hernandez v. Gulf Group Lloyds*, 875 S.W.2d 691, 693 (Tex. 1994)). The insurer must have sustained actual prejudice, as opposed to theoretical or presumed prejudice. *Id.* at 288-89.

16

As part of the consideration for the settlement agreement, Arctic Slope paid $2 million to Microtherm, even though Arctic Slope had not been found liable to Microtherm in the Underlying Case. (Geraghty, 1 C.T. 166-67). National Union asserts that this payment materially breached the "no voluntary payment" provision.  National Union asserts it was prejudiced by this payment because: (1) since Arctic Slope was not found liable to Microtherm, the payment created an otherwise non-existent obligation on which to seek payment from National Union; (2) the payment led to a collusive settlement; and (3) the payment led to the settlement, which included a waiver of appeal, that deprived National Union of its right to appeal under the Policy.

All of the testimony related to the $2 million payment indicates that the payment was made on behalf of Puget, treated as a Puget liability, and was never apportioned to Arctic Slope. (Geraghty, 1 C.T. 176-77); (Upicksoun Dep. at 46-47, 50).[15]  The trial record therefore does not support National Union's contention that Arctic Slope assumed any obligation by virtue of this payment. With regard to furthering the collusion, as set out above, there was no collusive settlement in this action.

With respect to the deprivation of National Union's right to appeal, trial counsel for Arctic Slope and Puget had indicated they had several strong bases for rendition on appeal. (Haller, COV3, p. 764-67); (PX 52); (DX 32).  The compromise settlement agreement, however, of which Arctic Slope's $2 million payment was part of the consideration, included an agreement and covenant

---

[15] The settlement agreement stated that the payment was made by or on behalf of Arctic Slope, Puget, and Puget Mexico.  (PX 14 at ¶ 2.13).  Indeed, there is much merit to the argument that the payment would satisfy the requirement of a payment of the self-insured retained limit for the policy year that Wausau did not cover Puget.  This argument is somewhat diminished by the agreement entered into after the settlement was in effect that Microtherm would repay the monies from any recovery against National Union.  (PX 363).  Given this Court's ruling with respect to the lack of any prejudice caused by the voluntary payment, and the remainder of the pertinent rulings, it is unnecessary to resolve this disagreement.

among the parties to the settlement "not to file a notice of appeal in connection with the Final Judgment or any interlocutory orders or summary judgments, or any post-verdict and post-judgment orders in the Lawsuit . . . ." (PX 14 at ¶ 2.13). National Union received notification of the covenant not to appeal within two weeks of the mediation, prior to the deadline to perfect an appeal. (Haller, 4 C.T. 780, 853); (Geraghty, 1 C.T. 168).

In Texas, an insurer may intervene in litigation on appeal to vindicate important rights under the theory of equitable virtual-representation. *See In re Lumbermens Mut. Cas. Co.*, 184 S.W.3d 718, 724 (Tex. 2006). The insurer is deemed to be a party to litigation if it will be bound by the judgment, its privity of interest appears from the record, and there is an identity of interest between the litigant and a named party to the judgment. *Id.* at 722 (citing *Motor Vehicle Bd. of Tex. v. El Paso Indep. Auto. Dealers Ass'n*, 1 S.W.3d 108, 110 (Tex. 1999)). The doctrine recognizes that often, if not always, the interests between the intervenor and the party will have diverged to some extent by the time the beneficiary of the doctrine invokes it. *Id.* at 724. Whether a would-be intervenor is entitled to appeal under the virtual-representation doctrine is an equitable determination that must be decided on a case-by-case basis. *Id.* at 729.

*In re Lumbermens* involved the attempted intervention by an insurer in an appeal initially brought by an insured. *Id.* at 720-22. The insured entered into an agreement pursuant to Texas Rule of Civil Procedure 11 (a "Rule 11 agreement") with the injured party settling a pending breach-of-contract suit, which waived the insured's right to appeal a potentially dispositive choice-of-law decision made by the state trial court. *Id.* at 722. The liability insurer sought to intervene to challenge the choice of law on appeal. *Id.* at 722. The Supreme Court of Texas held that as a virtually represented party (by virtue of having posted a supersedeas bond), the liability insurance

company was entitled to intervene in the appeal and raise the choice-of-law matter that the insured had abandoned. *Id.* at 729.

The principles set out in *Lumbermens* are applicable to this case. The waiver of appeal by Puget and Arctic Slope did not prohibit National Union from seeking to intervene and bring an appeal of the decision on the insureds' potentially meritorious arguments. By posting a supersedeas bond and taking up defense of the appeal, National Union would have been entitled to intervene to take Puget's and Arctic Slope's appeal to the Thirteenth Court of Appeals and beyond. Neither the $2 million payment nor the waiver of appeal affected this right. National Union has not shown it was materially prejudiced by the voluntary payment, and neither National Union's duties under the Policy nor coverage for the payment were voided by the payment.

E.    Multiple Occurrences

While primarily asserting that Puget's improper molding of the chambers is not an "occurrence" under the Policy, National Union also asserts that, should Puget's actions be construed as an "occurrence", Microtherm's injuries and Puget's liability were the product of multiple "occurrences" as that policy term is defined under the applicable case law. Should there be multiple "occurrences" under the Policy, this would affect whether Puget and Arctic Slope exhausted all of their underlying insurance/self-insured retention limits and ultimately the total amount of coverage for which National Union could be liable.[16]

_____

[16] The Wausau policy only covered Puget between July 1, 2000 and July 1, 2001. (PX 7). Puget had no primary insurance between July 1, 2001 and July 1, 2002 and was therefore subject to the self-insured retention limit of $1 million per occurrence with no aggregate limit during that period as set out in the National Union Policy. (*See* PX 1). Because there were approximately 800 Puget chamber failures between 2001 and 2002, a finding of multiple "occurrences" pursuant to National Union's argument set out above has the practical effect of holding Puget had a self-insured retention of approximately $800 million. While this practical effect has no bearing this Court's resolution of the legal issue of whether there were multiple occurrences, the Court notes that such a result may not have been what any party contemplated when the Policy was formed.

