IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| NATIONAL UNION FIRE INSURANCE | § | |
| OF PITTSBURGH, PENNSYLVANIA, | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil No. B-05-050 |
| | § | |
| PUGET PLASTICS CORPORATION; | § | |
| PUGET PLASTICS CORPORATION | § | |
| S.A. de C.V.; and WAUSAU BUSINESS | § | |
| INSURANCE COMPANY. | § | |
| Defendants. | § | |

United States District Court
Southern District of Texas
ENTERED

AUG 2 5 2010

David J. Bradley, Clerk of Court

**MEMORANDUM OPINION AND ORDER DENYING MOTION FOR NEW TRIAL
AND MOTION TO ALTER OR AMEND THE JUDGMENT**

Pending before the Court is the Defendant Puget Plastics Corporation ("Puget") and Intervenor Microtherm's Motion for a New Trial or to Alter or Amend the Judgment (Docket No. 339).[1] For the reasons set forth below, that motion will be denied.

I.      BACKGROUND

This Court has previously outlined the facts of this case in great detail. *See Nat'l Union Fire Ins. Co. v. Puget Plastics Corp. ("Puget II")*, 649 F. Supp. 2d 613 (S.D.Tex. 2009) (Docket No. 332).    The facts essential to the pending motion are in summary the following.    Microtherm manufactured the Seisco tankless water heater during times pertinent to this case. *Id.* at 617.  During most of the year 2000, Puget manufactured plastic water chambers which Microtherm installed into its Seisco water heaters. *Id.*  These chambers began to fail and leak water in April of 2001, and in 2002, Microtherm filed suit against Puget and other component part manufacturers in Texas state

---

[1] For ease, this Court will refer to Puget and Microtherm collectively as "Puget" and Puget and Microtherm's motion for new trial as "Puget's Motion."

court alleging economic losses that resulted from, *inter alia*, the failure of those component parts. *Id.* According to Microtherm, Puget had intentionally under-heated the plastic chambers during the manufacturing process, resulting in leaky chambers which in turn damaged Microtherm's reputation and profits. A Texas jury agreed with Microtherm and found that Puget had engaged in false, misleading, or deceptive acts or practices; engaged in unconscionable action; failed to comply with warranties; engaged in negligent misrepresentation; and committed fraud. *Id.* at 617–18. After forgoing the fraud findings, Microtherm obtained a judgment against Puget in the amount of $36,081,807. *Id.* at 618. Verdicts were also brought back against other manufacturers in the following amounts: (1) against Dana Corporation $27,600,000 in actual damages, $250,000 in additional damages, $3,308,712.33 in prejudgment interest, and $12,463,485 in reasonable and necessary attorneys' fees, and (2) against United Plastics Group $17,450,000 in actual damages, $600,000 in additional damages, $890,136.49 in prejudgment interest, and $7,576,055 in reasonable and necessary attorneys' fees. *Id.* at 617.

From July 1, 1999 to July 1, 2002, Puget was covered by an umbrella policy (the "Policy" or the "National Union Policy") issued by National Union to Arctic Slope, Puget's parent company. *Id.* at 618. Puget was an additional insured under the Policy. Four days after the jury verdict in favor of Microtherm in Texas state court, National Union filed the present action in this Court seeking a declaration that it had no duty to defend or indemnify Puget for the conduct giving rise to the state court action. *Id.* at 616–17. Meanwhile, Microtherm and Puget entered into a settlement agreement through which Microtherm assumed Puget's rights as an insured party under the National Union Policy. *Id.* at 619. After this Court granted a partial summary judgment and an interim appeal which clarified certain issues, and after holding a trial to determine National Union's duty to defend and

2

duty to indemnify, and a trial in which Microtherm intervened, this Court held that National Union did not have a duty to defend or indemnify Puget. *Id.* at 656. Puget/Microtherm timely filed a motion for new trial or, in the alternative, to alter or amend the judgment (Docket No. 339).

II.      APPLICABLE LAW

Following a bench trial, a court may grant a new trial "for any reason for which a rehearing has heretofore been granted in a suit in equity in federal court." FED. R. CIV. P. 59(a)(1)(B). "Courts do not grant new trials unless it is reasonably clear that prejudicial error has crept into the record or that substantial justice has not been done, and the burden of showing harmful error rests on the party seeking the new trial." *Sibley v. Lemaire*, 184 F.3d 481, 487 (5th Cir. 1999) (quoting *Del Rio Distrib., Inc. v. Adolph Coors Co.*, 589 F.2d 176, 179 n.3 (5th Cir. 1979)).

Under Federal Rule of Civil Procedure 59(e), a party may file a motion to alter or amend a judgment. Fed. R. Civ. P. 59(e). Such a motion, in order to be granted, "'must clearly establish either a manifest error of law or fact or must present newly discovered evidence' and 'cannot be used to raise arguments which could, and should, have been made before the judgement issued.'" *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 863 (5th Cir. 2003) (quoting *Simon v. United States*, 891 F.2d 1154, 1159 (5th Cir. 1990)).

III.     THERE WAS NO OCCURRENCE UNDER THE NATIONAL UNION POLICY.

Puget raises several arguments to support its motion for new trial, the first of which asserts that this Court erroneously concluded that Puget's conduct and the resulting damage did not constitute an accident, and thus was not an occurrence, under the Policy. *See* Puget's Motion, at 4. In relevant part, the Policy provides that National Union will pay sums in excess of the retained limit that Puget became legally obligated to pay arising from property damage caused by an *occurrence*.

3

*See* Notice of Filing of Petition For Permission to Appeal, Ex. 1C (hereinafter "The Policy"). "Occurrence" is defined in the Policy as "an accident, including continuous or repeated exposure to conditions, which results in Bodily Injury or Property Damage neither expected nor intended from the standpoint of the insured." The Policy at 5. The word *accident* is not defined in the Policy.

In its final judgment in this case, this Court found no accident had occurred and thus there was no "occurrence" under the Policy. This finding was, at least in part, based upon its analysis of Texas law and the dictates of the Fifth Circuit opinion in this case as to what constituted an accident. As part of that analysis the Court was called upon by the Fifth Circuit to determine whether damage incurred was "highly probable." Puget specifically objects to this Court's determination that whether the damage Microtherm suffered was "highly probable" is an objective question, not purely a subjective one, as Puget argues.

A.  *Reconsidering the Fifth Circuit's Interlocutory Opinion in this Case, this Court Concludes that it Did Not Err in Holding that No Accident Occurred Under the Policy.*

Early on, one of the central issues in this case was whether a Texas jury's finding of a knowing violation of the Texas Deceptive Trade Practices Act ("DTPA") could ever constitute an "accident" under Texas insurance law. In response to the parties' motions for summary judgment, this Court issued an opinion holding that a knowing violation of the DTPA could constitute an "accident" and certified that holding, among others, to the Fifth Circuit Court of Appeals for immediate review (Docket No. 131). The Fifth Circuit affirmed this Court's conclusion in *National Union Fire Insurance Co. v. Puget Plastics* (*"Puget I"*), 532 F.3d 398 (5th Cir. 2008). In analyzing the meaning of "accident" under Texas law, the Fifth Circuit held that

deliberate acts may constitute an accident unless: (1) *the resulting damage was*

4

> *"highly probable" because it was "the natural and expected result of the insured's*
> *actions,"* (2) "the insured intended the injury," or (3) the insured's acts constitute an
> intentional tort, in which case, the insured is presumed to have intended the injury.
> In sum, [Puget] cannot recover under the Policy if: (1) the injury to Microtherm was
> highly probable, (2) Puget intended or expected the injury inflicted on Microtherm,
> or (3) Puget committed an intentional tort.

*Id.* at 401–02 (quoting *Lamar Homes, Inc., v. Mid-Continent Cas. Co*, 242 S.W.3d 1, 8 (Tex. 2007))

(emphasis added).  This Court found that the insured committed intentional acts that resulted in

damage that was highly probable as they were the natural and expected result of Puget intentionally

under-heating the plastic used to manufacture the chambers used by Microtherm in its Seisco water

heaters.  This Court is bound to follow the dictates of the Fifth Circuit opinion rendered in this case,

and, applying that reasoning to the facts of this present controversy, this Court finds that it did not

err in holding that no accident occurred under the Policy.

> 1.    Whether the Damage Microtherm Suffered was "Highly Probable" is to be
>        Determined Using an Objective Standard.

Applying the three-part test articulated by the Fifth Circuit in *Puget I*, which it was bound

to do, this Court found that Puget's conduct did not constitute an occurrence under the Policy

because there was no accident.  *Puget II*, 649 F. Supp. 2d at 646.  In a nutshell, this Court held that

because a subjective "highly probable" standard would render the subjective "intended the injury"

prong of the Fifth Circuit's non-occurrence test superfluous, the Fifth Circuit could not have

intended a double or two-pronged subjective standard.  Accordingly, this Court applied an objective

"highly probable" standard.  The Court also found this conclusion to be consistent with the various

Texas cases addressing the issue of what constitutes an "accident."