19

Texas law uses a "cause" analysis to determine whether a set of facts involves one or more "occurrences". *Lennar Corp. v. Great Am. Ins. Co.*, 200 S.W.3d 651, 682 (Tex. App.—Houston [14th Dist.] 2006, pet. denied) (citing *Ran-Nan, Inc. v. Gen. Accident Ins. Co. of Am.*, 252 F.3d 738, 740 (5th Cir. 2001)). The proper focus is on "the number of events that cause the injuries and give rise to the insured's liability, rather than the number of injurious effects." *Id.*; *see also U.E. Texas One-Barrington, Ltd v. Gen. Star. Indem. Co.*, 332 F.3d 274, 277 (5th Cir. 2003). A single occurrence may result in multiple injuries to multiple parties over a period of time. *H.E. Butt Grocery Co. v. Nat'l Union Fire Ins. Co.*, 150 F.3d 526, 534 (5th Cir. 1998). "[I]f one cause is interrupted and replaced by another intervening cause, however, the chain of causation is broken and more than one occurrence has taken place." *Id.*; *see also* Allan D. Windt, *Insurance Claims and Disputes* § 11:24 (5th ed. 2009) ("The critical question . . . is whether the damages all resulted from one continuing source/cause."). "Most courts have, on that basis, held that there is a single occurrence when multiple claims have arisen from the policyholder's manufacture and sale of the same product to many customers." *Id.*; *see also, e.g., Associated Indem. Corp. v. Dow Chemical Co.*, 814 F. Supp. 613, 621 (E.D. Mich. 1993); *Sting Sec., Inc. v. First Mercury Synd., Inc.*, 791 F. Supp. 555, 560 (D. Md. 1992); *Uniroyal, Inc. v. Home Ins. Co.*, 707 F. Supp. 1368, 1383 (E.D.N.Y. 1988); *Owen-Illinois, Inc. v. Aetna Cas. & Sur. Co.*, 597 F. Supp. 1515, 1527 (D.D.C. 1984); *Bartholomew v. Ins. Co. of N. Am.*, 502 F. Supp. 246, 252 (D.R.I. 1980); *Cargill, Inc. v. Liberty Mut. Ins. Co.*, 488 F. Supp. 49, 53 (D. Minn. 1979).

Where courts have found that the distribution of a defective product yields multiple occurrences, the determinative factor has been the "number of causal events, not the number of claims or claimants." *Sting Sec. Inc.*, 791 F. Supp. at 560 (citing *Michigan Chem. Corp. v. Am.*

*Home Assur. Co.*, 728 F.2d 374, 382-83 (6th Cir. 1984)); *see, e.g.*, *U.E. Texas One-Barrington, Ltd v. Gen. Star. Indem. Co.*, 332 F.3d 274, 277 (5th Cir. 2003) (finding separate occurrences for leaks underneath separate buildings); *Maurice Pincoffs Co. v. St. Paul Fire & Marine Ins. Co.*, 447 F.2d 204, 205-06 (5th Cir. 1971) (finding eight separate occurrences when company distributed, but did not itself contaminate, contaminated bird seed to eight distributors); *Fina, Inc. v. Travelers Indem. Co.*, 184 F. Supp. 2d 547, 552 n.9, 552-53 (N.D. Tex. 2002) (finding single occurrence for multiple employees exposed to asbestos at same the facility at roughly the same time, but separate occurrences for each facility at which employees were exposed to asbestos); *Lennar Corp.*, 200 S.W.3d at 682 (finding separate occurrences each time Lennar applied defective EIFS to homes, when Lennar did not design or manufacture EIFS).

While the Fifth Circuit and Texas courts have consistently looked to the "events that cause the injuries and give rise to the insured's liability," the recent Fifth Circuit analysis distinguishing between single and multiple occurrences has blurred the level of generality at which a court should view the causal events. *Compare U.E. Texas One-Barrington, Ltd.*, 332 F.3d at 278 (declining to look to "any overarching cause" in finding pipe leakage in separate buildings was separate occurrences even though all the pipes were installed using the same faulty materials), *with Snelling & Snelling, Inc. v. Fed. Ins. Co.*, 205 Fed. Appx. 199, 2005 (5th Cir. 2006) (holding that the destruction of the two World Trade Center Towers by separate planes at different times was a single occurrence because they were part of a single terrorist attack). While recent precedent arguably has blurred the otherwise clear precedent related to manufacturing defects, the Court finds that the most intuitively plausible "cause" of Puget's liability, at least for insurance "occurrence" purposes, was

its improper molding of the chambers resulting in Microtherm's injuries.[17]  This improper molding

constitutes a single occurrence under the Policy.  This conclusion is consistent with the Texas (and

nationwide) precedent supporting the finding of a single occurrence when liability stems from a

manufacturer's defects.

IV.    "OCCURRENCE"

     A.    Proof of an Occurrence

The Policy only provides coverage for Property Damage "caused by an Occurrence . . . ."

(PX 1 at Coverage).  With respect to Property Damage, the Policy defines an "occurrence" as:

> an accident, including continuous or repeated exposure to conditions,
> which results in Bodily Injury or Property Damage neither expected
> nor intended from the standpoint of the Insured.  All such exposure
> to substantially the same general conditions shall be considered as
> arising out of one Occurrence.

(*Id.* at Definition H).  In this case, the Fifth Circuit noted on appeal the "occurrence" definition has

two aspects and that "an insured's conduct is an occurrence if it: (1) qualifies as an accident and (2)

results in harm that the insured did not expect or intend."  *Nat'l Union Fire Ins. Co. of Pittsburgh,*

*Pa. v. Puget Plastics Corp.*, 532 F.3d 398, 401-02 (5th Cir. 2008).  Since the Policy does not define

what constitutes an "accident", the Fifth Circuit interpreted the term in accordance with its generally

accepted or commonly understood meaning.  *Id.* at 402 (citing *Lamar Homes, Inc. v. Mid-Continent*

*Cas. Co.*, 242 S.W.3d 1, 8 (Tex. 2007)).  Deliberate acts may constitute an "accident" unless: "(1)

the resulting damage was 'highly probable' because it was 'the natural and expected result of the

---

[17] As discussed later in this opinion, the Underlying Case included a significant amount of evidence about delays and defaults in Puget's production of chambers.  These damages were not "Property Damage" as defined by the Policy.  As the Policy premises an "Occurrence" on the existence of "Property Damage", these delay damages cannot be the subject of an "Occurrence" under the Policy.  (*See* PX 1 at Definition H).

insured's actions,' (2) 'the insured intended the injury,' or (3) the insured's acts constitute an intentional tort, in which case, the insured is presumed to have intended the injury." *Id.* (citing *Lamar*, 242 S.W.3d at 8-9). While there was a factual dispute in the Underlying Case as to why Puget committed the act in question, there is no dispute that Puget acted deliberately when it molded the Zytel nylon below the DuPont recommended melt temperature. The Fifth Circuit concluded "[i]n sum, [Puget] cannot recover under the Policy if: (1) the injury to Microtherm was highly probable, (2) Puget intended or expected the injury inflicted on Microtherm, or (3) Puget committed an intentional tort." *Id.*[18]

This final conclusion does more than simply define "accident". By using the phrase "cannot recover", the Fifth Circuit incorporated both aspects of the "occurrence" definition, that is, both the "accident" and "neither expected nor intended from the standpoint of the Insured" aspects, into a three-scenario test for what constitutes a non-occurrence.[19] In essence, the Fifth Circuit simplified the entire "occurrence" definition into three specific "non-occurrence" scenarios. Therefore, under the Policy, Puget's deliberate actions are not an "occurrence" if: (1) the injury to Microtherm was highly probable, (2) Puget intended or expected the injury inflicted on Microtherm, or (3) Puget committed an intentional tort, in which case the intent to harm Microtherm would be presumed.