Puget raises several objections to that decision.  According to Puget, the use of the phrase,

"from the standpoint of the insured," in the Policy's definition of "occurrence," mandates the use of

a subjective standard in determining whether an accident occurred, and thus whether the injury to Microtherm was highly probable. Puget's Motion at 6–14. This argument is misguided.

The Policy defines "Occurrence" as "an accident, including continuous or repeated exposure to conditions, which results in Bodily Injury or Property Damage neither expected nor intended from the standpoint of the insured." The Policy at 5. The phrase, "from the standpoint of the insured," is used separately and in addition to the term "accident." *Id.* The structure of this definition does not imply that "from the standpoint of the insured" was placed where it was in order to modify the term "accident." Rather, it modifies "expected" or "intended." It was placed in such a way that (1) whether an accident occurred, and (2) whether the Bodily Injury or Property damage was expected or intended "from the viewpoint of the insured," are two separate inquiries under the Policy. *See Puget I*, 532 F.3d at 401–02. This separate treatment does not allow for the "standpoint of the insured" language to be absorbed into the initial "accident" inquiry or even to modify the definition of "accident," as Puget suggests.

Assuming *arguendo* that the phrase "from the viewpoint of the insured" was intended to be part of the "accident" inquiry, there is nothing inconsistent or erroneous about this Court applying an objective standard to that phrase as Puget suggests. In addressing coverage issues, Texas courts have often looked to what the insured knew at the time of the conduct in question, then asked whether a reasonable person, in similar circumstances and knowing what the insured knew, would have expected the damage or injury that resulted from the conduct. *See, e.g.*, *Republic Nat'l Life Ins. Co. v. Heyward*, 536 S.W.2d 549 (Tex. 1976). Applying an objective standard to the phrase "from the standpoint of the insured," thus, is not inconsistent with Texas law.

Puget next argues that *Lamar Homes* rejected an objective standard. *See* Puget's Motion at 8. There are several problems with this assertion. First, *Lamar Homes* did not reject any standard; instead it merely stated that *Mid-Century Insurance Co. v. Lindsey* "did not adopt foreseeability as the boundary between accidental and intentional conduct." *Lamar Homes*, 242 S.W.3d at 8. Even assuming that this language serves to reject foreseeability as the "standard," doing so is not the equivalent of rejecting an objective standard altogether, as Puget would have this Court hold. In fact, the *Lamar Homes* court explained that "[i]nsurance is typically priced and purchased on the basis of foreseeable risks, and reading *Lindsey* [as having adopted foreseeability as the boundary between accidental and intentional conduct] would undermine the basis for most insurance coverage." *Id.* This language does not necessarily indicate that an objective standard would be problematic, but that a simple question of foreseeability is not sufficient to determine whether or not an act or conduct constitutes an "accident" under Texas insurance case law. As a result, Puget's reliance on *Lamar Homes* to mandate solely a subjective standard is incorrect.

Puget also argues that *Tanner v. Nationwide Mutual Fire Insurance Co.*, 289 S.W.3d 828 (Tex. 2009), mandates a subjective standard. Puget's Motion at 11–14. In *Tanner*, the Supreme Court of Texas addressed an intentional injury exclusion which excluded coverage for injuries the insured intended or injuries the insured "knows or ought to know will follow." *Tanner*, 289 S.W.3d at 833. The Court held that the insurer had failed to prove that the intentional injury exclusion applied. *Id.* at 833–34.

This Court can see why Puget cites to certain language in this case, but its overall reliance upon it is misplaced. *Tanner* involved a high-speed police chase through central Texas which ultimately resulted in the escapee ramming the Tanner family's car that was being operated safely.

*Id.* at 829–30. Gibbons, the putative escapee, was caught, jailed, released on bond, and he ultimately fled the jurisdiction avoiding both the upcoming criminal prosecution and a civil lawsuit. The Tanners consequently received a default judgment against Gibbons and then in turn sued Gibbons' auto policy insurer. *Id.* at 830. The carrier pinned its defense on policy language which excluded "property damage or bodily injury caused intentionally by or at the direction of an insured, including willful acts the result of which the insured knows or ought to know will follow from the insured's conduct." *Id.* at 831. A jury found for the Tanners and the trial court granted a judgment notwithstanding the verdict. *Id.* at 830. It was in this context the Supreme Court addressed the issue.

The court merely held that Nationwide, the insurer, failed in its burden to prove the applicability of the exclusion and that the jury had evidence before it that would support a verdict that Gibbons did not intend the damage.[2] *Id.* at 832–33. Not unexpectedly, Puget seizes upon certain statements by the Supreme Court to the effect that the insured: (1) had to intend the damage and/or (2) had to know or ought to know the damage will follow in order for the exclusion to apply and that the Supreme Court in discussing same said that the policy language "reinforces the view that the dispositive inquiry is whether the insured intended to inflict damage or injury." *Id.* at 833.

Puget is correct that the court, in parsing the language of the Nationwide intentional injury exclusion, went no further than to acknowledge that "ought to know" *could* announce an objective standard, but Puget's argument is misleading. The *Tanner* court did not hold that the phrase "ought to know" was *not* an objective standard, as Puget suggests. In fact, it refers to it as an objective standard. Instead, it simply held that the policy's use of the phrase "will follow," a phrase which

---

[2] There was evidence admitted at the trial that, despite his reckless conduct, Gibbons braked and attempted to avoid the collision with the Tanner car.

8

indicates inevitability, served to modify the phrase "ought to know" in such a way that the "accident" inquiry under that policy became a subjective one. *Id.* The *Tanner* court, itself, made the point that if instead of the phrase "will follow," the policy had used a phrase such as "might follow" or "will likely follow," the phrase "ought to know" would indicate an objective standard. *Id.* This holding can hardly be represented as announcing that an objective standard has no place in a court's analysis of whether an accident occurred, plus its ultimate holding was keyed to a positive jury finding for the insured and specific policy language, neither of which is present herein.

Finally, Puget asserts that the holding in *King v. Dallas Fire Insurance Co.*, 85 S.W.3d 185 (Tex. 2002), precludes an objective inquiry.  In *King*, a business owner (King) was sued when his employee committed an intentional tort.  King in turn filed suit against his insurance carrier attempting to force the carrier to defend him against the lawsuit.  The Supreme Court of Texas was asked to determine from whose standpoint an injury-triggering event should be viewed when determining whether an accident has occurred:  (1) that of the insured, (2) that of the victim, or (3) that of the actor.  *Id.* at 188.  The court held that the event is to be viewed from the standpoint of the insured, not that of the actor or the victim (unless, of course, the insured is also the actor or victim). *Id.*  In reaching this decision, the court did not address whether the standard was to be objective or subjective.  Such an inquiry would have been tangential to the court's decision in that case.  Thus, Puget's reliance on this case as precluding an objective inquiry is misguided.

Having considered Puget's arguments concerning the implementation of a subjective "highly probable" standard, the Court reaffirms its holding that the Fifth Circuit's opinion in *Puget I* mandated an objective "highly probable" standard.

9

2.      Using the Objective "Highly Probable" Standard Articulated by the Fifth
        Circuit, Puget's Conduct Does Not Constitute an Accident Under the Policy.

The state-court jury in this case found that Puget's deliberate acts in lowering the melt temperatures when making the chambers resulted in the damage Microtherm suffered. As this Court previously held, a reasonable molder under the same or similar circumstances, i.e., from the standpoint of the insured, would know that lowering the melt temperatures in making the chambers would make it "highly probable" that damage would result to Microtherm's final product. *Puget II*, 649 F. Supp. 2d at 646. Among other things, a reasonable molder, under the same or similar circumstances as a Puget molder, would have known that (1) the chambers would be exposed to hot water inside people's homes, (2) the chambers were being manufactured with a chamber mold tool which was old and worn, and (3) using lower melt temperatures would lead to numerous integrity problems with the final chambers. Knowing this, Puget still intentionally used lower-than-specified melt temperatures. *See id.* at 645–46.[3] Puget argues that this Court's determination that the damage to Microtherm was "highly probable" from the standpoint of Puget was in error.

B.      *Review of Texas and Fifth Circuit Cases Concerning "Accident" Under Texas law.*

As stated above, the Fifth Circuit entered an interlocutory opinion in this case addressing what constitutes an accident under Texas law and holding that if the damage to Microtherm was "highly probable" given Puget's conduct, there is no coverage under the Policy. The Fifth Circuit's opinion notwithstanding, the parties in this case have offered differing opinions concerning the status

---

[3] For a more thorough review of why this Court held that injury to Microtherm was highly probable given Puget's deliberate lowering of melt temperatures, see *Puget II*, 649 F. Supp. 2d at 645–46. One should remember that Puget did not deny purposefully lowering the temperature; it maintained instead that Microtherm knew about the temperature change and agreed to it.

of "accident" case law in Texas.  Given these contentions, the complexity of the law concerning the definition of "accident,"  and its overriding importance to this case, this Court feels compelled to offer a review of Texas and Fifth Circuit Court of Appeals cases, many of which have been cited by Nation Union and/or Puget, discussing what constitutes an "accident" under Texas law.  This Court's review should not be taken as an expression of law or fact which differs from its prior opinion and judgment, but should only be viewed as an attempt to address the issues raised in Puget's motion for new trial and National Union's response thereto.  This discussion should also not be construed as an attempt by this Court to go behind or reach a conclusion inconsistent with the Fifth Circuit's interlocutory opinion in this case, an opinion which it is bound to follow.