Finding that the Fifth Circuit set out three "non-occurrence" scenarios implicates the next

---

[18] The jury in the Underlying Case made a positive fraud finding, but Microtherm elected not to pursue this cause of action and the state court did not include this finding in the final judgment. The judgment in the Underlying Case did not otherwise involve a finding of any other tort which could be described as intentional. That being the case, this Court will not discuss the intentional tort scenario as it is not applicable.

[19] The Fifth Circuit's conclusion must have incorporated the second part of the "occurrence" definition, i.e., whether the "injury was expected or intended from the standpoint of the Insured" into these three scenarios. Otherwise, the Fifth Circuit could not have held that coverage could be denied solely upon a finding of one of three "non-occurrence" scenarios it set out in its conclusion.

critical question—whether those scenarios involve an objective or subjective standard. Puget contends that they all involve a subjective standard, while National Union asserts the "highly probable" scenario must use an objective standard. Applying a subjective standard to the "highly probable" non-occurrence scenario would require a determination that Puget knew the injury inflicted on Microtherm was highly probable. Such an interpretation would leave little, if any, difference between the first two non-occurrence scenarios set out by the Fifth Circuit. In other words, since the acts were, by definition, intentional, there would be no discernible distinction between whether: (a) Puget knew that the injury to Microtherm was highly probable and (b) Puget intended or expected the injury inflicted on Microtherm. Creating two subjective tests using different but almost identical standards cannot have been the Fifth Circuit's intention.

The Fifth Circuit's opinion instead repeatedly distinguished between "what Puget intended" and "whether the injury was highly probable," indicating each independent scenario would be a non-occurrence. *See Puget Plastics*, 132 F.3d at 402 ("The jury made no determination as to: (1) whether Puget intended or expected the harm Microtherm ultimately suffered, or (2) whether this harm was highly probable. . . . [there is] a genuine issue of material fact as to whether Puget expected the chambers to rupture, or whether the ruptures were highly probable."). Because it would not make sense to read the Fifth Circuit's opinion as requiring a subjective standard for the "highly probable" non-occurrence scenario,[20] the Court shall use an objective standard with respect to its determination

---

[20] The Texas case law forming the basis of the "highly probable" scenario also supports the use of an objective standard. In *Lamar Homes, Inc. v. Mid-Continent Cas. Co.*, the Supreme Court of Texas held:

> an injury is accidental if "from the viewpoint of the insured, [it is] not the natural and probable consequence of the action or occurrence which produced the injury; or in other words, the injury could not reasonably be anticipated by the insured *or would not ordinarily follow from the action or occurrence which caused the injury*."

24

of whether the injury was "highly probable." With respect to whether the injury was highly probable, Puget therefore bears the burden of proving that, given the circumstances surrounding Puget's molding of the chambers, a similarly-situated reasonable person would not have known the injury to Microtherm was highly probable. *See Puget Plastics*, 532 F.3d at 401 (citing *W. Alliance Ins. Co. v. N. Ins. Co. of N.Y.*, 176 F.3d 825, 831 (5th Cir. 1999) ("In Texas, the insured carries the burden to establish the duty to indemnify by presenting facts sufficient to demonstrate coverage.")

The Fifth Circuit expressly stated that this Court may need to make factual findings concerning whether Puget intended or expected the injury suffered by Microtherm, or whether this injury was highly probable. *Puget Plastics*, 532 F.3d at 404. The Court now sets out its findings of fact with respect to these issues. These findings require the Court to delve into the world of plastic injection molding and the mindset of a reasonable molder.[21] This analysis requires an initial

---

242 S.W.3d 1, 8 (emphasis added) (citing *Mid-Century Ins. Co. v. Lindsey*, 997 S.W.2d 153, 155 (Tex. 1999) (quoting *Republic Nat'l Life Ins. Co. v. Heyward*, 536 S.W.2d 549, 557 (Tex. 1976)). The court noted that "foreseeability" was not "the boundary between accidental and intentional conduct." *Id.* It also clearly incorporated an objective standard by its use of the phrase "would not ordinarily follow from the action or occurrence which caused the injury." *Id.* The *Lamar* court then clarified its prior decision in *Lindsey* holding that:

> a claim does not involve an accident or occurrence when either direct allegations purport that the insured intended the injury (which is presumed in cases of intentional tort) *or circumstances confirm that the resulting damage was the natural and expected result of the insured's actions, that is, was highly probable whether the insured was negligent or not.*

*Id.* at 9 (emphasis added) (internal citations omitted). The use of the terms "circumstances" and "natural and expected result" in defining a court's analysis of whether the injury was "highly probable" support the use of evidence beyond the insured's own knowledge, thoughts, and intentions. These terms support the use of an objective standard in association with the "highly probable" standard.

[21] As part of their arguments regarding the Policy's "occurrence" language, the Defendants assert that, for the purpose of determining whether Puget intended or expected the injury, or whether the injury was "highly probable," the intent and actions of Puget's employee-molders cannot be attributed to Puget the employer. In Texas, "the general rule is that an employer may be held accountable for the wrongful act of his employee committed while acting in his employer's business and within the scope of his employment, although he had no knowledge thereof or had even expressly forbidden it." *Med. Slenderizing, Inc. v. State*, 579 S.W.2d 569, 574 (Tex. Civ. App—Tyler 1979, writ ref'd n.r.e). The jury in the Underlying Case clearly followed this general rule, finding Puget liable for

examination of the general responsibilities and knowledge of a reasonable molder.  Then the Court

must review how these responsibilities affected the particular processing parameters Puget used or

should have used to mold parts for Microtherm.  Lastly, the Court must determine the intended,

expected, or highly probable effect of Puget's actions.

> B.    Division of Responsibilities between Puget as Molder and Microtherm as Customer

Simply put, plastic injection-molding involves the transformation of solid plastic pellets into

molded parts.  (Chuck Fletcher[22] ("Fletcher"), 29 T.T. 79); (Dr. Maureen Reitman[23] ("Reitman"), 5

C.T. 884).  The customer should initially verify that the plastic to be used, here the nylon Zytel

77G33, and the design of the mold tool are suitable for the intended use of the product to be molded.