While perhaps not the first case that mentions the issue, the first Fifth Circuit Court of Appeals case that provides relevant guidance is *Maryland Casualty Co. v. Mitchell*, 322 F.2d 37 (5th Cir. 1963).  In that case, the Court of Appeals held that an accident was an event in which "injury was not in fact intended by the defendant, in the sense that he acted for the purpose of causing injury or that the injury was so substantially certain to result from the act that the defendant, knowing it would occur, can be said to have intended it in fact." *Id.* at 40.  From this holding, one can conclude that a showing of the insured's intent to injure or the insured's knowledge of substantial certainty that injury would occur was sufficient for a court to find no accident occurred under Texas law.[4]

In *Massachusetts Bonding and Insurance Co. v. Orkin Exterminating Co.*, 416 S.W.2d 396 (Tex. 1967), the insured was sued for its allegedly negligent application of pesticides to a customer's

---

[4]  It is important to note in *Maryland Casualty*, a case based upon the failure of an insurer to defend its insured, that, unlike the jury in the underlying case herein, the jury found the insured to be negligent.

11

facilities. *Id.* at 397. The jury in the underlying case found that Orkin's conduct was negligent. The insured's carrier had denied coverage, asserting that the application of the pesticide was not an "accident" as that term was used in the policy at issue. *Id.* at 400. The Supreme Court of Texas, in the subsequent coverage case, disagreed, holding that the term "accident" includes "negligent acts of the insured causing damage which is undesigned and unexpected."[5] *Id.* Thus, the result could still be an accident, despite the fact that the application (or conduct causing this result) was intentional. Following *Orkin*, a negligent act by the insured, or, stated another way, an intentional act performed negligently, could constitute an accident.

In 1973, the Supreme Court of Texas decided *Argonaut Southwest Insurance Co. v. Maupin*, 500 S.W.2d 633 (Tex. 1973). In this duty-to-defend case, the court had before it an agreed statement of facts which stated that the insured had mistakenly contracted with a tenant-in-common instead of the actual landowners to remove fill material from land the tenant-in-common occupied. *Id.* at 634. When the true owners learned of the removal of the fill material, they sued *Maupin* for trespass, and *Maupin* called on its insurance carrier to provide a defense. *Id.* Thus, the court had a situation with intentional conduct and no negligence finding, a case similar to the present one. The carrier refused to provide a defense, asserting that the intentional removal of fill dirt from the property could not be an accident under the policy. The court agreed, holding that "[w]here acts are voluntary and

---

[5] In *Maryland Casualty* and *Orkin*, discussed above, the courts were dealing with instances where a jury had already found the insured to have acted negligently. Sometimes, however, the use of the term "negligence" in opinions by certain courts does not necessarily mean "negligence" in the legal sense. Some courts have used "negligence" in the every day sense, analogous to committing an "error" or the making of a "mistake." This loose use of language can be troublesome in the application of the cases to a given fact situation and is perhaps part of the reason so much confusion has arisen in "accident" case law.

12

intentional and the injury is the natural result of the act, the result was not caused by accident even though that result may have been unexpected, unforseen and unintended." *Id.* at 635 (internal quotation marks and citations omitted). The court further held, although arguably not necessary to decide the case given the first ruling, that "[a]n intentional tort is neither an 'accident' nor 'occurrence' within the terms of the policy. . . ." *Id.* at 636.[6] This holding, in conjunction with *Orkin*, was a key opinion leading to the establishment of two distinct lines of cases concerning the definition of an "accident" under Texas insurance law—one holding that negligent acts always constitute an accident (*Orkin*), and one holding that intentional torts can never be accidents (*Maupin*).

In *Republic National Life Insurance Co. v. Heyward*, 536 S.W.2d 549 (Tex. 1976), the Supreme Court of Texas built upon the "*Maupin*/intentional act" line of cases, albeit under a different fact situation. This case involved a life insurance policy with additional available payments under an accidental death provision. In this matter, the insured was intentionally shot five times and subsequently died. *Id.* at 551-52. The Medical Examiner opined that it was a homicide. Two individuals affirmed in their depositions that they lived at the address where the decedent was murdered, but they refused to answer any other questions "on the ground that their answers might

---

[6] It is important to note that while these two holdings—the first being that when the injury is the natural result of an intentional act there is no accident and the second being that an intentional tort can never be an accident—are both equally applicable to the facts of *Maupin*, they are not necessarily interchangeable in all cases. Although a finding of intentional tort (the latter holding of the court) necessarily requires a finding of tortious conduct, the first holding announced by court paid no heed to whether the intentional act giving rise to injury or damage constituted an intentional tort. Thus, under *Maupin*, it is not necessary to prove a legally wrongful act in order to show that no accident has occurred; it is sufficient that intentional conduct led to injuries that were the natural result of that conduct.

tend to incriminate them." *Id.* at 552. The insured's wife, the beneficiary of the insured's group life insurance policy, filed suit against the insured's carrier to recover benefits, but the trial court granted a directed verdict in favor of the carrier. *Id.* The carrier argued on appeal that this incident could not be an accident because the insured's murderer intentionally killed him. *Id.* The Supreme Court of Texas disagreed with the carrier, reversed the directed verdict, and remanded the case for trial. According to the court, prior life insurance cases had adopted the *Hutcherson* test (from *Hutcherson v. Sovereign Camp, W.O.W.*, 251 S.W. 491 (Tex. 1923)). That case concluded that "injuries are 'accidental' and within the coverage of an insurance policy . . . if, *from the viewpoint of the insured*, the injuries are not the natural and probable consequence of the action or occurrence which produced the injury." *Id.* at 557 (emphasis added). The inverse of this holding is that when an insured acts intentionally, and the injury that results is the "natural and probable consequence" of its action, there is no coverage. Thus, the *Maupin* line of cases, which already excluded intentional torts from insurance coverage, was expanded to exclude coverage, albeit in the life insurance context, when the insured may not have intended the injury, but the injuries were the natural and probable consequence of the insured's intentional conduct. Whether the injuries were the natural and probable consequence of his/her/its conduct is an objective inquiry asked from the viewpoint of the insured.[7]

In 1993, the Supreme Court of Texas reiterated (although it distinguished) its holdings in

---

[7] One could argue, as Puget suggests, that "objective" and "from the viewpoint of the insured" are incompatible. As stated before, this Court disagrees. The question can be an objective one, with the reasonable person being one in the same circumstances and with the same knowledge as the insured at the time of the conduct in question. In the context of *Heyward*, for example, a court would ask if a reasonable man, under the same or similar circumstances and with knowledge of what had occurred just prior to the insured's death, would reasonably believe the two individuals would kill him. "From the viewpoint of the insured," thus, only instructs a court to place the "reasonable person" into the shoes of the insured at the time of the event in dispute.

*Maupin* and *Heyward* in the case of *State Farm Fire & Casualty Co. v. S.S. & G.W.*, 858 S.W.2d 374 (Tex. 1993). In *S.S. & G.W.*, an insured intentionally had sexual intercourse with another and unintentionally transmitted herpes to that person. *Id.* 375–76. The court held that although the insured intended the intentional act (intercourse), he did not intend the injury (the transmitting of herpes), nor would the injury "be the natural and probable consequence" of the act. *Id.* at 377. Thus, he may be entitled to coverage under his homeowner's policy. *Id.* Although the court in *S.S. & G.W.* was analyzing the intentional injury exclusion (and not the definition of "accident"), it held, seemingly for the first time, that the same analysis would apply to the "accident" analysis.[8] *Id.* The court distinguished this case from *Maupin*, stating that because the affidavit of the insured showed that he was not experiencing any symptoms of herpes, he did not think he could transmit herpes, and infecting a sexual partner was not the natural result of his intentional act of intercourse. *Id.* at 377 n.2. This case also is consistent with *Heyward* in that the court asked, after concluding that an intentional act led to the injury complained of, whether the insured intended the injury and whether the injury naturally followed.