(Stanley Drye ("Drye")[24], 31 T.T. 52-53, 61); (Dr. Tim Osswald[25] ("Osswald"), 28 T.T. 40); (Leeroy

---

knowingly making false representations, engaging in unconscionable acts, and breaching express and implied warranties.  Puget's employees' actions, made in the scope of their employment, may be attributed to Puget for the purpose of resolving whether Puget intended or expected the harm to Microtherm or whether the injury was highly probable.  Microtherm's reliance on *King v. Dallas Fire Insurance Company*, 85 S.W.3d 185 (Tex. 2002) is misplaced, as the case is inapplicable to the specific facts, to the verdict in the Underlying Case, and to the determination of indemnity coverage in this coverage action.  Furthermore, such an argument is directly opposite to the position Microtherm took in the Underlying Case.

[22] Chuck Fletcher was an employee of Puget, and was the process engineer responsible for setting the processing parameters that would be used to mold the chambers.  (Fletcher, 29 T.T. 78-86).  While not formally educated as an engineer or molder, he has been molding plastics since approximately 1982. (*Id.*)  During his career in plastics molding, he has been responsible for all aspects of the processing and molding of plastic parts, including the supervision and quality control of such processes. (*Id.*)

[23] Dr. Maureen Reitman is a material and polymer/plastics scientist and the leader of the National Polymers Group at Exponent.  (Reitman, 5 C.T. 883-893).  She is an expert in the field of plastic injection molding and the failure analysis of faulty molded plastics. (*Id.*)

[24] Stanley Drye is a plastics injection molder at UPG's facility in Houston, Texas.  (Drye, 31 T.T. 7-62).  He has been molding plastics parts since 1983 and is familiar with molding the chambers at issue and processing Zytel 77G33. (*Id.*)

[25] Dr. Tim Osswald is a professor of polymer/plastics engineering and mechanical engineering at the University of Wisconsin in Madison.  (Osswald, 27 T.T. 28-35).  He is an expert in the materials science and engineering processes underlying of plastic injection molding. (*Id.*)

Dangel[26] ("Dangel"), 42 T.T. 179); (Thomas Boyer [27] ("Boyer"), 37 T.T. 186, 194); (David Seitz[28]

("Seitz"), 25 T.T. 96).  To that end, the customer should instruct the molder on the part to be made,

its in-use application, and any quality expectations for the molded part.  (Fletcher, 29 T.T. 155);

(Reitman, 5 C.T. 941, 944, 946); (Osswald, 28 T.T. 40).

The molder must then determine if it has the capability of molding the product in such a way

as to meet the customer's specifications while maintaining the physical and mechanical properties

of the selected nylon. (Drye, 31 T.T. 23, 52-53, 61); (Osswald, 28 T.T. 40, 42); (Deposition of Dr.

Tim Osswald, April 7, 2009 (hereinafter Osswald Dep. (2009)) at 57-58); (Deposition of Dr. Tim

Osswald, April 29, 2004 (hereinafter Osswald Dep. (2004)) at 198); (Dangel, 42 T.T. 179); (Boyer,

37 T.T. 186, 194); (Seitz, 25 T.T. 96); (Reitman, 5 C.T. 890, 941, 946); (Sara Reynoso[29]

("Reynoso"), 29 T.T. 27-28); (Fletcher, 29 T.T. 149-50).  Upon accepting a job, the molder is

responsible for: (a) having an in-depth knowledge of the nylon to be processed, (Osswald Dep.

(2009) at 55), (Reynoso, 29 T.T. 51-52); (b) recognizing whether the product to be produced is

structural or cosmetic, (Dangel, 42 T.T. 196); (Drye, 31 T.T. 21-22); (Osswald Dep. (2004) at 86);

and (c) setting up processing conditions that will maintain the integrity of the molded part, (Fletcher,

---

[26] In November 2000, Leeroy Dangel was a production manager for UPG's facility in Gladewater, Texas and was responsible for developing the proper processing parameters for molding the chambers for Microtherm. (Dangel, 42 T.T. 162-64).  He has been working in plastic injection molding since 1987.  (*Id.*)

[27] During the pertinent period, Thomas Boyer was a DuPont Field Technical Support Representative. (Boyer, 37 T.T. 104-07).  He has extensive experience in plastic injection molding.  (*Id.*)

[28] David Seitz is the president and founder of Microtherm.  (Deposition of David Seitz, Apr. 20, 2004 (hereinafter Seitz Dep. (Apr. 2004)) at 45-50).  In that capacity, he has become familiar with plastic injection molding process and the processing conditions necessary to mold the plastics parts incorporated into the Seisco water heater.

[29] Sara Reynoso is a chemical engineer and Dupont's Technical Leader for Latin America for Industrial Polymers/Plastics.  (Reynoso, 28 T.T. 65-66).  In her work with Dupont, she visited production plants such as Puget to troubleshoot and resolve problems regarding the processing and molding of DuPont nylons.  (*Id.*)

29 T.T. 81); (Drye, 31 T.T. 46); (Osswald Dep. (2009) at 68); (Boyer, 37 T.T. 193); (Dangel, 42 T.T. 163); (Reitman, 5 C.T. 942).

C.      Microtherm's Stress Tests of Chambers

In the 1990s, after consultation with Dr. Walter Bradley[30] ("Bradley"), Microtherm selected the DuPont nylon Zytel 77G33 for use in molding the plastic water chambers. (Bradley, 11 T.T. 21, 25); (Seitz, 14 T.T. 19-20, 46). Zytel 77G33 is a glass-fiber reinforced nylon with the appropriate mechanical and physical properties for the intended pressurized, hot-water use of the chambers. (Linda Malone[31] ("Malone"), 33 T.T. 24); (Deposition of Linda Malone (hereinafter Malone Dep.) at 21); (Osswald, 28 T.T. 39); (Osswald Dep. (2004) at 32-33); (Deposition of Sara Reynoso (hereinafter Reynoso Dep.) at 11); (Reitman, 5 C.T. 894-95). Dr. Bradley molded chambers out of Zytel and ran accelerated stress tests on the chambers to simulate the conditions the chambers would experience in the home.[32] (Bradley, 11 T.T. 21-22). These tests verified the suitability of Zytel for molding the chambers and concluded that the chambers should only succumb to fatigue-based stress after 10 to 15 years. (Bradley, 11 T.T. 25-27, 32-33); (see Reitman, 5 C.T. 939); (Seitz, 3 C.T. 542); (Osswald, 28 T.T. 38-39).

---

[30] Dr. Bradley is an expert in the field of plastics engineering and has been employed as a professor of mechanical, polymer/plastics, and metallurgical engineering since 1968. (Bradley, 11 T.T. 12-21). He has also worked as a consultant with Materials Performance in these fields from approximately 1989 to 2000. (Id.)