Next, in *Trinity Universal Insurance Co. v. Cowan*, 945 S.W.2d 819 (Tex. 1997), another case involving a homeowner's liability policy, the Supreme Court of Texas addressed an incident in which a photo lab clerk named Gregory Gage intentionally made additional copies of revealing photographs of Nicole Cowan which she had dropped off for development. *Id.* at 820. Gage showed these photos to a friend, and they were circulated until a friend of Cowan's eventually saw them and

---

[8] "Although our language in [*Heyward*] referred to 'accidents,' the same reasoning applies in cases where the policy contains an intentional injury exclusion. An insured under a policy with an intentional injury exclusion still relies on the policy to provide indemnity against fortuitous, unexpected, or undesigned injury." *S.S. & G.W.*, 858 S.W.2d at 377.

told Cowan of Gage's actions. *Id.* at 821. Cowan sued the store clerk, and the clerk's homeowner insurance carrier denied coverage, asserting this was no "accident" under the policy. *Id.* The court, citing *Orkin, Maupin, Heyward,* and *S.S. & G.W.,* agreed there was no "accident" because Gage intentionally made and distributed copies of the photographs, and the mental anguish that Cowan suffered as a result naturally followed from his conduct and could have been "reasonably anticipated" by Gage. *Id.* at 828. It was irrelevant whether Gage subjectively intended or expected the injury. *Id.*[9] In citing *Heyward,* it noted that "whether an event is accidental is determined by its effect." *Id.* at 827. Notably, the *Cowan* court, in making its decision, equated injury that "naturally follows" to injury that "ordinarily follows" or that can be "reasonably anticipated," perhaps effectuating a minor change in terminology. *Id.* at 828.[10]

In 1999, the Supreme Court of Texas considered the case of *Mid-Century Insurance Co. v. Lindsey,* 997 S.W.2d 153 (Tex. 1999). In *Lindsey,* a young boy intentionally climbed through the sliding rear window of his father's pick-up and "accidentally touched" a loaded shotgun in the pick-up's gun rack, causing it to fire. *Id.* at 154. The shotgun discharge struck a passenger in a car parked next to the pick-up. *Id.* Citing *Maupin, Heyward,* and *Cowan,* the court held that this constituted

---

[9] In fact, the evidence was that Gage neither intended nor subjectively expected the resulting injury because he thought that the victim would never find out what he had done. Thus, the court in *Cowan* had to have used an objective standard. Aside from the holding, it is worth mentioning the court's rejection of the carrier's assertion that intentional conduct can never give rise to an accident. *Cowan,* 945 S.W.2d at 828. The court provided a helpful analogy to explain why it was unpersuaded by the carrier's argument: "[C]onsider the hunter who deliberately fires a gun at what he believes to be a deer but is actually a person. Though firing the gun was intentional, the harm can reasonably be characterized as an 'accident.'" *Id.* Although the *Cowan* court found no accident, they declined to hold that deliberate acts may never constitute an accident.

[10] This case may be somewhat of an anomaly given its subject matter and given that one might consider the underlying act of distributing the photographs to be an intentional tort—invasion of privacy—in which case any resulting harm would be presumed.

an accident because, although the boy had intentionally climbed through the window, the discharge of the shotgun and the plaintiff's injuries were not reasonably forseeable from the boy's (insured's) viewpoint. *Id.* at 155. He did not intend to discharge the shotgun and certainly did not intend the injury. *Id.*

In two separate cases in 2000 and 2001—*Federated Mutual Insurance Co. v. Grapevine Excavation, Inc.*, 197 F.3d 720 (5th Cir. 2000), and *Harken Exploration Co. v. Sphere Drake Insurance PLC*, 261 F.3d 466 (5th Cir. 2001)—the Fifth Circuit, analyzing Texas law, revisited the *Orkin* (negligence) line of cases and articulated a test to be applied by courts addressing whether negligent conduct constitutes an accident. In *Grapevine*, a duty-to-defend case, a contractor was hired to perform excavation, backfilling, and compacting work in preparation for building a parking lot. *Grapevine*, 197 F.3d at 722. The company intentionally performed under the contract, but did so, according to at least one allegation, negligently, using inferior fill materials. *Id.* Distinguishing the case from the *Maupin* (intentional acts) line of cases, the court held that the term "accident" includes "damage that is the unexpected, unforeseen or undesigned happening or consequence of an insured's negligent behavior." *Id.* at 725. Following this case, one gathers that when faulty performance leads to injury or damage, a court must ask whether the damage was designed, expected, or foreseen.

The court in *Harken* held that an accident had occurred when a company undertook to drill for oil on a landowner's property, but did so negligently resulting in property damage, water contamination, and the killing of livestock. *Harken*, 261 F.3d at 472–74. Expanding and clarifying the holding from *Grapevine*, the *Harken* court held that "if the act is deliberately taken, performed negligently, and the effect is not the intended or expected result had the deliberate act been

performed non-negligently, there is an accident." *Id.* at 473. "We also know, however, that there is an accident when the action is intentionally taken, but is performed negligently, and the effect is not what would have been intended or expected had the action been performed non-negligently." *Id.* at 472 (citing *Cowan*, 945 S.W.2d at 828). In other words, a finding that an insured party intentionally, but haphazardly or negligently, engaged in particular conduct is not the end of the inquiry. A court making such a finding must also ask whether the injury or damage that resulted would have resulted regardless of the insured party's negligence. If a court finds that the damage would have resulted even if the insured party had performed the intentional act in question flawlessly, then, for insurance purposes, there was no accident. If, however, the damage occurred only as a result of the poor performance of the intentional act, then there was an accident.

Two recent cases, frequently cited by Puget, confirm that the holding in *Harken* exemplifies the current status of Texas law concerning the definition of "accident" when negligence leads to the accident or injury in question. Those cases are *Lennar Corp. v. Great American Insurance Co.*, 200 S.W.3d 651 (Tex. App.—Houston [14th Dist.] 2006, pet. denied), and *Lamar Homes, Inc. v. Mid-Continent Casualty Co.*, 242 S.W.3d 1 (Tex. 2007). In *Lennar Corp.*, a homebuilder intentionally constructed homes using Exterior Insulation and Finish System (EIFS) and later learned that EIFS traps water within the homes constructed with it, causing problems such as wood rot, mold, and termite infestation. 200 S.W.3d at 661. After replacing the EIFS on the homes it built, Lennar filed a claim with its insurance carrier to be indemnified for costs it incurred in doing so. *Id.* The carrier refused to indemnify. Citing *Lindsey* and *Harken*, a court of appeals held that Lennar's use of EIFS constituted an accident. *Id.* at 664. Lennar intentionally built the homes in question using EIFS, but did so with defective material, resulting in damage that would not have occurred had Lennar not used

18

EIFS. The court held that the unintentional use of defective material resulted in damages neither intended nor expected is an occurrence.[11]

In *Lamar*, a series of questions was certified to the Supreme Court of Texas by the Fifth Circuit. 242 S.W.3d at 4. While also involving damages to houses, the allegations in that case were related to faulty workmanship, not defective products. More important than the court's final answers to the certified questions was the court's attempt to concisely summarize Texas law on the definition of "accident."[12] The court stated:

> Thus, a claim does not involve an accident or occurrence when either direct allegations purport that the insured intended the injury (which is presumed in cases of intentional tort) or circumstances confirm that the resulting damage was the natural and expected result of the insured's actions, that is, was highly probable whether the insured was negligent or not.

*Id.* at 9 (citation omitted).[13]

The *Lamar Homes* test, while answering the questions posed by the Fifth Circuit, seems to leave some gaps unfilled in the overarching inquiry of what constitutes an accident under Texas insurance law. Absent from the summary is any discussion of instances where a deliberate act performed intentionally (yet perhaps wrongly) leads to injury or damage, but the injury is not

---

[11] The result in this case is very similar to the holding of *Grapevine* where the Fifth Circuit held that an accident had occurred when a contractor intentionally performed under a contract but inadvertently used inferior materials. *See Grapevine*, 197 F.3d at 725.

[12] This Court finds the legal summary contained in *Lamar* to be helpful as far as it goes, but the present case falls in the cracks not addressed by the Supreme Court in *Lamar*. Hence, this present analysis might be described not as an attempt to reinvent the wheel, but as an attempt to fill in what lines were left blank.