[31] Linda Malone is an expert with respect to the molding and processing of Zytel 77G33. (See Malone, 33 T.T. 17-21). In her position as a DuPont Technical Consultant and Product Specialist, she was responsible for running testing programs concerning Zytel 77G33 and instructing DuPont sales representatives concerning the attributes of the nylon. (Id.)

[32] DuPont recommends that customer using a product molded out of one of its nylons should test its product and the selected nylon in the intended end-use environment to verify that the nylon will be acceptable for the intended application. (Malone Dep. at 79-80, 97); (see Osswald Dep. at 198).

D.    Processing Conditions

The nylon pellets used in injection molding must be melted prior to injection. (Reitman, 5 C.T. 889).  After being fed into the barrel of the injection-molding machine, a screw pushes the pellets forward as heater bands along the barrel attempt to heat the pellets into a fully molten, viscous liquid that can be injected into the mold tool. (*Id.* at 900-02).  The molder must select the proper combination of processing conditions to ensure the nylon has reached the proper melt prior to injection. (*Id.* at 903).

The primary processing conditions are melt temperature and injection pressure.  (Osswald Dep. (2009) at 16, 134); (Drye, 31 T.T. 48); (William Hines[33] ("Hines"), 36 T.T. 74); (Bradley, 11 T.T. 35, 102-03); (Reitman, 5 C.T. 966).  Secondary processing conditions include the temperature of the mold tool and the injection speed.  (Osswald Dep. (2009) at 134); (Reynoso, 28 T.T. 98); (Fletcher, 29 T.T. 79).  A molder typically does a few trial molding runs to determine the appropriate process parameters for the part to be molded.  (Reitman, 5 C.T. 942).  A process engineer then writes out the parameters that will be followed by the molder's operators when producing parts.  (Reynoso, 29 T.T. 148).  The molder must then inspect and monitor the production process to ensure the molder is continuing to produce quality parts. (Osswald Dep. (2009) at 109).

---

[33] William Hines is an engineer employed by DuPont as Manager of Special Projects.  (Hines, 36 T.T. 73-74).  In this capacity he was familiar with both DuPont's business arrangements with Microtherm and the processing conditions associated with Puget's molding of the chamber.

E.    Melt Temperature

The melt temperature of the nylon, i.e., the temperature of the nylon as it is injected from the nozzle into the mold, is the most important processing factor.[34] (Drye, 31 T.T. 48); (Hines, 36 T.T. 74); (Bradley, 11 T.T. 35, 102-03, 116); (Osswald Dep. (2009) at 16).  If the melt temperature is too low, the nylon pellets will not have reached a uniform melt prior to injection and will also be prone to re-crystallizing prematurely after being injected into the mold. (Osswald, 27 T.T. 68); (Osswald Dep. (2009) at 195); (Malone, 33 T.T. 39); (Bradley, 11 T.T. 104).  Since it is difficult for a molder to obtain a precise melt temperature, the nylon manufacturer provides a recommended range of melt temperatures for a particular nylon. (Bradley, 11 T.T. 72).  In formulating this recommended range, the nylon manufacturer takes into account that the nylon needs to reach a uniform melt prior to injection.   (Reitman, 5 C.T. 933).  The recommended range is also associated with the standard mechanical properties for the nylon that can be expected of a product molded using temperatures in that range. (Bradley, 11 T.T. 105); (Drye, 31 T.T. 25); (Fletcher, 29 T.T. 156).  Staying within the recommended range for the chamber part leads to a stronger part in terms of physical properties and mechanical properties.  (Drye, 31 T.T. 27, 46).

A molder can process the nylon at a melt temperature below the recommended range, to a certain degree, by adjusting the other processing conditions.  (Drye, 31 T.T. 47); (Osswald Dep.

---

[34] The melt temperature is the cumulative effect of the heat introduced by heater bands around the barrel and the shear heat produced as the screw moves the nylon moves along the barrel toward the injection nozzle. (Bradley, 11 T.T. 116).  The heater bands are the primary means of introducing the heat that will melt the nylon pellets. (Reitman, 5 C.T. 990).  The temperature of each heater band is set individually, but the temperature of the heater band is not a direct measurement of the temperature of the nylon as in passes through the barrel.  (Bradley, 11 T.T. 105-06); (Reynoso Dep. at 55-56); (Reitman, 5 C.T. 901); (Drye, 31 T.T. 36); (Osswald, 27 T.T. 58). Secondary to the heater bands, the pressure and speed of the screw pushing the nylon forward toward the nozzle adds up to 20°F to 26°F to the melt temperature.  (Bradley, 11 T.T. 114-16); (Osswald, 31 T.T. 108); (Reitman, 5 C.T. 901-02, 990, 1001).

(2004) at 72, 98); (Boyer, 37 T.T. 193); (Osswald Dep. (2009) at 194-95); (Reynoso, 28 T.T. 97);

(Deposition of William Hines, Apr. 23, 2009 (hereinafter Hines Dep. (2009)) at 68-69); (Hines, 36

T.T. 105). The greater the deviation from the recommended range, however, the more difficult it

is for the molder to compensate for the low melt temperature. (Bradley, 11 T.T. 73, 102); (Osswald

Dep. (2009) at 33); (Fletcher, 29 T.T. 130). A molder can go 5°F to 20°F below the recommended

range for the melt temperature and compensate with other process parameters. (Osswald Dep.

(2004) at 98); (Osswald Dep. (2009) at 33, 209-10); (Reitman, 5 C.T. 954, 967); (Reynoso, 28 T.T.

82, 98, 101-02). If the molder lowers the melt temperature too much, no combination of other

processing parameters will enable the molder to obtain a proper melt of the nylon before injection.

(Reitman, 5 C.T. 966);  (Osswald Dep. (2004) at 68); (Bradley, 11 T.T. 73); (Osswald, 28 T.T. 12).

Molding at such low melt temperatures affects the mechanical properties and the integrity of the

molded part, resulting in: (1) a lack of proper fusion at the weld line[35], resulting in defects and

cracks[36] along the weld line, (Bradley, 11 T.T. 35, 102); (Osswald Dep. (2009) at 16, 171, 173),

---

[35] The weld line is a critical region in a molded plastic part formed when two flow fronts of nylon come together during the molding process. (Drye, 31 T.T. 28); (Bradley, 11 T.T. 41); (Osswald Dep. (2009) at 13, 19). The melted nylon cools as it passes through the mold, resulting in the flows being at their lowest temperature when they reach the weld line. (Bradley, 11 T.T. 41, 45); (Osswald, 27 T.T. 40). Even when a molder follows the proper molding procedures, since the nylon is at a lower temperature at the weld line, the weld line lacks the same mechanical properties as the rest of the mold and is the weakest point in a plastic part. (Bradley, 11 T.T. 39-40); (Osswald, 28 T.T. 8, 20-21); (Osswald Dep. (2009) at 18-19). A molder must therefore process the nylon in such a way as to maximize the mechanical properties and strength at the weld line. (Reitman, 5 C.T. 906); (Drye, 31 T.T. 95);  (Reynoso, 28 T.T. 82); (Osswald Dep. (2009) at 26, 135); (Osswald, 28 T.T. 23-24); (Osswald Dep. (2004) at 38).   Low melt temperatures weaken weld lines beyond their normal status as the weakest part of a molded product. (Osswald Dep. (2009) at 19-20); (Reitman, 5 C.T. 960).