[13] The *Lamar Homes* court's use of the phrase "highly probable" would later form the basis for one of the Fifth Circuit's non-occurrence scenarios it articulated in the interlocutory opinion in this case, and it formed the basis for this Court's determination of whether Puget's actions constituted an accident.

intended by the insured.  Since *Lamar* did not address this area, this Court assumes that the law governing such scenarios remained unchanged following *Lamar*: if deliberate acts lead to injury or damage, a court must ask whether the resulting injury or damage was reasonably foreseeable from the viewpoint of the insured.  *Lindsey*, 997 S.W.2d 153, 155.[14]

The following chart provides a summary of the facts, damages, results and tests applied in the cases discussed above.

| Style of Case | Untoward Act | Damages | Result/Test Applied by the Court |
|---|---|---|---|
| *Md. Cas. Co. v. Mitchell*, 322 F.2d 37 (5th Cir. 1963). | Tenant injured landlord's agent when he "negligently" made the agent fall onto a concrete patio | Landlord's agent suffered injuries from the fall | Court found an accident had occurred because injury was neither intended nor so substantially certain to result that it could not have been an accident |
| *Argonaut Sw. Ins. Co. v. Maupin*, 500 S.W.2d 633 (Tex. 1973). | Insured mistakenly contracted with tenant-in-common to remove fill dirt (Trespass) | Insured removed fill dirt from property without owner's permission | No coverage "[w]here acts are voluntary. . . and the injury is the natural result of the act. . . ." |

---

[14] One might disagree with the notion that reasonable foreseeability remains a part of any test in the context of defining an "accident."  As stated before, however, *Lamar Homes* did not outright reject any use of a foreseeability test in the accident context.  It seems the court simply intended to hold that determining whether an accident occurred is not *simply* a question of foreseeability.  *See Lamar Homes*, 242 S.W.3d at 8.  Instead, a court must ask other questions, such as whether the conduct giving rise to the injury was intentional or negligent, and if intentional, whether it was performed poorly.  Thus, once a court has determined that an insured's intentional conduct led to the injury in question, *Lamar Homes* does not preclude that court from asking whether the injury was reasonably foreseeable from the standpoint of the insured.

| | | | |
|---|---|---|---|
| *Republic Nat'l Life Ins. Co. v. Heyward*, 536 S.W.2d 549 (Tex. 1976). | The insured was shot intentionally by an unknown assailant | The insured died as a result of the gunshot wounds | The court held there could be coverage because the insured's death was not the natural and probable consequence of the insured's actions |
| *State Farm Fire & Cas. Co. v. S.S. & G.W.*, 858 S.W.2d 374 (Tex. 1993). | An insured with herpes intentionally had intercourse with the plaintiff, but not during an outbreak | The plaintiff contracted herpes from the insured | An accident had occurred because infecting his partner was not the natural result of the insured's intentional act of intercourse |
| *Trinity Universal Ins. Co. v. Cowan*, 945 S.W.2d 819 (Tex. 1997). | Store clerk intentionally showed revealing photos of a customer to friends | Customer suffered mental anguish from the photos being shared | There was no accident because the mental anguish could have been reasonably anticipated by the insured, who acted intentionally in sharing the photos |
| *Mid-Century Ins. Co. v. Lindsey*, 997 S.W.2d 153 (Tex. 1999). | Boy intentionally climbed through a pick-up window and, in doing so, unintentionally discharged a shotgun | Passenger in a nearby car was struck by the shotgun fire | There was an accident because although the boy had intentionally crawled through the window, the injury to the passenger of the adjacent car was not reasonably foreseeable from the boy's viewpoint |
| *Federated Mut. Ins. Co. v. Grapevine Excavation, Inc.*, 197 F.3d 720 (5th Cir. 2000). | A company intentionally prepared land for a parking lot but inadvertently used inferior fill materials | Damage to the work of the paving contractor resulted | The court found a duty to defend because the damage was the "unexpected, unforeseen, and undesigned" result of negligent behavior |

| | | | |
|---|---|---|---|
| *Harken Exploration Co. v. Sphere Drake Ins. PLC*, 261 F.3d 466 (5th Cir. 2001). | Company drilled oil wells, and did so haphazardly | Property damage, water contamination, and the killing of livestock resulted from the negligence | An accident had occurred because the act performed was performed intentionally, but negligently, and the damage was not the intended or expected result had the deliberate act been performed properly |
| *Lennar Corp. v. Great Am. Ins. Co.*, 200 S.W.3d 651 (Tex. App.—Houston [14th Dist.] 2006, pet. denied). | Homebuilder intentionally constructed but used, unbeknownst to the builder, a defective product | Wood rot, mold, and termite infestation resulted | An accident had occurred because the unintentional use of defective materials resulted in damages neither intended nor expected by the insured. |
| *Lamar Homes v. Mid-Continent Cas. Co.*, 242 S.W.3d 1 (Tex. 2007). | Homes were intentionally, but poorly, constructed by a homebuilder | The homes suffered damage as a result of the poor workmanship | The court concluded that an accident has occurred when property damage results from the unexpected, unforeseen, or undesigned happening or consequence of the insured's negligent behavior. |

C.     *An Alternative Process by Which to Determine Whether an Intentional Act Can Ever be an Accident for Insurance Purposes*

Puget has objected not only to this Court's implementation of the Fifth Circuit standard, but has also argued that the Circuit was wrong in its analysis of Texas case law.  While this Court does not agree with either position, the Court in this opinion uses the above analysis to develop an

alternative process by which one can judge whether an intentional act can ever be an accident for insurance purposes under Texas law.  Put another way, since Puget does not think the Fifth Circuit test is accurate, the Court has derived the following test for determining whether an "occurrence," as that term is defined in insurance policies, has occurred in connection with an intentional act.

A court must first look to the chain of events leading up to the injury or property damage in question and identify the final deliberate or intentional act by the insured that took place prior to the injury or damage.  If that intentional act caused the injury or property damage, the court must ask: (1) was this act an intentional tort committed by the insured, (2) did the insured intend the resulting injury, or (3) was the resulting injury reasonably foreseeable/did it naturally follow from the viewpoint of the insured?  If the answer to any part of that question is "Yes," then no accident has occurred.  If the answer is "No" to all three parts of that question, then an accident may have occurred.[15]

This analysis is consistent with *Maupin* (the last intentional act was the removal of fill dirt, and that act led to the damage in question which naturally followed), *Heyward* (the last deliberate act was the shooting, and the death was neither an intentional tort committed by the insured, intended by the insured, nor reasonably foreseeable from the viewpoint of the insured), *S.S. & G.W.* (intercourse was the final deliberate act, and contracting herpes was the injury that was neither an intentional tort committed by the insured, intended by the insured, nor reasonably foreseeable from the viewpoint of the insured), *Cowan* (copying and distributing the photographs were the last deliberate acts, and the mental anguish that resulted was reasonably foreseeable and naturally

---

[15] With the exception of the use of the "reasonably foreseeable" language, this portion of the Court's newly derived test mirrors the analysis laid out in *Puget I* by the Fifth Circuit.

followed from the viewpoint of the insured), and *Lindsey* (crawling in the rear window was the last deliberate act, and the resulting shooting was neither an intentional tort committed by the insured, intended by the insured, nor reasonably foreseeable from the viewpoint of the insured).[16]

If, on the other hand, after identifying the last intentional act of the insured in the chain of events, a court determines that some subsequent careless intervening act or the poor execution of the intentional act or defective product actually caused, in whole or in part, the injury, then the court must ask itself whether the injury or property damage was highly probable had the careless intervening act not occurred or the intentional act not been executed poorly.[17] If the answer to that question is "Yes," i.e., the injury or damage would have occurred regardless of the carelessness or poor performance of the insured, then there was no "accident." The injury or damage would have resulted regardless of whether there were flaws in the insured's conduct. If, however, the answer to the court's question is "No," then an "accident" may have occurred under the policy because the injury or damage would not have occurred absent the insured's negligence or substandard conduct.[18]

---

[16] This Court is mindful that *Maupin* and *Cowan*, arguably cases involving an intentional tort, need not be governed by this test.

[17] This Court uses terms like "poor performance" or "careless intervening act" as opposed to the term "negligence" so there will no confusion between an intentional act and a negligent act. As stated earlier, some confusion has been generated by opinions describing an intentional act with the term "negligence." Obviously, most insurance policies of this kind are designed to cover negligent acts. Consequently, this discussion should be viewed only in the context of an intentional act.

[18] The Court notes that when a coverage case involves an underlying jury finding of negligence in the traditional tort sense, this inquiry is superfluous because, by definition, a common law negligence finding requires a finding of proximate cause before an award of damages.

This reasoning was applied in *Orkin* (the last deliberate act was applying pesticides, and the poor execution of that job caused the injury that would not have been highly probable had the insured performed the job non-negligently), *Harken* (operating an oil well was the last deliberate act taken, but it was performed poorly, and the damage would not have been highly probable had the insured performed the job flawlessly), *Grapevine* (the last intentional act was preparing the land for a parking lot, but that act was performed haphazardly, and the resulting damage would not have been highly probable had the insured performed properly), and *Lennar Corp.* (the last deliberate act was constructing the homes, but it was done haphazardly by using a defective product, and the resulting damage would not have occurred had Lennar not unintentionally used a defective product).

The Court concedes that the above-described analysis is more cumbersome, but it is also more inclusive and comprehensive while still being consistent with what the Supreme Court of Texas articulated in *Lamar Homes*. It encompasses those situations in which an insured intended the injury or committed an intentional tort, and it addresses those situations in which a negligent act or an improperly performed intentional act led to the injury or property damage in question. In those cases, the Supreme Court of Texas has instructed courts to ask whether the injury or damage would have occurred, whether the insured acted negligently or not. This analysis accounts for these inquiries.