[36] A crack in a wet environment will absorb water and swell, making the crack worse. (Malone, 33 T.T. 44). Hot water speeds up this problem. (*Id.* at 45) The chambers were obviously exposed to a hot water environment.

(Osswald, 27 T.T. 27, 46, 49, 55, 68-69), (Clinton Hanes[37] ("Hanes"), 37 T.T. 21); (Reitman, 5 C.T. 908); (2) a loss of the standard mechanical properties of the chosen nylon, affecting the integrity of the molded part, (Drye, 31 T.T. 27-28); (Deposition of William Hines, Mar. 30, 2004 (hereinafter Hines Dep. (Mar. 2004) at 318); (Fletcher, 29 T.T. 107, 136); (Osswald, 27 T.T. 27, 41, 46-47, 49, 68-69); (Deposition of Tony Mendoza[38] ("Mendoza") (hereinafter Mendoza Dep.) at 101); (3) poor flow of the nylon through the mold leading to poor packing of nylon molecules and decreased strength at the weld line; (Drye, 31 T.T. 25-26); (Hines Dep. (Mar. 2004) at 387-388); (Reynoso Dep. at 52); (Osswald Dep. (2004) at 109); and (4) the injection of unmelted nylon into the mold, which creates major stress factors; (Osswald, 27 T.T. 42, 66); (Reynoso, 28 T.T. 78, 82); (Malone, 33 T.T. 39-40); (Hanes, 36 T.T. 267); (Reitman, 5 C.T. 935).  The use of low melt temperatures with glass fiber-reinforced nylons creates two additional problems, as the poor melt also results in: (5) the improper alignment of the reinforcing glass fibers at the weld line; (Malone, 33 T.T. 39, 41); (Reitman, 5 C.T. 906); (Malone Dep. at 126); (Hanes, 36 T.T. 253-54); (Bradley, 11 T.T. 38-39, 41); (Osswald, 28 T.T. 43); (Osswald Dep. (2009) at 32); and (6) the glass fibers not crossing the weld line, leaving an empty seam.  (Reitman, 5 C.T. 906); (Malone Dep. at 132-33); (Osswald, 28 T.T. 36-37); (Hanes, 36 T.T. 253-54).  Overall, a molder knows that molding at low melt temperatures will make it highly probable there will be weak weld lines and cracks in the part, ultimately leading to premature part failure.  (Reitman, 5 C.T. 919, 936); (Malone Dep. at 143-44); (Osswald Dep.

---

[37] Clinton Hanes is a consultant on plastics production, tooling, and injection molding with Stress Engineering.  (Hanes, 36 T.T. 239-41).  In the Underlying Case, Hanes testified as an expert for Puget after conducting a stress analysis and computer analysis of Puget's molding processes.  (*Id.* at 245).

[38] Tony Mendoza has designed and manufactured mold tools for use in plastic injection molding since 1974.  (Mendoza, 37 T.T. 201-02).  He consulted with Seitz and later Puget regarding the design and repair of the chamber mold tool.

(2009) at 18, 63, 67, 171, 173, 199, 205); (Osswald Dep. (2004) at 154); (Osswald, 28 T.T. 48); (Bradley, 11 T.T. 51-52, 105).

Given the potential serious consequences of molding at lower melt temperatures, when a molder decides to use a melt temperature below the recommended range, it should verify that the deviation in temperature will not compromise the integrity of the molded product. (Osswald, 28 T.T. 41); (Osswald Dep. (2009) at 33, 65, 196); (Mendoza Dep. at 156). The molder must experiment and validate the proposed deviation to determine the whether it can obtain right combination of processing conditions. (Deposition of Chuck Fletcher (hereinafter Fletcher Dep.) at 223); (Deposition of William Hines, Jan. 28, 2004 (hereinafter Hines Dep. (Jan. 2004) at 103); (Reitman, 5 C.T. 940); (Hines Dep. (2009) at 69).

F.    DuPont's Recommend Melt Temperature Range for Zytel

DuPont's recommended range of melt temperatures for Zytel 77G33 is 536°F to 581°F, with 554°F being the ideal melt temperature to obtain Zytel's optimal mechanical properties. (Osswald Dep. (2004) at 94); (Bradley, 11 T.T. 48, 72); (Reynoso, 28 T.T. 82, 97); (Drye, 31 T.T., 24); (Malone Dep. at 119). To obtain these melt temperatures, DuPont recommends using barrel temperatures between 510°F and 560°F. (Hines Dep. (Jan. 2004) at 97);(Reitman, 5 C.T. 31); (PX 115). As set out in detail later, Puget processed the Zytel when molding the chambers using temperatures approximately 100°F below DuPont's recommended range. Puget's melt temperature was outrageously low for processing Zytel. (Osswald Dep. (2009) at 122). At such a low melt temperature, Zytel does not reach a uniform melt before being injected into the mold, resulting in each of the problems with a low melt temperature listed previously, including making it highly probable that there will be cracks and premature failure at the weld line. (Osswald Dep. (2004) at

33

92, 103, 154, 194); (Osswald Dep. (2009) at 18, 63, 67, 123, 171, 199, 205); (Malone Dep. at 124);

(Bradley, 11 T.T. 51-52, 105); (Malone, 33 T.T. 39); (Boyer, 37 T.T. 157, 190); (Reitman, 5 C.T.

907); (Osswald, 28 T.T. 48).

G.      Other Processing Considerations

1.      *Mold Tools*

The mold tool is the cavity into which the molder injects the nylon. (*See* Drye, 31 T.T. 62);

(Osswald, 28 T.T. 8, 11, 37).  Using a complex or worn mold tool complicates molding, (Drye, 31

T.T. 17); (Fletcher, 29 T.T. 144, 153-154).  Nevertheless, even with a complex or worn tool, a

molder can produce quality materials if it uses a labor-intensive molding process , though doing so

may lead to increased costs and lower yields for the molder.  (Dangel, 42 T.T. 193, 207); (Boyer, 37

T.T. 172); (Fletcher, 29 T.T. 139).