In addition to addressing the scenarios articulated by *Lamar Homes*, this Court's alternative analysis also covers those scenarios not addressed, such as those situations in which an intentional act led to the injury, and the injury naturally followed or was reasonably foreseeable from the viewpoint of the insured. *See, e.g.*, *Cowan*, 945 S.W.2d 819. Thus, this Court's test not only falls

in line with *Lamar Homes*, but it also covers those scenarios not accounted for by that case.[19]

      D.      *Applying the Court's Test to the Facts of this Case, Puget's Conduct Does Not Constitute an Accident Under Texas Law.*

Having reviewed the relevant case law and having constructed an alternate test or process by which one can analyze all of the pertinent Texas and Fifth Circuit cases, this Court stands by its original opinion that Puget's conduct did not constitute an accident. Examining the chain of events, this Court recognizes that Puget's lowering the melt temperatures while manufacturing the chambers was an intentional act. This intentional act, while perhaps ill-advised, was neither performed negligently/poorly nor was it followed by any intervening negligence. It was the cause of the damage Microtherm suffered. Thus, this case falls into the *Heyward*, *S.S. & G.W.*, and *Cowan* line of cases, the line of cases which discusses intentional acts that were neither performed negligently nor followed by negligent intervening acts.[20]

Given its finding that the facts of this case fall into the *Heyward*, *S.S. & G.W.*, and *Cowan* line of cases, and given that it was not an intentional tort, this Court must ask itself whether the damage was either (1) intended by Puget or (2) reasonably foreseeable from the viewpoint of Puget. With respect to whether Puget intended the damage, this Court has previously held there was no

---

[19] Perhaps *Lamar Homes* did not account for all possible scenarios because the Supreme Court was simply articulating a few scenarios that were applicable to the questions it was called upon to answer. It does not directly address the situation that exists here, i.e., a situation in which an intentional act, which should not have been performed, was performed adequately, and that act led to damages that were not intended by the insured, but were highly probable.

[20] Many of the arguments made by Puget are based upon cases where a jury found (or at least, in the duty-to-defend cases, it was alleged) the conduct in question to be negligent. Here that is not the problem. We have no negligence finding—all we have is a finding of "knowing" conduct. Given the fact that Puget intentionally under-heated the parts in question, one must follow the rules established in the intentional conduct cases.

intent on the part of Puget to cause damage and declines to re-evaluate that decision here. *See Puget II*, 649 F. Supp. 2d at 644. Whether the damage to Microtherm was reasonably foreseeable from viewpoint of Puget, however, is a different question. In its prior opinion in this case, this Court held, applying an objective standard, that the damage to Microtherm was, from the viewpoint of the insured, "highly probable." The term "highly probable" logically indicates a level of certainty greater than reasonable foreseeability. *Id.* at 646. Puget agreed in its motion for new trial that the standard of "highly probable" is a higher standard than "reasonable foreseeability." *See Puget's Motion*, at 15 ("'Highly probable' must mean a level of certainty greater than merely foreseeable. . . ."). Because this Court has previously held that, given Puget's conduct in lowering the melt temperatures when manufacturing the Seisco chambers, the injury to Microtherm was "highly probable," *a fortiori* the injury to Microtherm was also reasonably foreseeable from the viewpoint of Puget. Thus, no accident occurred under Texas law.

> E.    *Puget's Concerns About the Fifth Circuit's Interlocutory Opinion in This Case Have No Impact on This Court's Decision in this Case.*

In retrospect, the Fifth Circuit's three-pronged, non-occurrence test in *Puget I*, which was discussed more thoroughly in Part III.A of this opinion, may have left some aspects of Texas law concerning accidents unaddressed, perhaps because the *Lamar Homes* opinion did as well.[21] By not distinguishing between damage resulting from intentional or deliberate acts and damage resulting from negligence, one could argue that the Fifth Circuit test seems to superimpose the two scenarios

---

[21] This Court does not view *Lamar Homes* as effectuating a sweeping change over the status of accident law in Texas. In fact, the Supreme Court of Texas in *Lamar Homes*, when it articulated what does not constitute an accident, cited its prior case law, an indication that the court intended for its holding to be in line with prior precedents of the court.

upon each other, meshing the two tests into one test that cannot adequately address all possible scenarios.[22]

Under the Fifth Circuit's test, for example, if damage results from negligence, a court must only ask whether the damage was highly probable. However, the real question under Texas case law, as expressed in *Lamar Homes*, is whether the damage was highly probable *had the insured party performed the intentional act flawlessly. See Lamar Homes*, 242 S.W.3d at 9 (following the "highly probable" language with "whether the insured was negligent or not," mandating a review of whether the damage would have occurred had the insured performed non-negligently). At oral argument on Puget's motion for new trial, counsel arguing on behalf of Puget took issue with the Fifth Circuit's omission of this important language from *Lamar Homes. See* Transcript of Hearing on Mot. for New Trial, at 10.

In addition to omitting the language from *Lamar Homes* that requires a court to consider whether the resulting injury or damage would have resulted even if the insured party had performed flawlessly, the Fifth Circuit's opinion also leaves open the legal meaning of "highly probable" and whether "highly probable" should be an objective or subjective standard. Given that an insured's subjective intent was covered by a different element (the "did the insured intend the injury" element), this Court obviously felt "highly probable" should be an objective question.

---

[22] This Court notes that it is more probable that the Fifth Circuit panel, like the Supreme Court in *Lamar*, was not trying to resolve all issues of Texas insurance law; it was merely trying to resolve the issues before it, and since it was an interlocutory opinion, it additionally tried to give this Court some guidance for future proceedings. This was certainly the attitude of this Court in its prior opinions in this matter. This Court's lengthy discussion of Texas case law herein was not prompted because of its concern over the Circuit's analysis, but rather due to issues raised in the motions for new trial and oral argument on same.

Finally, the Fifth Circuit's test does not explicitly account for the "reasonably foreseeable" and "naturally follows" language, which appears to be the standard that, according to some opinions, should be applied when intentional conduct leads to damage. *See Lindsey*, 997 S.W.2d 153; *Cowan*, 945 S.W.2d 819; *S.S. & G.W.*, 858 S.W.2d 374; *Heyward*, 536 S.W.2d 549. Under Texas case law, when an intentional act causes damage, a court should not only ask whether the insured intended the damage, but *also* whether the damage was reasonably foreseeable from the viewpoint of the insured. *Id.* The Fifth Circuit's non-occurrence test articulated in *Puget I* does not account for the scenario where a deliberate act caused the damage, and the damage was "reasonably foreseeable" from the viewpoint of the insured, even though such a scenario would in fact be a non-occurrence under most standard insurance policies. *Id.* Instead, the operative language of the Fifth Circuit opinion only asks (1) whether the injury was "highly probable," (2) whether the insured party intended or expected the injury, or (3) whether the insured party committed an intentional tort. *See Puget I*, 532 F.3d at 403. The Circuit did not attempt to compare or contrast "reasonably foreseeable" with "highly probable."

As stated before, this Court only mentions these issues because Puget has argued that the Fifth Circuit opinion is flawed and that these flaws led to this Court's inaccurate conclusions regarding "accident" case law in Texas. *See, e.g.*, Transcript of Hearing on Mot. for New Trial, at 10. In reality, as explained *supra*, whether this Court applies its own analysis of Texas case law or the three-part test the Fifth Circuit articulated in *Puget I*, the result is the same. Either the damage to Microtherm resulting from Puget's intentional conduct was "reasonably foreseeable" or "naturally followed" from the viewpoint of Puget using the language found in some Texas cases, or the damage to Microtherm was "highly probable" from the viewpoint of Puget under the Fifth Circuit's non-

occurrence test articulated in *Puget I*. Under either analysis, there was no accident and thus no occurrence under the Policy.

F.    *Conclusion Concerning Whether an Accident or Occurrence is Present Given the Facts of this Case.*

Since Puget has failed to make it "reasonably clear that prejudicial error has crept into the record or that substantial justice has not been done," *Sibley*, 184 F.3d at 487 (quoting *Del Rio Distrib., Inc.*, 589 F.2d at 179 n.3), its motion for a new trial, with respect to whether an "accident" occurred under the Policy, is DENIED. Furthermore, Puget has failed to "clearly establish either a manifest error of law or fact" or "present newly discovered evidence," *Rosenzweig*, 332 F.3d at 863 (quoting *Simon*, 891 F.2d at 1159) (internal quotation marks omitted), a requirement for this Court to alter or amend its prior judgment. Thus, that motion, with respect to whether an "accident" occurred, is DENIED.

IV.    PUGET DID NOT ALLOCATE DAMAGES DURING THE UNDERLYING TRIAL OR DURING THE COVERAGE TRIAL.

Puget's second principal argument in its Motion for New Trial is that this Court erroneously held that Puget had a duty to allocate among covered and non-covered damages and that Puget failed to do so. According to Puget, the National Union Policy's impaired property exclusion is not applicable in this case and, therefore, all damages recovered at the state-court trial were for covered property damages. In the alternative, Puget argues that the duty to allocate is not an absolute duty and is a duty that Puget satisfied either in the underlying trial or in the coverage trial of this case. The Court disagrees with each of these suggestions.