2.      *Mold Temperature*

A molder also controls the temperature of the mold tool. (Bradley, 11 T.T. 41, 45); (Osswald,

28 T.T. 44); (Dangel, 42 T.T. 223).  The mold temperature can change how quickly the nylon cools

as it passes through the mold, but does not significantly affect the melt temperature. (Drye, 31 T.T.

109); (Bradley, 11 T.T. 41, 45); (Osswald, 28 T.T. 44); (Dangel, 42 T.T. 190, 223); (Malone, 33 T.T.

41); (Reitman, 5 C.T. 940); (Osswald Dep. (2009) at 133).

3.      *Cycle Time*

Cycle time is the amount of time between the ejection of a finished molded part from the

mold and the ejection of the next molded part from the mold. (Fletcher, 29 T.T. 103); (Reitman, 5

C.T. 903).  Lowering melt temperatures decreases cycle time, because the molded product does not

take as long to cool.  (Reynoso, 28 T.T. 83-84); (Osswald Dep. (2009) at 47).  Conversely, raising

34

mold temperature increases cycle time as it increases the time necessary for the molded part to cool. (Reitman, 5 C.T. 992-93). Decreasing cycle times increases the number of parts a molder can produce in a given period of time. (Reynoso, 28 T.T. 83-84); (Reitman, 5 C.T. 993); (Fletcher, 29 T.T. 102-103); (Osswald Dep. (2009) at 177).

     H.    <u>Post-Production Quality Control</u>

Prior to the production of parts, the molder and customer must establish a quality control plan specifying a visual inspection process for determining whether the molder has produced an acceptable part. (Osswald Dep. (2004) at 62). A visual inspection can look for burrs, bursts, bubbles, blisters, flash (excess plastic resulting from an improperly clamped mold), gloss, cold slugs (visible chunks of unmelted nylon injected into the mold), contamination, color changes, short shots (failure to completely fill out the mold), fissures, and voids. (Seitz, 19 T.T. 18-20); (Fletcher, 29 T.T. 151-52); (Fletcher Dep. at 153); (Albert Dep. at 30-32); (Reitman, 5 C.T. 945, 951). Cold slugs, short shots, fissures, and voids are indications that the molder has a processing issue that needs to be resolved. (*See* Reitman, 5 C.T. 945); (Boyer, 37 T.T. 106); (Osswald Dep. (2009) at 136); (Malone, 33 T.T. 32). A visual inspection, however, will not reveal whether the nylon properly bonded at a molecular level, meaning any visual inspection plan operates under an assumption that the molder used proper processing conditions that would produce a part with the proper mechanical properties. (Osswald Dep. (2004) at 62-63, 87); (Drye, 31 T.T. 28); (Osswald Dep. (2009) at 149); (Fletcher, 29 T.T. 135).

In addition to a visual inspection, a molder can measure the part weight[39] to determine whether the mold tool was properly packed during molding. (Reynoso Dep. at 52); (Osswald Dep. (2004) at 107, 135, 195); (Osswald Dep. (2009) at 50-51, 55); (Malone, 33 T.T. 32). A molder can also use a microstructural analysis ("MSA") to look for voids, contamination, or poorly formed weld lines. (Boyer, 37 T.T. 107); (Reynoso, 28 T.T. 43, 113); (Malone Dep. at 51).

I.   Molding at Puget's Facility in Guadalajara, Mexico

1.   *Chuck Fletcher and Other Puget Employees at the Guadalajara Facility*

Chuck Fletcher ("Fletcher") was a process engineer employed by Puget to run the molding operations at the Puget facility located in Guadalajara, Mexico.[40] (Fletcher, 29 T.T. 86, 108); (Fletcher Dep. at 24); (Reynoso, 28 T.T. 79);   (Rebollo, 30 T.T. pp. 44-45).   Fletcher's responsibilities included setting the process parameters for molding the chambers and other parts for the Seisco water heater. (Fletcher, 29 T.T. 80, 104); (Savelieff Dep. at 38, 67). He had molded using Zytel in the past and believed he was knowledgeable about molding nylons. (Fletcher, 29 T.T. 128-29); (Mendoza, 37 T.T. 224); (Rebollo, 30 T.T. 32). He had memorized the recommended range of melt temperatures for Zytel. (Fletcher, 29 T.T. 128-29).

Fletcher was also in charge of improving the processing operations at the Guadalajara facility. (Fletcher, 29 T.T. 101). During the time Puget molded for Microtherm, Puget's operators (the actual individuals who ran the injection molding machine according to the process plan) were

---

[39] Measuring the part weight does not indicate the quality of the weld line. (Reynoso Dep. at 52); (Osswald Dep. (2004) at 107, 135, 195); (Osswald Dep. (2009) at 50); (Malone, 33 T.T. 32).

[40] While Puget was processing parts for Microtherm, Andre Savelieff ("Savelieff"), and later Tony Luethe ("Luethe"), were the general managers of the Guadalajara facility. (Savelieff Dep. at 24, 31); (Seitz, 15 T.T. 101); (Fletcher Dep. at 23). The general manager was responsible for the administration of the plant and not for the actual processing or molding the parts. (Savelieff Dep. at 26, 39, 51); (Mendoza Dep. at 86).

36

inexperienced, untrained, and not prepared to mold a large amount of new products. (Mendoza Dep. at 138-39); (Seitz, 16 T.T. 17); (Reynoso Dep. at 112). DuPont had concerns with Puget's level of experience in molding nylons and offered to provide Puget with technical support and training for Puget's operators and supervisors. (Reynoso Dep. at 112); (Hines Apr. Dep. at 21). For the most part, Puget refused these offers of training. (Reynoso Dep. at 114, 127). Fletcher believed Puget's operators were sufficiently trained to mold for Puget's clients, but needed training to improve cycle time and waste. (Fletcher, 29 T.T. pp. 102, 107); (Fletcher Dep. at 94-95, 113-14).

2.    *Puget's Molding of the Baseplates*

One of the other Seisco water heater parts Puget molded was a baseplate, which attached to the bottom of the chambers, was also molded out of Zytel, and, according to some witnesses, was subject to similar water temperatures and pressures as the chambers. (*See* Reynoso, 28 T.T. 100); Fletcher, 29 T.T. 124-25). As set out below, Puget's improper molding of these baseplates further establishes its knowledge of the problems associated with its use of extraordinarily low temperatures and that, even after DuPont corrected Puget with respect to molding the simple, flat baseplates, Puget purposefully did not make a corresponding correction to its molding of the more complex chambers.