A.    *Texas Law Requires an Insured Party to Allocate Between Covered Damages and Non-Covered Damages.*

Texas recognizes the doctrine of concurrent causes, so that when "covered and non-covered perils combine to create a loss, the insured is entitled to recover only that portion of the damage caused solely by the covered peril(s)." *Wallis v. United Services Auto Ass'n*, 2 S.W.3d 300, 302–03 (Tex. App.—San Antonio 1999, pet. denied) (citing *Travelers Indem. Co. v. McKillip*, 469 S.W.2d 160, 163 (Tex. 1971)); *see also Lyons v. Millers Cas. Ins. Co.*, 866 S.W.2d 597 (Tex. 1993). Failure to provide evidence upon which a jury or court can allocate damages between those that resulted from covered perils and those that did not is fatal to an insured party's claim. *Id.* at 304. In such a case, an insured party will not be entitled to recover under its policy. *Id.*[23]

Puget has directed this Court to *United Services Automobile Ass'n v. Lambert*, No. 03-97-00811-CV, 1999 Tex. App. LEXIS 6337 (Tex. App.—Austin, Aug. 26, 1999, no pet.) (not designated for publication), for the proposition that the allocation requirement announced in *Lyons* and *McKillip* is not absolute. Puget's Motion at 29 n.37. In *Lambert*, the insured filed suit against his insurer under the Texas Deceptive Trade Practices Act for damages resulting from plumbing

---

[23] The burden of allocation remains with the insured party, even if the allocation is being made between covered perils and *excluded* perils, the type of which the insurer normally has the burden of proving. *See* Tex. Ins. Code. Ann. § 554.002 (West 2009); *Wallis*, 2 S.W.3d 300. In *Wallis*, the court held that Tex. Ins. Code Ann. § 21.58, the predecessor to Tex. Ins. Code Ann. § 554.002 which placed on the insurer the burden of proving any "avoidance or affirmative defense" to coverage, did not legislatively overrule an insured party's duty to allocate. *Id.* at 303. According to the court, concurrent causation is not an "avoidance or affirmative defense." *Id.* Instead, concurrent causation "is a rule which embodies the basic principle that insureds are entitled to recover only that which is covered under their policy. . . ." *Id.* Thus, under *Wallis*, once testimony of concurrent causes has been offered into the record, the insured has the burden of allocating the damages among the various causes. *See id.*; *see also State Farm Lloyds v. Kaip*, No. 05-99-01363-CV, 2001 WL 670497 (Tex. App.—Dallas, June 15, 2001, pet. denied) (not designated for publication) (holding that the insured's own testimony, which gave rise to the possibility of concurrent causation, created a burden on the insured to allocate the damages between the various causes).

leaks and foundation damage to his house.  1999 Tex. App. LEXIS 6337 at *1, *7.  The insured was awarded damages resulting from covered plumbing leaks in his home, but he did not recover for mental anguish damages resulting from foundation problems. *Id.* On appeal, the insurer argued that Lambert should receive no recovery for mental anguish because he had failed to allocate his mental anguish damages between those resulting from the covered plumbing leaks and those resulting from the non-covered foundation problems. *Id.* at *31.  The court, in holding that the insured's damages were covered under the policy, suggested that the rigid allocation requirement announced in *Lyons* and *McKillip* might not apply to Lambert's mental anguish claim. *Id.* at *32–33.  Analogizing to an award of attorneys' fees—which does not require allocation among claims when allocation would be "impractical, if not impossible"—the court wrote that requiring Lambert to allocate his mental anguish damages would be impractical, forcing him to testify "that on day one he was extremely angry and lost sleep due only to [the insurer's] handling of his plumbing claim, while on day two he could with certainty attribute his anger and loss of sleep only to the handling of the foundation claim." *Id.* at *32, *33 (citing *Chilton Ins. Co. v. Pate & Pate Enters.*, 930 S.W.2d 877, 896 (Tex. App.—San Antonio 1996, writ denied), for the "impractical, if not impossible" standard applied in the context of attorneys' fees).  "Testimony of this nature," the court held, "would be questionable at best." *Id.* at *33.

The Court agrees to some extent with Puget's assessment of *Lambert*, but fails to see its applicability to the instant case.  First, the *Lambert* court's holding was a narrow holding applying only to recovery of mental anguish damages and not intended to loosen the rigidity of *Lyons* and *McKillip* in the context of all damages in all insurance coverage cases.  The court twice referred to the "exception" to the general rule of allocation applied in the context of attorneys' fees, and held

32

that the "exception should be applied" in *Lambert*. *Id.* at *32–33. Use of the word "exception" does not imply to this Court that the *Lambert* court intended more than a limited carve-out to the allocation rule in the context of mental anguish damages, a category of damages where allocation would, for reasons stated in *Lambert*, be much more difficult than in the present controversy.

Second and much more importantly, the *Lambert* court, shortly after suggesting that an exception to the allocation requirement might be appropriate, went on to hold that at trial Lambert had been asked only about his mental anguish damages that resulted from the covered plumbing leaks. *Id.* at *34–35. From this testimony, "the jury could reasonably have inferred that the mental anguish to which Lambert testified was attributable *in toto* to the plumbing claim." *Id.* This observation deems the *Lambert* court's carve-out dictum.[24] If Lambert limited his trial testimony to those mental anguish damages resulting from covered risks, there is no need for an exception to the allocation requirement. His testimony was the proof needed for allocation. This further supports this Court's view that the *Lambert* court's carve-out has little, if any, impact on the current status of Texas law concerning concurrent causes and allocation or its adjudication of the instant case. Accordingly, this Court stands by its previous holding, based upon an unending line of cases, that Puget had a duty to allocate between those damages resulting from covered property loss and those resulting from non-covered property loss.

Even assuming that *Lambert* was intended to loosen the strict allocation requirement under

---

[24] The very wording of the opinion makes this clear. After the discussion of the attorney's fees/damages allocation analogy, the court begins its discussion of the testimony by stating, "[i]n any event, in the present case . . . ." *Lambert*, 1999 Tex. App. LEXIS 6336 at *34. This language verifies to this court that the prior discussion was dictum and not necessarily applicable to the facts of that case.

33

Texas insurance law, Puget has not offered this Court any reason to extend the reasoning in *Lambert*

to the present controversy. In fact, as opposed to arguing that allocation would be "impractical, if

not impossible," Puget has consistently argued that it *did* allocate between covered and non-covered

risks. Puget's Motion at 30–32; Defs.' Reply in Support of Their Mot. for a New Trial or to Alter

or Amend the Judgment at 19–20; Post-Argument Brief of Puget Plastics Corp., Arctic Slope

Regional Corp., and Microtherm, Inc., in Support of Their Mot. for a New Trial or to Alter or Amend

the Judgment ("Puget's Post-Argument Brief") at 21. Accordingly, this Court is not convinced that

the dictum in *Lambert* has any application in this case.

> B.    *The Court Reaffirms its Holding that the Underlying Jury Verdict was for Covered*
> *and Non-Covered Damages.*

As stated above, Microtherm sued Puget in state court, at least in part, because the plastic

water chambers Puget manufactured to go in the Seisco water heater began to leak in 2001. In its

judgment following the coverage trial of this case, this Court held that only those instances in which

a Puget-manufactured chamber leaked *and* caused damage to either a water heater's circuit board

or a third party's property are instances covered under the Policy.[25] Puget objects to this finding,

asserting that although the impaired property exclusion may apply at first blush, the exception to that

exclusion for sudden and accidental physical injury to the insured's product is also applicable. If

Puget were correct, which this Court holds it is not, all instances of leaky chambers would result in

covered property damage, and allocation of damages between covered and non-covered damages

---

[25] Under the Policy, the damage need only be to tangible property other than Puget's product.
*See* The Policy, at 6 (defining "property damage"), 7 (excluding coverage for "Property Damage to
[Puget's] Product arising out of it or any part of it"). The testimony established that the most
prevalent property damage resulting from the leaks that falls into this category was the damage to
the circuit boards or, more rarely, the damage to homeowner's property.

would not be necessary.

The Policy covered property damage, defined in the Policy as

1. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

2. Loss of use of tangible property that is not physically injured. All such loss shall be deemed to occur at the time of the Occurrence that caused it.

The Policy, at 6. From this definition of "property damage," the Policy excluded coverage for

Property Damage to Impaired Property or property that has not been physically injured, arising out of:

1. A defect, deficiency, inadequacy or dangerous condition in [Puget's] Product or [Puget's] Work; or

2. A delay or failure by [Puget] or anyone acting on [Puget's] behalf to perform a contract or agreement in accordance with its terms.

The Policy, at 7.[26]   Impaired Property, as defined in the Policy is tangible property, other than

[Puget's] Product or [Puget's] Work, that cannot be used or is less useful because:

1. It incorporates [Puget's] Product or [Puget's] Work that is known or thought

   to be defective, deficient, inadequate or dangerous . . . if such property can

   be restored to use by;

2. The repair, replacement adjustment or removal of [Puget's] Product

   or [Puget's] Work . . . .

---

[26] The Court acknowledges the existence of a case, *McKinney Builders v. Nationwide Mutual Insurance Co.*, No. 3:97-CV-3053-R, 1999 U.S. Dist. LEXIS 12559 (N.D. Tex. Aug. 11, 1999), in which the judge found, in dictum, a similar impaired property exclusion to be ambiguous, and therefore required an anti-insurer, pro-insured interpretation. This Court has not found that to be the case, nor was ambiguity seriously argued by Puget during trial. Accordingly, the Court declines to address this issue.