Fletcher independently decided to mold the baseplate using heater band temperatures ranging between 410°F and 450°F[41], approximately 100°F below the DuPont recommended range for heater band temperatures of 510°F to 560°F, because Puget was having problems with the color and flash

---

[41] On one of the four process sheets setting out the processing parameters for baseplates, Fletcher set the final heater band to 510°F. (Fletcher, 29 T.T. 124-25); (Fletcher Dep. at 169).

of the molded baseplates.[42] (Fletcher, 29 T.T. 124-25); (Fletcher Dep. at 169); (Reynoso, 28 T.T. 79). Fletcher never determined the melt temperature associated with these heater band temperatures.

At some point, Puget informed DuPont that it was having problems with molding the baseplates. (Rebollo, 30 T.T. 34-35); (Reynoso, 28 T.T. 72, 75-76). Reynoso arranged to attend a molding of the baseplates on September 13, 2000, to provide Puget with technical support. (Reynoso, 28 T.T. 72, 75-76). Seitz also attended this molding trial. (Seitz, 15 T.T. 98). When Reynoso learned that Fletcher was using such low heater band temperatures, she became concerned. (Reynoso, 28 T.T. 78). She spoke with Fletcher about the ideal melt temperature for Zytel and explained that molding at low temperatures can lead to breakage in the part, both of which were facts that Fletcher testified he already knew.[43] (Reynoso, 28 T.T. 80, 82, 85); (Fletcher, 29 T.T. 90, 112-13, 129-30, 160); (Fletcher Dep. at 121, 187-88). Fletcher told Reynoso that he did not want to raise the temperature because it would increase cycle time. (Reynoso, 28 T.T. pp. 83-84). Reynoso then explained to Fletcher that he needed to balance cycle time and part quality. (Reynoso, 28 T.T. 87).

While she could not convince Fletcher to increase the temperatures into DuPont's recommended range, Reynoso ultimately convinced Fletcher to raise the heater band temperatures from 430°F to 480°F. (Reynoso, 28 T.T. 79); (Seitz, 15 T.T. 99-100). Using a pyrometer, Reynoso determined the melt temperature using these new heater band temperatures was 506°F. (Reynoso, 28 T.T. 79). At these new temperatures, Puget produced baseplates with the necessary strength for their intended use in the Seisco water heaters. (Reynoso, 28 T.T. 105-120); (Seitz, 22 T.T. 44).

---

[42] There is no evidence or allegation that Microtherm ever instructed Puget or Fletcher to use lower temperatures for the baseplates. (Fletcher, 29 T.T. 124).

[43] Fletcher had no recollection of working with Reynoso. (Fletcher, 29 T.T. 96).

DuPont issued a technical report on the September 13, 2000 molding trial recommending that Puget continue to use the higher temperatures when molding the baseplates. (Reynoso, 28 T.T. 111).

### 3.    *Puget's Molding of the Chambers*

#### a.    <u>*The Chamber Mold Tool*</u>

The chamber was a difficult part to mold. (Dangel, V42, p. 184); (Mendoza Dep. at 33). The complexity, size, and thickness of the chambers made processing more difficult than the production of thinner, simpler parts, such as the baseplates. (Dangel, 42 T.T. 184); (Osswald Dep. (2004) at 83-84); (Seitz, 24 T.T. 43). The size of the chambers resulted in a longer fill time, increasing concerns about the cooling of nylon as it passed through the chamber mold. (*See* Reynoso, 29 T.T. 41-42).

The chamber mold tool itself was very complex, old, and worn. (Boyer, 37 T.T. 110); (Hines Mar. Dep. at 339); (Fletcher, 29 T.T. 143); (Boyer, 37 T.T. 110, 181); (Dangel, 42 T.T. 177); (Albert, 40 T.T. 22). By the time the tool reached Puget, it had been repaired several times, indicating a molder would have difficulties running the tool. (Fletcher, 29 T.T. 153-54). The tool also had problems involving the flow of coolant, meaning the chambers did not cool properly and led to uneven fills and warpage. (Fletcher, 29 T.T. 144-45). Further, the location of gate on the chamber tool, the place where the nylon was injected into the mold, led to high stresses at the weld line[44], uneven shrinkage, and warpage, even in a properly molded part. (*See* Hanes, 36 T.T. 289); (*see* Fletcher, 29 T.T. 138); (Fletcher Dep. at 28-29). The overall mold design also hindered the flow of the nylon through the tool. (Hines, 36 T.T. 100). Despite all these problems, a molder could mold acceptable parts using the chamber tool if he used a labor-intensive process and spent the time

---

[44] The weld line for the chamber part in the neck region. (Seitz, 2 C.T. 368).

necessary to determine the correct processing parameters. (Dangel, 42 T.T. 193, 207); (Boyer, 37 T.T. 172); (Seitz, 19 T.T. 14; 22 T.T. 79-80; 25 T.T. 45-48).[45]

Puget inspected the chamber tool and chose to proceed with the job, even though it knew processing with the tool would be difficult. (Fletcher, 29 T.T. 86); (Fletcher Dep. at 32-33); (*see* Seitz, 26 T.T. 136-37). Puget had a difficult time molding using the chamber tool. (Fletcher Dep. at 32-33); (Albert Dep. at 87). In addition to all the inherent problems discussed above regarding molding with the chamber tool, Puget's operators also had trouble mastering the complex sequence necessary to put all the pieces of the chamber tool in place prior to molding. (*See* Mendoza Dep. at 35-36, 139); (Boyer, 37 T.T. 181); (Fletcher Dep. at 32-33); (Albert Dep. at 87).

b.    *DuPont's Attempts to Attend a Molding of the Chambers*

DuPont tried to schedule multiple training sessions for Puget regarding the molding of the chambers. (Reynoso, 29 T.T. 34-35). (Seitz, 19 T.T. 72-73; 26 T.T. 15); (Rebollo, 30 T.T. 51, 60, 64-67). Fletcher rebuffed these efforts. (Rebollo, 30 T.T. 45). DuPont also asked for the processing parameters that Puget was using to produce the chambers. (Rebollo, 30 T.T. pp. 46-49). Fletcher refused to provide those documents. (Rebollo, V30, p. 46-49). Fletcher was simply opposed to receiving any support or assistance from DuPont with regard to molding Zytel. (Rebollo, 30 T.T. 45). In October 2000, eight months after production began, Puget stated it was finally willing to schedule an opportunity for DuPont to see the production of the chambers. (Reynoso, 28 T.T. 126). DuPont's representatives were not available on the day offered by Puget. (Reynoso, 28 T.T. 126).

---

[45] When told that other molders had produced quality parts using the chamber tool, Fletcher questioned whether those molders were still able to produce enough product such that the molders would not be losing money using the more labor-intensive process. (Fletcher, 29 T.T. 139). This statement and other statements throughout Fletcher's testimony indicate he may have sacrificed part quality to produce more parts to increase Puget's bottom line.