The Policy at 3. In other words, the Policy does not cover property damage to tangible property when that tangible property is not usable because it incorporates the insured's product but can be made usable again by simply replacing the insured's product. An exception to the exclusion applies when the property damage in question involved "the loss of use of other property arising out of sudden and accidental physical injury to [Puget's] Product or [Puget's] Work after it has been put to its intended use." *Id.* Based on these provisions in the Policy, and based on its review of the testimony, the Court held in its final judgment that National Union had satisfied its burden of proving the impaired property exclusion applied and that the exception for "sudden and accidental physical injury" was not applicable. *See Puget II*, 649 F. Supp. 2d at 649 n.69.

   1.  The Impaired Property Exclusion Applies.

  Having reviewed the relevant testimony from the underlying trial and the coverage trial, the Court reaffirms its decision that the impaired property exclusion applies to at least a portion of Microtherm's losses that resulted from Puget chamber leaks. The testimony showed that, at least sometimes, when Puget-manufactured chambers leaked, they were simply replaced with new Puget-manufactured chambers, and the Seisco water heaters were restored to full capacity. *See, e.g.,* Transcript of Depo. of Michael Carr at 137; Seitz, 2 C.T. 448;[27] Seitz, 3 C.T. 546; Seitz, 7 C.T. 1318; Transcript of Depo. of William Uecker, III at 46. Thus, in many instances, when a chamber leaked in a Seisco water heater, the water heater was, by definition, (1) tangible property, (2) other than

---

[27] Similar to its method of citation in its original opinion, the Court will cite to the coverage trial using the following format: Name, X C.T. Y, with "Name" representing the name of the witness testifying, "X" representing the volume of the coverage trial, and "Y" representing the page within that volume. The state-court trial will be cited using the following format: Name, X T.T. Y, with "Name" representing the witness testifying, "X" representing the volume of the state-court trial, and "Y" representing the page within that volume.

Puget's product, (3) that could not be used because it incorporated a Puget chamber that was known to be defective, (4) but could be restored to use by the replacement of the Puget chamber. *See* The Policy. In these instances, the impaired property exclusion applies and, assuming no exception applies, there is no coverage.

Puget contests this conclusion, arguing that because the Seisco water heaters could not in fact be "restored to use" by the simple replacement of the Puget chambers, the impaired property exclusion does not apply. According to Puget, the chambers were altered by Microtherm after they left the Puget factory and, therefore, were no longer Puget's product when they were installed into the Seisco water heaters. *See* Transcript of Hearing on Mot. for New Trial at 43. If this assertion were true, Puget argues, the impaired property exclusion would not be applicable and all damages caused by the leaky Puget chambers would be covered under the Policy.

Puget bases its argument that the chambers were not Puget's products on *Fireman's Insurance Co. v. Bauer Dental Studio, Inc.*, 805 F.2d 324 (8th Cir. 1986). In that case, a dental corporation purchased crowns from Bauer, the insured party. Dentists at the dental corporation ground and polished the crowns to achieve the correct fit and bite. After customers complained of the crowns cracking and fracturing, Bauer replaced the defective crowns, then turned to its insurance carrier to reimburse the replacement costs. *Id.* at 325. The policy in *Bauer* covered damages resulting from property damage, but excluded damages to "the insured's work product." *Id.* Based on this exclusion, the court held that Bauer's carrier had no duty to indemnify because once the dentists ground and polished the crowns, the crowns were no longer Bauer's work product, but a composite product. *Id.* Puget argues this case is applicable to the present case because the Puget chambers underwent many modifications after leaving Puget's factory but before being installed into

37

the Seisco water heaters.  *See* Transcript of Hearing on Mot. for New Trial at 41–42.

Perhaps the facts of *Bauer* were such that the holding was appropriate in that case, but the Court declines to apply the same reasoning here.  Additionally, it seems that Puget's decision to argue that *Bauer* should apply forces Puget to argue that the chambers, as they were installed in the Seisco water heater, were no longer Puget's product.  This argument is contrary to the facts adduced both in this Court and in the state-court trial.  Further, this position is at odds with, and has never been argued during, the last eight years of litigation in this case.  Microtherm has consistently argued that the chambers were Puget's and has never claimed that it modified them so radically as to change the nature of the product.  Puget has not disclaimed responsibility for the chambers it manufactured, but instead asserted that the chambers were either not faulty or, in the alternative, that any damage they caused was property damage covered under the National Union Policy.  For Puget to now argue that the chambers were not actually Puget's product, but a composite product, is disingenuous and therefore an argument this Court declines to seriously address.  Indeed, if this were true, Puget might not be liable at all, and its insurer would positively be free from liability.  The Court reaffirms its decision that the impaired property exclusion applies to at least a portion of the damages recovered in the underlying trial.

2.      The "Sudden and Accidental Physical Injury Exception" Does Not Apply.

In addition to arguing that the impaired property exclusion does not apply at all, Puget argues in the alternative that an exception to that exclusion applies.  As cited above, the Policy excepted from the impaired property exclusion "the loss of use of other property arising out of sudden and accidental physical injury to [Puget's] product or [Puget's] Work after it has been put to its intended

38

use."[28]  The Policy at 7.  Dr. Maureen Reitmann testified, before this Court in the coverage trial, that cracks in the Puget-manufactured chambers were present at the time they were manufactured and simply grew over time until the chambers finally began to leak.  *See* Reitmann, 5 C.T. 930–31, 1002 (testifying that the leaks "weren't, you know, an immediate event").  Based in part on this testimony, the Court concluded that the damage caused by Puget-manufactured chambers was not sudden and accidental.

Although Puget challenges Reitmann's testimony as "pure speculation and contrary to all other evidence,"  Puget Mot. at 27, the Court declines to agree.  Having viewed her testimony originally and having reviewed the testimony concerning the "sudden and accidental" nature of the chamber leaks, the Court reaffirms its decision that the "sudden and accidental" exception to the impaired property exclusion does not apply.  This finding, in conjunction with the finding that at least some of the damage was caused by instances that fall into the impaired property exclusion, requires Puget to allocate the damages recovered in the underlying trial.

C.    *Puget Failed to Allocate Between the Property Damage Covered Under the Policy and the Property Damage Not Covered Under the Policy.*

Having reviewed Texas case law requiring an insured party to allocate between covered and non-covered damages, and having concluded that the state-court verdict in this case was based on both covered and non-covered damages, the Court finds that Puget failed to satisfy its duty of allocation.  Puget was required to (1) distinguish which portion of damages assessed against Puget

---

[28]  Ironically, Puget's earlier argument that the chambers, as they were installed into Seisco water heaters, were not Puget's product would deem this exception to the impaired property exclusion inapplicable.  Needless to say, Puget/Microtherm does not argue this position.

were the result of covered property damage,[29] and (2) distinguish the damages assessed against Puget from those assessed against the other defendants.  Puget failed to do either.

With respect to how much of Microtherm's damages resulted from chamber failures which are covered under the Policy, Puget argues that this Court, in holding that there was no reliable evidence of allocation, erred in not picking "a percentage number with which it is most comfortable" within the range of testimony provided at either the underlying trial or the coverage trial.  Puget Mot. at 32 (citing *State Farm Fire and Cas. Co. v. Rodriguez*, 88 S.W.3d 313 (Tex. App.—San Antonio 2002, pet. denied)).  As stated above, only those instances in which a Puget-manufactured chamber leaked and caused damage either to a circuit board or a homeowner's property are covered under the Policy.  Having reviewed the relevant testimony again, the Court stands by its original holding that there is "simply no reasonable, reliable, non-arbitrary basis supported by a preponderance of the evidence in the record upon which to allocate economic damages between covered and non-covered risks." *Puget II*, 649 F. Supp. 2d at 652.

David Seitz, the President of Microtherm, testified at different times that when a Puget chamber leaked  (1) it shorted the circuit board *ninety percent* of the time, *see* Transcript of Depo. of David Seitz (2009), at 45 (emphasis added); (2) it shorted the circuit board "*well over 95%* of the time," Seitz, 2 C.T. 372 (emphasis added); (3) "it *oftentimes* will take the board and short it out, too," Seitz, 14 T.T. 58 (emphasis added); (4) it *"had"* to get the board wet, Seitz, 2 C.T. 372

---

[29] The only jury question from the state-court trial that related to property damage concerned "parts provided or work performed by" the defendants, and this Court has been affirmed by the Fifth Circuit in holding that such damages are not covered under the Policy. *See* Pl.'s Opposition to Wasau's Mot. to Dismiss, Ex. A (State Court Judgment) (Docket No. 14); *see also Puget I*, 532 F.3d at 403.  Thus, the source of damages still at issue and which might be covered under the Policy are the past and future lost profits and the damage to the value of Microtherm that resulted from covered property damage.